**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**Laredo Division**

| | | |
|---|---|---|
| PRISCILLA VILLARREAL, Plaintiff | § § § | No. 5:19-cv-48 |
| vs. | § § § § | |
| THE CITY OF LAREDO, TEXAS, | § § | **JURY TRIAL DEMANDED** |
| WEBB COUNTY, TEXAS, | § § | |
| ISIDRO R. ALANIZ, | § § | |
| MARISELA JACAMAN, | § § | |
| CLAUDIO TREVIÑO, JR., | § § | |
| JUAN L. RUIZ, | § § | |
| DEYANIRA VILLARREAL, | § § | |
| ENEDINA MARTINEZ, | § § | |
| ALFREDO GUERRERO, | § § | |
| LAURA MONTEMAYOR, | § § | |
| and | § § | |
| DOES 1-2 | § § | |
| Defendants. | § § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

### I. Introduction

1. Citizen journalism—the gathering and publication of newsworthy information by those who are not professional journalists—is essential to the vigor of modern self-governance and the democratic process. The evolution of information and communications technology has enabled citizens to take a more active role in adding to the public discourse and holding elected officials accountable. Today, citizen journalists provide a candid and highly-accessible view of newsworthy events, often equipped with only a smartphone, a social media account, and gumption.

2. The First Amendment rights of citizens to gather and publish information on matters of public concern are clear. "State action to punish the publication of truthful information seldom can satisfy constitutional standards," particularly "about a matter of public significance." *Bartnicki v. Vopper,* 532 U.S. 514, 527-28 (2001) (quotation omitted). And as the Supreme Court recently confirmed, First Amendment protections extend to users of social media, because social media platforms

> for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge. These websites can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard. They allow a person with an Internet connection to 'become a town crier with a voice that resonates farther than it could from any soapbox.

*Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017) (citation omitted).

3. Plaintiff Priscilla Villarreal ("Villarreal") is the epitome of such a modern-day "town crier." For several years, Villarreal has used her Facebook page to provide residents of Laredo, Texas with unfiltered access to matters of local public concern. Equipped with only a smartphone and an old pickup truck, "Lagordiloca" (as Villarreal is well-known) publishes livestreams, videos, and photographs of newsworthy events in and around Laredo to her over 120,000 Facebook followers. As The New York Times observed, "[Villarreal] is arguably the most influential journalist in Laredo. . . ."[1]

4. But Villarreal's efforts have come at a price. Defendants have engaged in numerous acts to harass and intimidate Villarreal and interfere with her citizen journalism efforts. Defendants went so far as to arrest and detain Villarreal simply because she received and published truthful

---

[1] *La Gordiloca: The Swearing Muckraker Upending Border Journalism*, New York Times Online, Mar. 10, 2019 *available at* https://www.nytimes.com/2019/03/10/us/gordiloca-laredo-priscilla-villarreal.html.

information of interest to the public. Defendants did so without probable cause and under the auspices of a vague statute upon which no reasonable official would have relied.

5. The First Amendment forbids state actors from abusing their power to retaliate against and chill a citizen's efforts to investigate and publish the truth, comment on local government affairs, and provide a forum for other citizens to do the same. Defendants' unconstitutional conduct, if left unchecked, could ensnare and chill any journalist—professional or citizen—who lawfully gathers newsworthy information and happens to disseminate it before government officials do the same. The Constitution demands that such conduct be deterred.

6. Defendants' conduct deprived Villarreal of her clearly established rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution. She is entitled to actual and punitive damages, declaratory and injunctive relief, and a recovery of attorneys' fees and costs as a result.

## II. Parties

7. Plaintiff is an individual and is a resident of Webb County in the State of Texas.

8. Defendant City of Laredo is a municipality organized under the laws of Texas. Defendant City of Laredo may be served through service upon the City of Laredo Secretary, Jose A. Valdez, Jr., at 1110 Houston Street, Laredo, Texas 78040. Defendant City of Laredo is subject to liability pursuant to 42 U.S.C § 1983, as set forth in *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658 (1978), and as alleged further herein.

9. Defendant Webb County is a governmental entity under the laws of the State of Texas. Defendant Webb County may be served through service upon the Webb County Judge, the Honorable Tano Tijerina at 1000 Houston Street, Third Floor, Laredo, Texas 78040. Defendant Webb County is subject to liability pursuant to 42 U.S.C § 1983 as set forth in *Monell v. Dep't of*

*Soc. Servs. of N.Y.*, 436 U.S. 658 (1978), as alleged further herein.

10. Defendant Isidro R. Alaniz is the Webb County District Attorney and a resident of Webb County, Texas. Defendant Alaniz may be served at his principal place of business at 1110 Victoria Street, Suite 401, Laredo, Texas 78040. Defendant Alaniz acted under color of state law at all times with respect to the allegations made herein, and is a person subject to liability under 42 U.S.C. § 1983. Defendant Alaniz is a duly elected official of Webb County, administers and oversees the Webb County Office of the District Attorney ("WCDA"), and is a final policymaker for Webb County. Defendant Alaniz is being sued in his individual and official capacities.

11. Defendant Marisela Jacaman is the Chief Assistant Webb County District Attorney and a resident of Webb County, Texas. Defendant Jacaman may be served at her principal place of business at 1110 Victoria Street, Suite 401, Laredo, Texas 78040. Defendant Jacaman acted under color of state law at all times with respect to the allegations made herein, and is a person subject to liability under 42 U.S.C. § 1983. Defendant Jacaman is being sued in her individual and official capacities.

12. Defendant Claudio Treviño Jr. is the Chief of Police for the Laredo Police Department ("LPD") and a resident of Webb County, Texas. Defendant Treviño may be served at his principal place of business at 4712 Maher Avenue, Laredo, Texas 78041. Defendant Treviño acted under color of state law at all times with respect to the allegations made herein, and is a person subject to liability under 42 U.S.C. § 1983. Defendant Treviño is a duly appointed official of the City of Laredo, administers and oversees the LPD, and is a final policymaker for the City of Laredo. Defendant Treviño is being sued in his individual and official capacities.

13. Defendant Juan L. Ruiz is an investigator for LPD and a resident of Webb County, Texas. Defendant Ruiz may be served at his principal place of business at 4712 Maher Avenue,

Laredo, Texas 78041. Defendant Ruiz acted under color of state law at all times with respect to the allegations made herein, and is a person subject to liability under 42 U.S.C. § 1983. Defendant Ruiz is being sued in his individual and official capacities.

14. Defendant Enedina Martinez is an officer for LPD and a resident of Webb County, Texas. Defendant Martinez may be served at her principal place of business at 4712 Maher Avenue, Laredo, Texas 78041. Defendant Martinez acted under color of state law at all times with respect to the allegations made herein, and is a person subject to liability under 42 U.S.C. § 1983. Defendant Martinez is being sued in her individual and official capacities.

15. Defendant Alfredo Guerrero is an officer for LPD and a resident of Webb County, Texas. Defendant Guerrero may be served at his principal place of business at 4712 Maher Avenue, Laredo, Texas 78041. Defendant Guerrero acted under color of state law at all times with respect to the allegations made herein, and is a person subject to liability under 42 U.S.C. § 1983. Defendant Guerrero is being sued in his individual and official capacities.

16. Defendant Laura Montemayor is an officer for LPD and a resident of Webb County, Texas. Defendant Montemayor may be served at her principal place of business at 4712 Maher Avenue, Laredo, Texas 78041. Defendant Montemayor acted under color of state law at all times with respect to the allegations made herein, and is a person subject to liability under 42 U.S.C. § 1983. Defendant Montemayor is being sued in her individual and official capacities.

17. Defendant Deyanira Villarreal ("DV")[2] is an officer for LPD and a resident of Webb County, Texas. Defendant DV may be served at her principal place of business at 4712 Maher Avenue, Laredo, Texas 78041. Defendant DV acted under color of state law at all times with

---

[2] To avoid confusion, Defendant Deyanira Villarreal will be referred to throughout this Complaint as "DV."

respect to the allegations made herein, and is a person subject to liability under 42 U.S.C. § 1983. Defendant DV is being sued in her individual and official capacities.

18. The true names and capacities of the Defendants named as Does 1-2 ("Doe Defendants") currently are unknown to Villarreal, and therefore, Villarreal sues them by fictious names. Villarreal will amend this Complaint to reflect the true names and capacities of the Doe Defendants when the same is fully ascertained.

19. On information and belief, the Doe Defendants were at all times relevant officials or employees of the City of Laredo or Webb County. On further information and belief, the Doe Defendants took part in the unconstitutional acts alleged herein, and acted under color of state law at all times with respect to the allegations. Thus, it is believed the Doe Defendants are persons subject to liability under 42 U.S.C. § 1983.

### III. Jurisdiction and Venue

20. This Court has original subject matter jurisdiction under the United States Constitution, 42 U.S.C. §§ 1983 and 1985, and 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

21. This Court has personal jurisdiction over Defendant City of Laredo because it is a local government entity of the State of Texas and is located in this judicial district.

22. This Court has personal jurisdiction over Defendant Webb County because it is a local government entity of the State of Texas and is located in this judicial district.

23. This Court has personal jurisdiction over Defendants Alaniz, Jacaman, Treviño, Ruiz, Martinez, Guerrero, Montemayor, DV, and the Doe Defendants (collectively the "Individual Defendants") because they reside in the state of Texas and in this judicial district.

## IV. FACTUAL ALLEGATIONS

### A. Villarreal embarks on a mission of citizen journalism.

24. Since early 2015, Villarreal has gathered and published information about matters of local public concern in and around Laredo, Texas.

25. One afternoon in March 2015, Villarreal awoke to police sirens speeding down her street in Laredo. Curious, Villarreal got in her truck and followed the sirens, where she discovered a hostage situation at a local residence. After hearing gunshots, she discovered that officers from LPD had shot and killed the captor, after the captor had already shot the two hostages.

26. Villarreal turned on her phone and recorded footage from the scene, including officers removing bodies from the scene. She then posted three short clips of the recording to her Facebook page.

27. Over the next few hours, thousands viewed the videos. Many viewers engaged in discussion about the videos in the comments section of Villarreal's Facebook post and elsewhere. The discussion ranged from a man wanting to pay for the funerals, to others questioning Villarreal's choice to post raw footage of a grim scene. One thing was clear—Villarreal's footage brought people together to talk about a matter of local public concern.

28. The response to the videos motivated Villarreal to capture more footage of local crime scenes and traffic incidents, and post it onto her Facebook page to share with other citizens. After Facebook launched its "Facebook Live" feature, Villarreal began live-streaming crime scenes, traffic incidents, and other events of local concern. Villarreal occasionally added commentary. But she mostly let the footage speak for itself.

29. Villarreal's following grew quickly. She also begin to get texts, phone calls, and other messages from local residents with tips about matters of local public interest.

30. Starting in 2015, Villarreal also begin to regularly receive information about local crime and public safety matters from LPD spokesman Jose Baeza. The information Baeza provided was occasionally in real-time, allowing Villarreal to act upon it and provide live feeds and real-time commentary about law enforcement activity.

31. Villarreal goes by the nickname "Lagordiloca," ("The big crazy lady"). She is well-known locally and nationally by that nickname, and operates her Facebook page under the same.

**B. Villarreal's influential role in the Laredo community.**

32. Villarreal uses her Facebook page—"Lagordiloca News Laredo Tx"[3]—to publish live feeds, recorded footage, and photographs of local crime scenes, traffic incidents, local fundraisers, and other newsworthy events in Laredo. She also shares information from other news sources on her Facebook page as part of her efforts as a citizen journalist serving the Laredo community.

33. Villarreal sometimes provides commentary—often colorful—about the newsworthy events she covers, including issues concerning local government officials and activities.

34. She also posts information and photographs she receives from local citizens about missing persons and people or organizations in need. She occasionally promotes a local business on her Facebook page at the request of a business owner.

35. Villarreal does not generate regular revenue or other regular economic gain from her citizen journalism. She sometimes enjoys a free meal from appreciative readers, and occasionally receives fees for promoting a local business. She also has used her Facebook page to ask for donations for new equipment necessary to continue her citizen journalism efforts.

36. "Lagordiloca" has used her Facebook page and increasing influence and readership to

---

[3] Villarreal's "Lagordiloca" Facebook page can be accessed at https://www.facebook.com /lagordiloca956/

successfully organize events that support Laredo and other communities in Texas. For example, Villarreal used her Facebook page to organize a relief drive for Hurricane Harvey victims. Villarreal's relief drive outpaced even the official relief drive sponsored by the local government. Villarreal has never received any monetary or other economic benefit for her altruistic efforts.

37. Many Laredo residents consider Villarreal as a principal source of information about local matters, including crime, traffic, and government. Over 120,000 Facebook users follow Villarreal's Facebook page.

38. Local residents have and continue to use the comments section of Villarreal's Facebook posts and live feeds as a forum for discussing matters of local public concern with other citizens. Villarreal's published news and commentary also generate similar discussions in other places online and in establishments and gatherings across Laredo.

39. Many Facebook users and others familiar with Villarreal's citizen journalism have praised her efforts to provide an authentic and real-time look at Laredo crime and safety, government conduct, and other newsworthy events in the city. Her readers have frequently commented that Villarreal provides a candid view of local matters that other media outlets often do not provide. Her citizen journalism has been featured in publications including *Texas Monthly*, *The New York Times*, and the *Los Angeles Times*.

40. And given her gritty style of journalism and often colorful commentary, Villarreal has her share of critics.

41. Villarreal's citizen journalism has heightened public discourse in Laredo and increased transparency on critical issues like local crime and safety, the welfare of Laredo citizens, and local government conduct.

**C. Villarreal's reporting on local government.**

42. Villarreal publishes on her Facebook page live feeds, recorded video, and commentary about LPD activities.

43. When doing live feeds or recording law enforcement activity, Villarreal takes care to record only from public places and not cross crime or accident scene perimeters set up by law enforcement. Villarreal has proactively met with LPD officials on to make clear that she does not want to be a disruption to or interfere with law enforcement activities when she records law enforcement activities.

44. Several of Villarreal's live feeds and recorded videos have shown authentic views of LPD members in difficult, and sometimes controversial, situations.

45. These have included, for example: (1) recorded video of police dealing with the aftermath of a hostage and homicide scene where Laredo officers shot and killed the captor; (2) a live feed of Laredo officers choking and using force on an arrestee at a traffic stop; (3) a live feed of Laredo officers working the scene of a drive-by shooting; (4) a live feed of a police shooting; and (5) other live feeds and recordings of LPD officers arresting citizens and working traffic accident and crime scenes.

46. Villarreal occasionally has posted follow-up feeds or videos with commentary on the video of LPD activities she published. Villarreal's commentary about LPD has been both praiseworthy and critical.

47. Villarreal has also posted information and commentary about other Laredo government affairs. Such information and commentary has been both praiseworthy and critical of Laredo officials and local government conduct.

48. As an example, in 2015, Villarreal posted images of and commentary on a

malnourished horse at a property in Laredo. She and others managed to relocate the horse to a local ranch, and alerted local law enforcement to the problem.

49. When local law enforcement arrived at the property where Villarreal found the malnourished horse, they discovered other animals suffering a similar fate.

50. The property was owned by Patricia Jacaman, a close relative of Defendant Jacaman. On her Facebook page, Villarreal openly criticized the Webb County District Attorney's ("WCDA's") decision to recall the arrest warrant for Patricia Jacaman and not prosecute her for animal cruelty charges, and instead enter into a nominal civil settlement.

**D. City and county officials and employees embark on a campaign of harassment, intimidation, and interference against Villarreal because of her citizen journalism.**

51. Several city officials and employees have acted with hostility toward Villarreal's candid journalism, because it provides a truthful and unfiltered depiction of law enforcement and other activities in the city, often before law enforcement and other officials arrive on the scene. Villarreal's reporting often provides an accurate look at events that many local officials do not want the public to know.

52. This hostility from these local government officials is also a response to Villarreal's citizen journalism that publishes information and content unfavorable to or critical of the local government, which in turns generates criticism and discussion of government conduct from her readers..

53. As a result of this hostility, Villarreal has been singled out and subjected to a pattern of harassment, intimidation, and indifference from several members of LPD and WCDA, and other Laredo officials and employees. These officials and employees have acted to interfere with Villarreal's efforts to gather and publish information about matters of local concern.

54. These hostile, defamatory, and indifferent acts and efforts include, for example and

without limitation:

    a.  Officer Martinez willfully and falsely exclaiming to a group of fellow officers that Villarreal is a five-time convicted felon, when Martinez knew that Villarreal has never been convicted of a felony.

    b.  Officer Montemayor threatening to take Villarreal's phone as "evidence" while Villarreal was using her phone to record a live feed of a shooting scene. Villarreal was recording from a public area and behind the yellow-tape perimeter police had set up. Montemayor did not threaten to take the equipment of any other media members also at the scene.

    c.  Officer Guerrero harassing and intimidating Villarreal without justification while she was working a traffic incident for her employer Orozco Crane and Towing, and continuing to arbitrarily harass her and force her away from her jobsite after he verified with Villarreal's boss that she was on the job. His harassment and intimidation induced Villarreal to have a panic attack that required a trip to the hospital;

    d.  LPD treating Villarreal with indifference when she called and spoke to Laredo police officers about a sexual assault she endured at a business in Laredo, forcing Villarreal to call the Webb County sheriff;

    e.  Deliberately treating Villarreal differently than other journalists and media members, including withholding information from Villarreal generally released to local newspapers and broadcasters;

    f.  Holding a closed door meeting between Villarreal and several city and county officials, during which Defendant Alaniz openly declared to Villarreal that he did not appreciate her criticizing his office, including her criticism of his office for withdrawing the arrest warrant for Patricia Jacaman; and

    g.  Initially attacking and obstructing a proposal to construct a local park reading kiosk named after Villarreal's late niece, which Villarreal published to her readers and helped introduce into the city council. The hostility from various city council members was motivated solely out of malice towards Villarreal's past criticism of the city council, and was demeaning toward Villarreal's late niece.

    55. These examples show a pattern of conduct intended to retaliate against and chill Villarreal's publication of unfavorable information and commentary on her Facebook page, and to deprive citizens of a forum to discuss local government officials and conduct. These acts were also intended to retaliate against and chill Villarreal from recording police activity from public areas.

56. Defendants performed these acts with malice toward and/or knowing indifference to Villarreal's First Amendment rights.

57. These acts are also reflective of an official City of Laredo policy or custom intended to retaliate against and punish Villarreal for investigating, gathering, and publishing fair and truthful information about newsworthy local matters and commentary on the same, including information and commentary unfavorable to or critical of local government officials and operations

58. Defendant City of Laredo ratified this official policy or custom with the intent to intimidate Villarreal, so that (a) she stop recording police activity in view of the public; (b) that she stop gathering and publishing information on newsworthy events in Laredo—including those that are unfavorable to the Laredo city government; and (c) that she stop facilitating citizen discussion about on the same.

59. The City of Laredo developed, ratified, endorsed, and enforced and continue to enforce this official policy and/or custom through its officials having final policy-making authority over law enforcement issues, including but not limited to at least Defendant Treviño in his position as chief of police, the Laredo City Council, and the Laredo City Manager.

60. The City, its officials, and employees carried out and continue to carry out this official policy or custom despite the clearly established First Amendment protections afforded to Villarreal's citizen journalism efforts.

**E. Defendants wrongfully arrest and detain Plaintiff for her protected First Amendment activity.**

61. As part of their intent to retaliate against, punish and intimidate Villarreal in response to her citizen journalism, Defendants planned, directed, and caused the arrest and detention of Villarreal. Defendants did so without probable cause, and under a statute that no reasonable government official would apply or otherwise rely upon under the circumstances.

62.  On April 11, 2017, Villarreal published a story on her Facebook page about a man who committed suicide by jumping off a public overpass in Laredo. She published the name of the man who committed suicide and indicated that he was employed by the United States Customs and Border Protection agency. Villarreal first learned of the man's identity and occupation from a janitor who worked at or near the overpass. She received some corroborating information about the man's identity and occupation from LPD Officer Barbara Goodman.

63. On May 6, 2017, Villarreal posted a live feed on her Facebook page of a fatal traffic accident. She published the location of the accident, that a family involved was from Houston, and the family's last name. Villarreal first learned facts about the family's identity from a relative of the family who saw the live feed on Villarreal's Facebook page. She received some corroborating information about the man's identity and occupation from Officer Goodman.

64. Villarreal had made similar posts in the past, including one in 2015 publishing information about a local suicide that she had received directly from LPD spokesman Baeza. She was not investigated for breaking any law after she published the information she received from Baeza. Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants knew or should have known the receipt of such information from an LPD official and truthful publication of the same is protected First Amendment activity.

65. Yet in late 2017, LPD and WCDA, including Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants determined that Villarreal should be arrested and detained for her Facebook posts of April 11, 2017 and May 6, 2017 ("Targeted Publications").

66. Specifically, they deliberately determined to investigate, arrest and detain Villarreal under Tex. Penal Code 39.06(c), "Misuse of Official Information" ("the Statute"). It provides that a person commits a Class 3 felony if:

"with intent to obtain a benefit or with intent to harm or defraud another, he
solicits or receives from a public servant information that:

    (1) the public servant has access to by means of his office or
        employment; and

    (2) has not been made public."

67. The Statute further defines "information that has not been made public" as "any
information to which the public does not generally have access, and that is prohibited from
disclosure under Chapter 552, Government Code," which is the Texas Public Information Act
("TPIA").

68. The Texas Penal Code also defines "benefit" as "anything reasonably regarded as
economic gain or advantage, including benefit to any other person in whose welfare the beneficiary
is interested." (Tex. Pen. Code 1.07(a)(7)).

69. There was no probable cause to arrest and detain Villarreal under the Statute in relation
to the Targeted Publications, and any reasonable official would have understood the same.

70. Villarreal did not receive or solicit information with "intent to obtain" a benefit. Any
reasonable official would have understood there was no economic gain or advantage tied to her
gathering and publication of the information in the Targeted Publications on her Facebook page.
Any reasonable official would have understood that publishing truthful information for wider
distribution is protected First Amendment activity and not subject to criminal penalty.

71. There also was no probable cause because the information Villarreal received and
published in the Targeted Publications was generally accessible by the public. And its disclosure
was in no way "prohibited" by or subject to any exception under the TPIA. Any reasonable official
would have understood this, and further, would have understood that gathering and accurately
disseminating publicly-accessible information is protected First Amendment activity.

72. Thus, any reasonable official would have understood that applying the Statute to

Villarreal under the facts was unconstitutional. Villarreal lawfully gathered and disclosed publicly-accessible information from various sources before the Laredo Police Department released it. While it may have been embarrassing to LPD to have Villarreal beat them to the punch, Villarreal's gathering and publication of the information was not probable cause supporting an investigation, arrest, and detention under the Statute or any other law. No reasonable official would have chosen to apply or rely upon the Statute to investigate and arrest any citizen for merely asking for or receiving from an official information on a matter of public concern, and publishing the same.

73. It also would have been evident to any reasonable official that the Statute was facially unconstitutional, being vague to the average reader, and contrary to the clearly established First Amendment right to lawfully gather and publish information on newsworthy issues. Indeed, that the Statute made it a felony simply to ask a public official for information would have been understood as unconstitutional by any reasonable person, let alone any reasonable law enforcement officer.

74. LPD, WCDA, or the Webb County Sheriff's Office had never arrested, detained, or prosecuted any person under the Statute prior to wrongfully targeting Villarreal under the Statute.

75. Yet Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants proceeded to manufacture arrest warrant against Villarreal for a violation of the Statute. Defendant Ruiz, under the supervision and direction of Defendants Treviño, Alaniz, and Jacaman, willingly provided statements in support of two criminal complaints and arrest warrants ("Arrest Warrants").

76. No other LPD officer provided an affidavit or other statement in support of the Arrest Warrants.

77. Ruiz's statements alleged that Villarreal violated the Statute and that probable cause existed to support the same. In his statements, Ruiz named DV as an officer participating in the

16

investigation leading to the Arrest Warrants, and named Defendant Jacaman as "signing off" on subpoenas related to the investigation of Villarreal. Defendant Jacaman signed two documents titled "Arrest Warrant Approval Form" that were dated November 21, 2017, and to which Ruiz's statements were attached.

78. In his statements, Ruiz alleged that the information Villarreal published in the Targeted Publications was received from Officer Goodman and that it "had not been made public." Ruiz also alleged that an unnamed source (on information and belief, one of the Doe Defendants) informed Defendant DV that Officer Goodman was communicating with Villarreal.

79. But nowhere in his statements did Ruiz explain or address why any information Villarreal received or published was not generally accessible to the public or "prohibited" from disclosure under the TPIA—an essential requirement of the Statute.

80. Ruiz's statements in support of the Arrest Warrants also did not suffice to show how Villarreal's receipt and use of any information conferred an economic benefit on Villarreal—another essential element of the Statute. Ruiz alleged only that Villarreal's release of the information before other news outlets gained her popularity on Facebook. On information and belief, Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants were aware at all times relevant that Villarreal did not use her Facebook page as a means of economic gain.

81. Ruiz's statements in support of the Arrest Warrants did not address Villarreal's intent or knowledge in receiving or using the information—another essential element of the statute.

82. Before finalizing the Arrest Warrants for presentation to a judge, Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants deliberately did not question or attempt to question Villarreal about the circumstances of her access to the information in Targeted Publications, in furtherance of their efforts to manufacture the Arrest Warrants without probable

cause.

83. The Arrest Warrants were issued on December 5, 2017.

84. Villarreal learned of the Arrest Warrants and LPD's plan to execute them. She posted a live feed to her Facebook page on the evening of December 12, 2017 informing her readers of the Arrest Warrants. Villarreal turned herself in on the morning of December 13, 2017.

85. Upon turning herself in and being taken from booking, Villarreal found herself surrounded by numerous LPD officers and employees, who were laughing at Villarreal, taking pictures of her in handcuffs with their cell phones, and otherwise showing their animus toward Villarreal with an intent to humiliate and embarrass her. On information and belief, these officers included Defendants Martinez, Montemayor and Guerrero.

86. When a local reporter outside booking asked to speak to Villarreal, she was denied the opportunity, and instead was left only with the impression of LPD officers mocking Villarreal.

87. Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants formulated, supervised, and approved the decision to investigate, arrest, and detain Villarreal under the Statute.

88. Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants formulated, supervised, and approved department-wide advance notice of Villarreal's arrest with the intent that LPD officers and other government officers and employees show *en masse* to mock, photograph, and humiliate Villarreal during the arrest process.

89. Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants knowingly initiated and participated in the investigation, arrest, and detention of Villarreal with the goal of retaliating against Villarreal for the exercise of her First Amendment rights, and with the further goal of intimidating her from further exercising those rights.

90. Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants knew or

should have known that there was no probable cause to investigate and arrest Villarreal under the Statute. They knew or should have known that the information in the Targeted Publications was publicly-accessible and not subject to an exception under TPIA. And they knew that Villarreal did not use her Facebook page as a means for economic gain or economic advantage.

91. Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants also knew or should have known there was no basis for criminally investigating, arresting, and prosecuting a citizen for simply asking for or receiving publicly-accessible information, and that doing so would be unconstitutional. These Defendants also knew or should have known that applying the Statute to those who publish information to gain more readers would unlawfully subject every media outlet, blogger, and other publisher to criminal liability. No reasonable official would have so selectively, maliciously, and arbitrarily misapplied the Statute in such a way to Villarreal.

92. For these same reasons, Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants also knew or should have known that applying the Statute to Villarreal under the facts was unconstitutional.

93. Defendant Treviño, having supervisory authority over LPD, knowingly and directly contributed to the violation of Villarreal's constitutional rights, as he initiated, directed, supervised, participated in, approved, and caused (a) the deliberate choice to single out and investigate Villarreal for her newsgathering, publishing, and commentary; (b) the selection of a pretextual and inapplicable statute under which to arrest and detain Villarreal; (c) the preparation and execution of the Arrest Warrants without probable cause; and (d) the arrest and detention of Villarreal against her will and without probable cause.

94. Defendant Treviño was deliberately indifferent to Villarreal's rights because of his hostility toward Villarreal's coverage and criticism of LPD. Treviño engaged in the above acts

despite having actual or constructive knowledge that there was no probable cause to support the investigation and Arrest Warrants, and that Villarreal had engaged in First Amendment-protected activity.

95. At all relevant times, Defendant Treviño was responsible for training, supervising, and employing individuals within LPD.

96. Defendants Alaniz and Jacaman, having supervisory authority over WDCA and LPD, knowingly and willingly participated in the investigatory and arrest phases of the criminal process as to Villarreal. In doing so, they knowingly and directly contributed to the violation of Villarreal's constitutional rights, as they initiated, directed, supervised, participated in, approved, and caused (a) the deliberate choice to single out and criminally investigate Villarreal for her newsgathering, publishing, and commentary; (b) the selection of a pretextual and inapplicable statute under which to arrest and detain Villarreal; (c) the preparation and execution of the Arrest Warrants without probable cause; and (d) the arrest and detention of Villarreal against her will and without probable cause.

97. Defendants Alaniz and Jacaman also willingly advised, instructed, and assisted Ruiz, Treviño, DV, and other LPD members on the investigation of Villarreal and the preparation of the retaliatory Arrest Warrants, further contributing to the violation of Villarreal's constitutional rights.

98. Defendant Jacaman, with the knowing endorsement of Defendant Alaniz, personally approved Defendant Ruiz's statements in support of the Arrest Warrants, with actual or constructive knowledge that the Arrest Warrants lacked probable cause. In addition, Defendant Jacaman, with the knowing endorsement of Defendant Alaniz, personally approved subpoenas related to the investigation of Villarreal, with actual or constructive knowledge that the

investigation was wrongfully targeting Villarreal's protected First Amendment activity.

99. Defendants Alaniz and Jacaman were deliberately indifferent to Villarreal's constitutional rights, because of their hostility toward Villarreal's coverage and criticism of WCDA, LPD, and Defendant Jacaman's relatives.

100. Defendants Alaniz and Jacaman willingly engaged in the above acts outside of the judicial phase of the criminal process, having actual or constructive knowledge that there was no probable cause to support the investigation and Arrest Warrants. Defendant Alaniz and Jacaman also knew or should have known that Villarreal had engaged in constitutionally-protected activity, and that applying the Statute to Villarreal under the circumstances was unconstitutional.

101. At all relevant times, Defendants Alaniz and Jacaman were responsible for training, supervising, and employing individuals within WCDA and LPD.

**E**. **Villarreal is detained.**

102. After her arrest and booking, Villarreal was detained at the Webb County Jail, which is under the exclusive control of the Webb County Sheriff's Office ("WCSO"), the exclusive law enforcement department for Defendant Webb County. WCSO was aware of, participated, in, and approved the arrest and detention of Villarreal despite knowing or having reason to know there was no probable cause to arrest and detain her, and knowing or having reason to know that Villarreal's arrest was in retaliation for exercising her First Amendment rights.

103. Despite knowing there was no probable cause to arrest Villarreal under the Statute, and despite that no reasonable officer would apply the Statute under the circumstances, Defendants carried out their plan to arrest Villarreal as retaliation and punishment for Villarreal's constitutionally-protected citizen journalism. Defendants did so with the intent that it dissuade Villarreal from engaging in further journalism efforts, including recording and publishing video

of law enforcement operations in public; for publishing information and commentary unfavorable to local government officials and operations; and for encourage and facilitating public criticism of local government officials and conduct.

104. Villarreal's investigation, arrest and detention under the Statute were done in furtherance of the above-detailed official City policy or custom ratified and intended to retaliate against and punish Villarreal for publishing accurate accounts of and commentary on newsworthy local matters, including those concerning government operations and city officials.

105. Villarreal's unconstitutional arrest and detention under the Statute were also done in furtherance of an official Webb County policy intended to retaliate against and punish Villarreal for publishing authentic accounts of and commentary on newsworthy local matters, including those unfavorable to Defendants Alaniz and Jacaman, and to the WCDA generally.

106. The Webb County official policy was developed, endorsed, and approved by final-policy making officials for Webb County for matters of law enforcement, including but not limited to the Webb County Sheriff and Defendant Alaniz. On information and belief, Defendants Alaniz and Jacaman influenced WCSO into ratifying, adopting, and enforcing this official Webb County policy, because of their desire to intimidate Villarreal into stopping any criticism of WDCA, as evidenced by the closed door meeting between Villarreal and Alaniz and other officials described in Paragraph 52.

107. WCSO's willing detention of Villarreal, knowing it was without probable cause and under an inapplicable statute, was an act fairly attributable to the Webb County policy of retaliation against Villarreal.

**F.  Villarreal defeats the criminal charges.**

108. After Villarreal posted bond and was released from physical detention at the Webb

County Jail, Villarreal filed a petition for a writ of habeas corpus in the Webb County District Court on February 14, 2018. Villarreal argued that the Statute was facially unconstitutional because it (a) was unconstitutionally vague and (b) violated the free speech and free press clauses of the First Amendment and Article 1, Section 8 of the Texas Constitution.

109. In its response to Villarreal's petition, WCDA construed the Statute as requiring that the accused "must <u>know</u> that the information is private information from a public-official source."

110. Nothing in the Arrest Warrants or Ruiz's statements indicated that Villarreal knew the basic information about the persons identified in the April 11 and May 6 Posts was private. And Defendants could not have established probable cause for such knowledge, because (1) the information was publicly-accessible and not excluded from disclosure under TPIA, and (2) Villarreal initially received the information from private individuals, and not any official. On information and belief, Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants were aware of and understood this when investigating Villarreal and preparing the Arrest Warrants.

111. On March 28, 2018, Judge Monica Z. Notzon of the 111th Judicial District of Texas issued a bench ruling on Villarreal's habeas petition, and held the Statute unconstitutionally vague.

112. Webb County did not appeal Judge Notzon's ruling.

113. Yet after the ruling, Defendant Alaniz was cited by a local paper as stating that the LPD was refusing to drop the investigation, and would continue to look into who in the department supplied Villarreal with the publicly-accessible information she published in the Targeted Publications.

## V. Causes of Action

### Count I:

### Direct and Retaliatory-Based Violations of Free Speech and Freedom of the Press – U.S. Const. Amends. I and XIV, and 42 U.S.C. § 1983

(Defendants Alaniz, Jacaman, Treviño, Ruiz, Martinez, Guerrero, Montemayor, DV, and the Doe Defendants in their individual capacities)

114. Villarreal fully incorporates by reference herein the allegations in each of the foregoing paragraphs.

115. Defendants Alaniz, Jacaman, Treviño, Ruiz, Martinez, Guerrero, Montemayor, DV, and the Doe Defendants ("Individual Defendants") willfully acted to intimidate, defame, and harass Villarreal in retaliation for her newsgathering, publication, and commentary about matters of public concerns, as well as for her creation of a forum for public discourse. The Individual Defendants' acts are exemplified by (but not limited to) the arrest and detention of Villarreal, and by the acts detailed in Paragraph 52. The Individual Defendants knew or should have known Villarreal's activities were clearly protected under the First Amendment.

116. The Individual Defendants also willfully acted to interfere directly with Villarreal's gathering and publication of information and commentary about matters of public concern, as exemplified by (but not limited to) the arrest and detention of Villarreal, and by the acts detailed in Paragraph 52.

117. The Individual Defendants' intended their willful acts to intimidate Villarreal, and to retaliate against her for engaging in activity protected under the First Amendment, including: (1) gathering and publishing information about local newsworthy matters, often providing a candid look at local crime and safety, and LPD and other local government operations; (2) video recording and streaming law enforcement activities occurring in public areas; (3) encouraging citizen engagement and providing through her Facebook page a forum for discussion on matters of local

public concern, including citizen criticism of local government officials and conduct; and (4) publishing commentary critical of or otherwise unfavorable to Defendants, their activities, and their policies.

118. For example and without limitation, the Individual Defendants' intended for their arrest and detention to intimidate Villarreal, under the force of state action, into ceasing her lawful public recording of, sharing of, reporting on, and speaking on matters of public concern, including information and commentary unfavorable to Defendants.

119. Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants intentionally investigated, arrested, and detained Villarreal without probable cause, or acted to cause the same, in response to Villarreal engaging in protected-First Amendment activity. No reasonable law enforcement officer would have investigated, arrested, and detained Villarreal, or caused the same, knowing that gathering and publishing accurate and publicly-accessible information is protected under the First Amendment.

120. In addition, no reasonable law enforcement officer would have relied upon Texas Penal Code § 39.06 to investigate, arrest, or detain Villarreal. A reasonable law enforcement officer would have known that a retaliatory investigation and arrest under a pretextual application of the statute and without probable cause would have interfered with Villarreal's First Amendment rights and deprived her of the same.

121. The Individual Defendants' acts of harassing, defaming, and singling out Villarreal, including but not limited to those acts detailed in Paragraph 52, were in response to Villarreal engaging in protected First Amendment activity, and were intended to intimidate Villarreal into ceasing her lawful public recording of, sharing of, reporting on, and speaking on matters of public concern. A reasonable law enforcement officer would have known that these acts would have

interfered with Villarreal's First Amendment rights and deprived her of the same, and would not have undertaken such acts.

122. Each of the Individual Defendants' acts, as alleged herein, were undertaken at all times under the color of law.

123. Each of the Individual Defendants' acts, as alleged herein, was done with actual or constructive knowledge that the acts would interfere with and infringe upon Villarreal's First Amendment rights.

124. The Individual Defendants' actions injured Villarreal in a way likely to chill a person of ordinary firmness from further participation in First Amendment protected activity, including the protected activity in which Villarreal engaged.

125. The Individual Defendants' actions violated Villarreal's clearly established rights under the First and Fourteenth Amendments to the United States Constitution, of which a reasonable official would have been aware.

126. It is clearly established that the First Amendment protects the right of every citizen to publish truthful information about matters of public concern that is publicly-accessible, publicly-available, or otherwise lawfully obtained.

127. It is clearly established that the First Amendment protects the right of every citizen to ask for information from a police officer or other official, as for example, is routine by members of the press or those seeking information under the Texas or Federal Freedom of Information Acts.

128. It is clearly established that the First Amendment protects every citizen's right to record and photograph law enforcement activities carried out in public.

129. It is also clearly established that the First Amendment prohibits any individual acting under the color of state law from restricting speech or punishing a speaker based on the viewpoint

expressed, including speech that criticizes government officials and conduct.

130. The First Amendment also clearly protects the right of a citizen to create a platform to encourage engagement and discussion from other citizens on matters of public concern.

131. No reasonable official would so unlawfully, willingly, and arbitrarily retaliate against and restrict speech on matters of public concern in the same manner as Defendants have.

132. The Individual Defendants have knowingly and willfully harassed, intimidated, interfered with, and arrested Villarreal with a reckless and callous disregard for, and deliberate indifference to, her First Amendment rights.

133. As a direct and proximate cause of The Individual Defendants' unlawful acts, as alleged herein, Villarreal has been deprived of her rights under the First and Fourteenth Amendments to the United States Constitution, and suffered damage to her reputation, wrongful incarceration, legal and other costs, and fear of further retaliation from Defendants. The Individual Defendants' acts have caused Villarreal to suffer further injuries, including financial hardship, physical and mental anguish, emotional distress, humiliation, and public embarrassment.

134. Plaintiff is entitled to actual, compensatory, and punitive damages against the Individual Defendants under 42 U.S.C. §1983 in an amount to be proven at trial.

135. Plaintiff is also entitled to preliminary and permanent injunctive relief against each of the Individual Defendants. Their acts of targeting Villarreal under the color of state law for engaging in activity protected under the First and Fourteenth Amendment is likely to continue absent injunctive relief.

136. Villarreal has and will continue to suffer considerable and irreparable harm without injunctive relief. Villarreal is entitled to be free of fear of retaliation for engaging in protected First Amendment activity, including asking for and publishing information on local public matters, and

criticizing local officials and their actions. There is no adequate remedy available at law sufficient to redress Villarreal's injuries and prevent further harm to her and journalism.

137. Villarreal is likely to succeed on the merits of her claims set forth herein. Moreover, there is substantial public interest in ensuring that Defendants cease engaging in acts intended to harass and intimidate Villarreal and interfere with her citizen journalism efforts.

**Count II:**

**Wrongful Arrest and Detention – U.S. Const. Amends. IV and XIV and 42 U.S.C. § 1983**
(Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants, in their individual capacities)

138. Villarreal fully incorporates by reference herein the allegations in each of the foregoing paragraphs.

139. Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants, acting at all times under color of state law, knowingly arrested and detained Villarreal, or knowingly acted to cause the same, against her will and without probable cause, in deprivation of Villarreal's rights under the Fourth and Fourteenth Amendments.

140. Defendants' acts, as alleged herein, were undertaken at all times under the color of law.

141. Lacking a valid basis to arrest Villarreal, Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants (a) manufactured allegations under a pretextual application of Texas Penal Code § 39.06, upon which no reasonable official would have relied under the circumstances; (b) prepared and obtained a warrant for Villarreal's arrest under false pretenses; and (c) knowingly arrested and detained her and/or caused her arrest and detention without probable cause and against her will, based on a knowing or deliberately indifferent wrongful application of Texas Penal Code § 39.06.

142. Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants willfully

28

arrested and detained Villarreal, or willfully caused and directed her arrest and detention, with malice and/or a reckless and callous disregard for, and deliberate indifference to, her constitutional rights.

143. It is clearly established that an official or another acting under the color of state law cannot deprive a person of due process and seize and detain her person without probable cause.

144. It is also clearly established that an official or another acting under the color of state law cannot deprive a person of due process and seize her person in response to that person engaging in constitutionally-protected activity, including gathering information about matter of public concern and reporting on the same.

145. It would have been clear to any reasonable law enforcement officer that no probable cause existed to arrest and detain Villarreal under Texas Penal Code § 39.06.

146. No reasonable official would have relied upon the statute to so unlawfully, willingly, and arbitrarily act to cause the arrest and detention of a citizen based on Villarreal's constitutional-protected activities. It also would have been clear to a reasonable official that applying the statute to Villarreal under the circumstances was unconstitutional.

147. As a direct and proximate cause of the actions of Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants, Villarreal was deprived of her rights guaranteed by the Fourth and Fourteenth Amendments of the Constitution of the United States, and suffered damage to her reputation, wrongful incarceration, legal and other costs, and fear of further retaliation from these Defendants. These Defendants' acts have caused Villarreal to suffer further injuries, including financial hardship, physical and mental anguish, emotional distress, humiliation, and public embarrassment.

148. Plaintiff is entitled to actual, compensatory, and punitive damages against Defendants

Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants under 42 U.S.C. §1983 in an amount to be proven at trial.

## Count III:

## Selective Enforcement– Equal Protection under U.S. Const. Amend. XIV and 42 U.S.C. § 1983

(Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants in their individual capacities)

149. Plaintiff fully incorporates by reference herein the allegations in each of the foregoing paragraphs.

150. Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants violated Villarreal's right to equal protection under the Fourteenth Amendment.

151. Specifically, through their wrongful criminal investigation, arrest, and detention of Villarreal, or  knowingly acting to cause the same, Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants intentionally and arbitrarily singled Villarreal out as a selective enforcement of Texas Penal Code § 39.06.

152. These Defendants' acts, as alleged herein, were undertaken at all times under the color of law.

153.  Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants had motive for, and exhibited, animosity and ill will toward Villarreal for her newsgathering, reporting and commentary. Defendants levied a false and vindictive pre-arrest investigation and arrest under Texas Penal Code § 39.06 against Villarreal.

154. LPD and WCDA had never before arrested, detained, or prosecuted any other person under Texas Penal Code § 39.06.

155. LPD and WCDA had never before arrested, detained, or prosecuted any person similarly-situated to Villarreal. These similarly-situated persons include those who had asked for

or received information from local law enforcement officials, and persons who published truthful and publicly-accessible information on a newsworthy matter. Examples include local professional newspaper journalists, local professional broadcast journalists, and citizens who published on matters of local public concern.

156. Defendants knew or should have known that Villarreal, like most local media, requested and received law enforcement information from LPD spokesman Baez and other LPD officials.

157. Yet Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants investigated Villarreal and arrested or caused her to be arrested and detained her under a pretextual and inapplicable statute, under which no reasonable official could have found probable cause.

158. Any reasonable official would have understood Villarreal was engaging in lawful and constitutionally-protected activity. No reasonable official would have relied upon Texas Penal Code §39.06 to investigate and arrest Villarreal. And a reasonable official would have understood that selectively enforcing an inapplicable criminal statute without probable cause was unconstitutional.

159. Defendants' unlawful application of Texas Penal Code § 39.06 would subject to investigation, arrest, detention, and prosecution any media member who simply asked for information from an official; received newsworthy information from an official; or published newsworthy information to a wider audience. Defendants knew their investigation and arrest of Villarreal was based on an improper and unconstitutional use of the statute.

160. Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants had no rational basis for singling out Villarreal. They intentional and selectively enforced the statute against Villarreal in retaliation for her citizen journalism with which they subjectively disagreed

and disliked.

161. Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants selectively enforced the statute against Villarreal with malice and/or a reckless and callous disregard for, and deliberate indifference to, her constitutional rights.

162. As a direct and proximate cause of these Defendants' unlawful acts, as alleged herein, Villarreal has been deprived of her constitutional rights and suffered damage to her reputation, wrongful incarceration, legal and other costs, and fear of further retaliation from Defendants. Defendants' acts have caused Villarreal to suffer further injuries, including financial hardship, physical and mental anguish, emotional distress, humiliation, and public embarrassment.

163. Plaintiff is entitled to actual, compensatory, and punitive damages against Defendants Alaniz, Jacaman,, Treviño, Ruiz, DV, and the Doe Defendants under 42 U.S.C. §1983 in an amount to be proven at trial.

## Count IV:

## Conspiracy to Deprive Constitutional Rights —42 U.S.C. §§ 1983 and 1985

(Defendants Alaniz, Jacaman, Treviño, Ruiz, Guerrero, Martinez, and Montemayor, DV, and the Doe Defendants in their individual capacities)

164. Plaintiff fully incorporates by reference herein the allegations in each of the foregoing paragraphs.

165. All or some of the Individual Defendants conspired with the intent to deprive Villarreal of equal protection of the laws and of her constitutionally-protected rights.

166. The Individual Defendants' relevant acts, as alleged herein, were undertaken under the color of law.

167. Defendants Alaniz and Jacaman, at all times relevant, acted outside of the judicial phase of the criminal process in conspiring to deprive Villarreal of her constitutional rights. They

both willingly participated in the criminal investigation, arrest, and detention of Villarreal, as detailed herein.

168. All or some of the Individual Defendants agreed and conspired to harass, intimidate, and defame Villarreal with the intent of retaliating against Villarreal for newsgathering, publication, and commentary on matters of public concern—including information and commentary unfavorable to Defendants—that is clearly protected under the First Amendment. All or some of the Individual Defendants also agreed and conspired to purposely interfere with Villarreal's First Amendment-protected activity.

169. As detailed herein, and including but not limited to the examples detailed in Paragraph 52, each of the Individual Defendants did in fact engage in an act in furtherance of the deprivation of Villarreal's First Amendment rights, and did so pursuant to an express or tacit agreement or intended to deprive Villarreal of those rights.

170. Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants knowingly conspired to selectively investigate and cause the arrest and detention of Villarreal, to deprive her of equal protection under the laws and her right to be free from arbitrary and selective enforcement of the law under the Fourteenth Amendment and from unlawful arrest and detention under the Fourth Amendment.

171. On information and belief, at least two of Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants conspired to (a) find a statute to serve as a pretext for selectively targeting Villarreal and (b) initiate, oversee, cause and carry out the unlawful investigation, arrest and detention of Villarreal.

172. Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants knew or should have known that there was no probable cause to arrest and detain Villarreal. All were aware

or should have been aware that Villarreal had engaged in First Amendment-protected activity, and they conspired with the intent to punish and chill Villarreal's exercise of her protected First Amendment rights.

173. Defendants Alaniz, Jacaman, Treviño, Ruiz, and DV conspired with actual or constructive knowledge that the selective and wrongful arrest and detention of Villarreal would deprive her of equal protection of the law and her First, Fourth, and Fourteenth Amendment rights.

174. No reasonable official would have so unlawfully, willingly, recklessly and/or arbitrarily conspired to deprive Villarreal of her constitutional rights.

175. As a direct and proximate cause of the Individual Defendants' unlawful acts, as alleged herein, Villarreal has been deprived of her constitutional rights and suffered damage to her reputation, wrongful incarceration, legal and other costs, and fear of further retaliation from the Individual Defendants. The Individual Defendants' acts have caused Villarreal to suffer further injuries, including financial hardship, physical and mental anguish, emotional distress, humiliation, and public embarrassment.

176. Plaintiff is entitled to actual, compensatory, and punitive damages against the Individual Defendants under 42 U.S.C. §§ 1983 and 1985 in an amount to be proven at trial.

**Count V:**

**Supervisory Liability – U.S. Const. Amend. I, IV, and XIV, and 42 U.S.C. § 1983**

(Defendants Alaniz, Jacaman, and Treviño, in their individual capacities)

177. Plaintiff fully incorporates by reference herein the allegations in each of the foregoing paragraphs.

178. Defendants Alaniz, Jacaman and Treviño, at all times relevant, had supervisory duties over law enforcement in the City of Laredo.

179. Defendants Alaniz and Jacaman were responsible for training, supervising, and

employing individuals within WCDA.

180. At all relevant times, Defendant Treviño was responsible for training, supervising, and employing individuals within LPD.

181. Defendants Alaniz, Jacaman, and Treviño, with actual or constructive knowledge, initiated, directed, approved, and participated in the events leading to (a) the criminal investigation of Villarreal under a pretextual statute; (b) the preparation, issuance, and execution of the Arrest Warrants and supporting statements without probable cause;  and (c) Villarreal's selective arrest and detention. All of these directly contributed to the violation of Villarreal's First, Fourth, and Fourteenth Amendment rights.

182. Defendants Alaniz, Jacaman, and Treviño supervised, directed, and participated in, and approved the investigation of Villarreal and the preparation, issuance, and execution of the Arrest Warrants and supporting statements by their subordinates. Defendants Alaniz, Jacaman, and Treviño did so with actual or constructive knowledge that (a) there was no probable cause to arrest Villarreal under Texas Penal Code 39.06; (b) that Texas Penal Code 39.06 was inapplicable to Villarreal under the circumstances and in light of clearly-established First Amendment protections for Villarreal's citizen journalism activities; and (c) that the investigation and arrest of Villarreal targeted and would interfere with her constitutionally-protected activity.

183. Defendants Alaniz, Jacaman, and Treviño acted with malice and/or deliberate indifference to Villarreal's rights, because of their hostility toward Villarreal's citizen journalism and criticism of LPD, WCDA, and other government operations.

184. Defendants Alaniz, Jacaman, and Treviño, with actual or constructive knowledge, directed, approved, participated in, and supervised the harassment, intimidation, and defamation of Villarreal, and the interference with her ability to gather and publish newsworthy information,

in violation of Villarreal's First Amendment rights. This includes, but is not limited to, those acts detailed in Paragraph 52.

185. Defendants Alaniz, Jacaman, and Treviño acted with malice and/or deliberate indifference to Villarreal's rights, because of their hostility toward Villarreal's coverage and criticism of LPD, WCDA, and other local government operations.

186. Defendants Alaniz, Jacaman, and Treviño acted at all times under color of law in undertaking such supervisory acts.

187. At all times relevant to the allegations herein, Defendants Alaniz, Jacaman, and Treviño knew or should have known that the acts of their subordinates, which they knowingly supervised and approved, were unconstitutional. It is clearly established that an official (a) cannot restrict, interfere with, or punish the lawful gathering of information and publication of information on matters of public concern; (b) cannot restrict, interfere with, or punish the video recording of government activities in or from public places; and (c) cannot restrict, interfere with, or punish speech based on the viewpoint expressed.

188. No reasonable official with supervisory duties would so have knowingly directed, authorized, participated in, and/or approved the deprivation of Villarreal's constitutional rights in the same manner as Defendants Alaniz, Jacaman and Treviño did.

189. As a direct and proximate cause of these Defendants' unlawful supervisory acts, as alleged herein, Villarreal has been deprived of her constitutional rights and suffered damage to her reputation, wrongful incarceration, legal and other costs, and fear of further retaliation from Defendants. Defendants' acts have caused Villarreal to suffer further injuries, including financial hardship, physical and mental anguish, emotional distress, humiliation, and public embarrassment.

190. Plaintiff is entitled to actual, compensatory, and punitive damages against Defendants

Alaniz, Jacaman, and Treviño under 42 U.S.C. § 1983 in an amount to be proven at trial.

## Count VI:

## Municipal Liability - U.S. Const. Amend. I, IV, XIV, and 42 U.S.C. § 1983

(Defendant City of Laredo)

191. Plaintiff fully incorporates by reference herein the allegations in each of the foregoing paragraphs.

192. At all times relevant to the allegations made herein, Defendant City of Laredo developed, ratified, enforced, and continues to enforce an official city policy and/or custom that constitutes impermissible state action intended to restrict and interfere with Villarreal's First Amendment activity, and to retaliate against Villarreal for the same,

193. Specifically, the City's unconstitutional policy and/or custom was and remains intended to intimidate, retaliate against, and punish Villarreal for (a) recording and publishing law enforcement activities occurring in public; and (b) publishing accurate information and commentary about matters of local public interest, including those concerning Laredo government affairs and city officials.

194. The City's unconstitutional policy and/or custom also was and remains intended to restrict and interfere with Villarreal's citizen journalism, with the intent that (a) she stop gathering and publishing information and commentary critical of or otherwise unfavorable to the Laredo government, and (b) she stop encouraging and providing a forum for other citizens to do the same.

195. This unconstitutional official city policy and/or longstanding custom, as alleged herein, was developed, ratified, and enforced, and continues to be enforced, under the color of law.

196. The official city policy and/or longstanding custom was developed, ratified, enforced, and continues to be enforced through and by officials vested with final policymaking authority either by law or delegation, including at least Defendant Treviño (by law or by lawful delegation,

including under the Laredo City Charter), the Laredo City Council, and the Laredo City Manager.

197. Defendant Treviño's unconstitutional acts, as detailed herein, further establish the approval, adoption, and enforcement of the City's official policy or custom.

198. In furtherance of this official policy or custom, City officials, including its final-policy making officials, knowingly influenced, directed, participated in, and encouraged LPD and WDCA to selectively investigate, arrest, and detain Villarreal under a pretextual statute, knowing that there was no probable cause to arrest and detain Villarreal, and knowing that Villarreal had engaged in First Amendment-protected activity to which the application of the statute would be unconstitutional. The official city policy or custom was a moving force behind the arrest and detention of Villarreal.

199. In furtherance of this official policy or custom, City officials, including its final-policy making officials, knowingly influenced, directed, and encouraged LPD, WDCA, and other government officials and employees to harass, defame, and intimidate Villarreal in retaliation for exercising her First Amendment rights, as detailed herein (including but not limited to the acts listed in Paragraph 52). The official city policy or custom was a moving force behind these acts.

200. At all times relevant to the allegations herein, Defendant City of Laredo and its policymakers were or should have been aware that the official policy and/or longstanding custom as alleged was unconstitutional. Villarreal's rights to record law enforcement activities from public areas, gather and publish accurate information on matters of public concern, and engage in commentary on matters of public concern regardless of the viewpoint expressed were clearly established.

201. No local government or reasonable official with final policy-making authority would so unlawfully, willingly, and arbitrarily have developed, ratified and enforced the unconstitutional

official county policy and/or longstanding custom alleged herein.

202. The City's official policy and/or longstanding custom were the moving force behind the deprivation of Villarreal's constitutional rights, as described herein.

203. As a direct and proximate cause of Defendants' unconstitutional official policy and/or longstanding custom, Villarreal was deprived of her rights guaranteed by at least the First, Fourth, and Fourteenth Amendments of the Constitution of the United States, and has suffered damage to her reputation, wrongful incarceration, legal and other costs, and fear of further harassment, retaliation, and other adverse actions from City officials and employees. Defendants' acts have caused Villarreal to suffer further injuries, including financial hardship, physical and mental anguish, emotional distress, humiliation, and public embarrassment.

204. As a result, Plaintiff is entitled to actual and compensatory damages against Defendant City of Laredo under 42 U.S.C. § 1983, in an amount to be proven at trial.

205. Plaintiff is also entitled to preliminary and permanent injunctive relief against Defendant City of Laredo and its continued enforcement of the unconstitutional official county policy and/or longstanding custom detailed herein. The policy or custom of targeting Villarreal for engaging in activity protected under the First and Fourteenth Amendments is likely to continue absent injunctive relief.

206. Villarreal has and will continue to suffer considerable and irreparable harm without injunctive relief. Villarreal is entitled to be free of fear of retaliation for engaging in protected activity. There is no adequate remedy available at law sufficient to redress Villarreal's injures and prevent further harm to her and journalism.

207. Villarreal is likely to succeed on the merits of her claims set forth herein. Moreover, there is substantial public interest in ensuring that Defendants cease engaging in acts intended to

harass and intimidate Villarreal and interfere with her citizen journalism efforts.

**Count VII:**

***Monell* Claim For Damages and Injunctive and Declaratory Relief—U.S. Const. Amend. I,
IV, XIV, and 42 U.S.C. § 1983**

(Defendant Webb County)

208. Plaintiff fully incorporates by reference herein the allegations in each of the foregoing paragraphs.

209. At all times relevant to the allegations made herein, Defendant Webb County developed, approved, endorsed, enforced, and continue to enforce an official county policy to retaliate against Villarreal for gathering and publishing publicly-available information and commentary on newsworthy local matters, including those concerning local government officials and conduct.

210. The county's official policy is also intended to restrict and interfere with Villarreal's citizen journalism, with the intended that she stop gathering and publishing information and commentary unfavorable to the WCDA and its staff, and encouraging and providing a forum for other citizens to do the same.

211. In furtherance of this official policy, the Webb County Sheriff's Office (WCSO), the duly authorized law enforcement arm of Webb County, participated in the selective arrest of Villarreal and detained Villarreal against her will, under the pretext of an inapplicable and facially-unconstitutional statute, Texas Penal Code § 39.06. WCSO did so with actual or constructive knowledge that there was no probable cause to arrest and detain Villarreal. WCSO also did so with actual or constructive knowledge that Villarreal had engaged in First Amendment-protected activity, or acted with deliberate indifference to the same, in violation of Villarreal's Fourth Amendment rights.

212. This unconstitutional official Webb county policy, as alleged herein, was developed, ratified, and enforced, and continues to be enforced, under the color of law.

213. The official county policy was developed, ratified, enforced, and continues to be enforced through and by officials vested with final policymaking authority either by law or delegation, including at least Defendant Alaniz and the Webb County Sheriff.

214. Defendant Webb County's acts taken pursuant to the official county policy, as alleged herein, was impermissible state action seeking to deprive Villarreal of her First, Fourth, and Fourteenth Amendment rights, including  (1) gathering and publishing audiovisual and written information about newsworthy matters; (2) encouraging citizen engagement and providing a forum for citizen discussion on matters of local public concern, including criticism of local government affairs; (3) speaking unfavorably about WCDA and its officials; and (4) being free from selective arrest and detention where no probable cause existed.

215. At all times relevant to the allegations herein, Defendant Webb County and its policymakers knew or should have known that the official policy as alleged were unlawful. Villarreal's rights to record and gather information from public areas, publish truthful information on matters of public concern, and engage in commentary on matters of public concern regardless of the viewpoint expressed were clearly established, as was her right to be free from arrest and detention without probable cause and deliberately selective enforcement of the law.

216. No local government or reasonable official with final policy-making authority would so unlawfully, willingly, and arbitrarily have developed, ratified and enforced the unconstitutional official county policy and/or longstanding custom alleged herein.

217. The County's official policy were the moving force behind the deprivation of Villarreal's constitutional rights as alleged herein.

218. As a direct and proximate cause of Defendants' unconstitutional official policy, Villarreal was and continues to be deprived of her rights guaranteed by at least the First, Fourth, and Fourteenth Amendments of the Constitution of the United States, and has suffered damage to her reputation, wrongful incarceration, legal and other costs, and fear of further harassment, retaliation, and other adverse actions from County officials and employees. Defendants' acts have caused Villarreal to suffer further injuries, including financial hardship, physical and mental anguish, emotional distress, humiliation, and public embarrassment.

219. As a result, Plaintiff is entitled to actual and compensatory damages against Defendant Webb County under 42 U.S.C. § 1983, in an amount to be proven at trial.

220. Plaintiff is also entitled to preliminary and permanent injunctive relief against Defendant Webb County and its continued enforcement of the unconstitutional official county policy detailed herein. The policy or custom of targeting Villarreal for engaging in activity protected under the First and Fourteenth Amendments is likely to continue absent injunctive relief.

221. Villarreal has and will continue to suffer considerable and irreparable harm without injunctive relief. Villarreal is entitled to be free of fear of retaliation for engaging in protected activity. There is no adequate remedy available at law sufficient to redress Villarreal's injuries and prevent further harm to her and journalism.

222. Villarreal is likely to succeed on the merits of her claims set forth herein. Moreover, there is substantial public interest in ensuring that Defendants cease engaging in acts intended to harass and intimidate Villarreal and interfere with her citizen journalism efforts.

## Count VIII:

## Declaratory Judgment

### (All Defendants)

223. Plaintiff fully incorporates by reference herein the allegations in each of the foregoing

paragraphs.

224. Villarreal seeks declaratory relief against the Defendants.

225. A justiciable controversy involving the continuing deprivation of Villarreal's rights under the First Amendment to the United States Constitution, to gather and publish newsworthy information and comment on matters of public concern, free of retaliation and acts of interference from the Defendants acting under color of state law and/or pursuant to an official City policy, exists between the parties.

226. A justiciable controversy involving the continuing deprivation of Villarreal's rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, to be free of arbitrary and selective enforcement of the law, exists between the parties.

227. Villarreal continues to gather newsworthy information and publish the same on her "Lagordiloca" Facebook page, including recording government activity in public places. She continues to engage in commentary on matters of public concern, and to provide a forum for others to do the same on her Facebook page.

228. Villarreal has no reason to believe that Defendants will not attempt to suppress or retaliate against her protected expressive activities in the future, or selectively and arbitrarily attempt to enforce the law against her. As alleged, even after a Webb County district judge held Texas Penal Code § 39.06 to be unconstitutionally vague, Defendant Alaniz was quoted in a local publication stating that the criminal investigation would continue.

229. A declaratory judgment will serve to further resolve and clarify the dispute between the parties, thaw any speech-chilling effects of the Defendants' acts and policies, and ensure that Villarreal and other citizens may participate in citizen journalism free from fear of retaliation from Defendants and other local government officials.

## VI. JURY DEMAND

Pursuant to Fed. R. Civ. P. 38 and Civ. L.R. 38-1, Villarreal demands a trial by jury on all issues so triable.

## VII. PRAYER

Plaintiff requests that Defendants be cited to appear and answer the allegations herein, and that this Court grant Plaintiff the following relief:

A. Entry of judgment holding Defendants liable for their unlawful conduct;

B. Actual damages in an amount to be proved at trial;

C. Compensatory damages in such amount as may be found, or otherwise permitted by law;

D. Punitive damages against the Individual Defendants in such amount as may be found, or otherwise permitted by law, for the Individual Defendants' retaliatory and malicious intent toward Villarreal and their callous disregard for her exercise of clearly established constitutional rights;

E. Injunctive relief enjoining the Individual Defendants and their agents, servants, officers, and persons in concert with Defendants from harassing, threatening, suppressing, or interfering with Villarreal's constitutionally-protected rights to (i) record and publish law enforcement activities occurring in or viewable from public spaces, (ii) inquire about, gather, and publish accurate information on matters of public concern, (iii) express viewpoints that are critical of or unfavorable to Defendants, and (iv) facilitate commentary about matters of public concern from other citizens;

F. Injunctive relief enjoining Defendant City of Laredo from enforcing any policy or custom directed at harassing, threatening, suppressing, or interfering with Villarreal's

constitutionally-protected rights to (i) record  and publish law enforcement activities occurring in or viewable from public spaces, (ii) inquire about, gather, and publish accurate information on matters of public concern, (iii) express viewpoints that are critical of or unfavorable to Defendants, and (iv) facilitate commentary about matters of public concern from other citizens;

G. Injunctive relief enjoining Defendant Webb County from enforcing any policy or custom directed at harassing, threatening, suppressing, or interfering with Villarreal's constitutionally-protected rights (i) record and publish law enforcement activities occurring in or viewable from public spaces, (ii) inquire about, gather, and publish accurate information on matters of public concern, (iii) express viewpoints that are critical of or unfavorable to Defendants, and (iv) facilitate commentary on her Facebook page from other citizens about matters of public concern.

H. For a declaratory judgment that the retaliatory arrest and detention of Villarreal violated the First Amendment to the United States Constitution and the Equal Protection Clause of the Fourteenth Amendment;

I. For a declaratory judgment that the Individual Defendants' pattern of harassment of Villarreal and interference with her recording, gathering, and publishing publicly-available information or other information on matters of public concern violated the First Amendment to the United States Constitution;

J. For a declaratory judgment that the City of Laredo's policy or custom related to harassment and intimidation of Villarreal, and interference with her ability to record, gather, and publish content regarding matters of public concern and to criticize government officials, violates the First Amendment to the United States Constitution and the Equal Protection Clause of the Fourteenth Amendment;

K. For a declaratory judgment that Webb County's policy or custom related to harassment and intimidation of Villarreal, and interference with her ability to record, gather, and publish content regarding matters of public concern and to criticize government officials, violates the First Amendment to the United States Constitution and the Equal Protection Clause of the Fourteenth Amendment;

L. For attorneys' fees, statutory fees, and costs under 42 U.S.C. § 1988;

M. For such other and further relief as the Court may deem just and proper.


Dated: April 8, 2019                                  Respectfully submitted,

                                                      /s/ JT Morris

                                                      JT Morris
                                                      Texas State Bar No. 24094444
                                                      jt@jtmorrislaw.com
                                                      Ramzi Khazen
                                                      Texas State Bar No. 24040855
                                                      ramzi@jtmorrislaw.com
                                                      JT MORRIS LAW, PLLC
                                                      1105 Nueces Street, Suite B
                                                      Austin, Texas 78701
                                                      Telephone: (512) 717-5275
                                                      Fax: (512) 582-2948

                                                      Jose Salvador Tellez II
                                                      Texas State Bar No. 24038076
                                                      joeytellez@tellezlaw.com
                                                      1000 Washington Street, # 1
                                                      Laredo, Texas 78040
                                                      Telelphone: (956) 717-8200
                                                      Fax: (888) 290-0725

                                                      **Attorneys for Plaintiff Priscilla Villarreal**