# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
### Laredo Division

| | |
|---|---|
| PRISCILLA VILLARREAL,<br>Plaintiff<br><br>vs.<br><br>THE CITY OF LAREDO, TEXAS, *et al.*<br>Defendants. | No. 5:19-cv-48<br><br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS ISIDRO ALANIZ, MARISELA JACAMAN, AND WEBB COUNTY'S MOTION TO DISMISS FOR FAILURE TO <u>STATE A CLAIM UNDER FRCP 12(B)(6)</u>

JT Morris
Texas State Bar No. 24094444
jt@jtmorrislaw.com
Ramzi Khazen
Texas State Bar No. 24040855
ramzi@jtmorrislaw.com
JT Morris Law, PLLC
1105 Nueces Street, Suite B
Austin, Texas 78701
Telephone: (512) 717-5275
Fax: (512) 582-2948

**Attorneys for Plaintiff Priscilla Villarreal**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ iv

SUMMARY OF THE ARGUMENT………………………………………………………..1

I. Villarreal's allegations and claims against the County Defendants. ........................... 1

    A. Villarreal's work as a citizen journalist in and around Laredo. ........................... 1

    B. A pattern of intimidation and retaliation against Villarreal by Defendants. ...................... 2

    C. Alaniz and Jacaman decide to selectively investigate and wrongfully arrest Villarreal in retaliation for Villarreal's protected reporting. .................................................... 3

    D. Villarreal's § 1983 claims against the County Defendants .................................. 5

II. Legal standards under Fed. R. Civ. P. 12(b)(6). ........................................................ 5

III. Alaniz and Jacaman are not entitled absolute immunity. ......................................... 6

    A. Prosecutors are not entitled to absolute immunity for investigatory acts and other conduct outside the judicial phase of the criminal process. ............................................ 6

    B. Villarreal's allegations focus on Alaniz's and Jacaman's alleged participation in investigatory acts and planned retaliation well outside the judicial phase. ...................... 7

    C. Alaniz and Jacaman fail to meet their burden on absolute immunity. ................................ 8

IV. Because Alaniz and Jacaman are not entitled to qualified immunity, the Court should deny their motion to dismiss. .......................................................................................... 9

    A. The qualified immunity framework. ..................................................................... 9

    B. Alaniz and Jacaman are not entitled to qualified immunity on Villarreal's First Amendment claims. ..................................................................................... 10

        1.     Villarreal's allegations establish a claim for First Amendment retaliation. ......... 10

        2.     Villarreal's allegations also establish a claim of First Amendment interference. 12

        3.     Villarreal's First Amendment rights were clearly established. ............................. 12

        4.     Alaniz's and Jacaman's misconduct was objectively unreasonable. .................... 14

            i.   A reasonable prosecutor would have understood any investigation and arrest of Villarreal under the circumstances to be unconstitutional. .................................. 14

            ii.  No reasonable prosecutor could have found probable cause. ........................... 16

C. Alaniz and Jacaman are not entitled to qualified immunity on Villarreal's Fourth Amendment wrongful arrest claim. ................................................................. 18

D. Alaniz and Jacaman are not entitled to qualified immunity on Villarreal's Equal Protection clause claim. .................................................................................. 19

E. Alaniz and Jacaman are not entitled to qualified immunity on Villarreal's § 1983 claim for conspiracy to deprive her constitutional rights. ........................................... 20

V. The Court should deny Defendants' motion to dismiss as to Webb County. .......................... 22

A. Legal standards for § 1983 municipal liability. ............................................... 22

B. Villarreal has sufficiently alleged a Webb County policy. ................................. 23

C. Villarreal's allegations show a nexus between the policy and final policymakers........... 23

D. Villarreal's allegations meet the moving force prong......................................... 24

VI. Villarreal's allegations show she is entitled to pursue injunctive and declaratory relief. ...... 24

VII. Conclusion and Prayer.................................................................................. 25

CERTIFICATE OF SERVICE ........................................................................27

## **TABLE OF AUTHORITIES**

<u>Cases</u>

*Adams v. City of New Orleans*, No. 15-1543, 2016 U.S. Dist. LEXIS 107534 (E.D. La. 2016)...21

*Anderson v. Creighton,* 483 U.S. 635 (1987) ..............................................................................10

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ...................................................................................10

*Aubin v. Columbia Cas. Company,* 272 F. Supp. 3d 828 (M.D. La. 2017) ............................15, 16

*Ballentine v. Las Vegas Metro. Police Dep't,* No. 2:14-cv-01584-APG-GWF, 2015 U.S. Dist. LEXIS 54720 (D. Nev. 2015) .........................................................................................................16

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................................5-6

*Bryan v. City of Madison*, 213 F.3d 267 (5th Cir. 2000) ..............................................................19

*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) .................................................................... *passim*

*Burns v. Reed*, 500 U.S. 478 (1991) ..........................................................................................7, 8

*Campbell v. City of New Kensington*, No. 05-0467, 2010 U.S. Dist. LEXIS 135268 (W.D. Pa. 2010) ............................................................................................................................................16

*Carey v. Nevada Gaming Control Bd*., 279 F.3d 873 (9th Cir. 2002)..........................................15

*Chrissy F. ex rel. Medley v. Miss. Dep't of Pub. Welfare*, 925 F.2d 844 (5th Cir. 1991)..........6, 24

*City of Hearne v. Johnson*, No. 6:16-CV-00284-RP-JCM, 2016 U.S. Dist. LEXIS 192745 (W.D. Tex. 2016) .....................................................................................................................................12

*Colle v. Brazos County,* 981 F.2d 237 (5th Cir. 1993) .................................................................22

*Colson v. Grohman*, 174 F.3d 498 (5th Cir. 1999) .......................................................................12

*Crane v. Texas,* 759 F.2d 412 (5th Cir. 1985) ..............................................................................24

*Culbertson v. Lykos*, 790 F.3d 608 (5th Cir. 2015).......................................................................22

*Davidson v. City of Stafford*, 848 F.3d 384 (5th Cir. 2017)..........................................................16

*District of Columbia v. Wesby,* 138 S. Ct. 577 (2018)..................................................................10

*Elrod v. Burns*, 427 U.S. 347 (1976) ..........................................................................................25

*Espinoza v. City of N.Y.*, 2012 U.S. Dist. LEXIS 110728 (S.D.N.Y. 2012)................................20

*Florida Star v. B.J.F.,* 491 U.S. 524 (1989) ....................................................11, 13, 15

*Forrester v. White,* 484 U.S. 219 (1988) ......................................................................6

*Franks v. Delaware*, 438 U.S. 154 (1978)...................................................................18

*Garza v. Guerra,* No. B-08-084, 2009 U.S. Dist. LEXIS 3304 (S.D. Tex. 2009).........................19

*Groden v. City of Dallas*, 826 F.3d 280 (5th Cir. 2016) ................................................22

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ...............................................................10

*Hartman v. Moore*, 547 U.S. 250, 256 (2006)............................................................13

*Heaney v. Roberts*, 846 F.3d 795 (5th Cir. 2017) .....................................................9-10

*Hill v. City of Seven Points*, 31 F. App'x 835 (5th Cir. 2002) ........................................21

*Hoog-Watson v. Guadalupe Cty.*, 591 F.3d 431 (5th Cir. 2009) ...................................7, 8

*Hope v. Pelzer*, 536 U.S. 730 (2002) ........................................................................10

*Hous. Chronicle Publ'g Co. v. Houston*, 531 S.W.2d 177 (Tex. Civ. App.—Houston [14th Dist.] 1975) ..................................................................................................15

*Imbler v. Pachtman*, 424 U.S. 409 (1976) ................................................................6, 7

*Johnson v. City of Shelby*, 135 S.Ct. 346 (2014) .........................................................6

*Kalina v. Fletcher* 522 U.S. 118 (1997)....................................................................7, 9

*Keenan v. Tejeda*, 290 F.3d 252 (5th Cir. 2002)......................................................11, 13

*Kelly v. Borough of Carlisle*, 622 F.3d 248 (3d Cir. 2010) ...........................................17

*Kinney v. Weaver*, 367 F.3d 337 (5th Cir. 2004) .......................................................10

*Lacey v. Maricopa Cty.*, 693 F.3d 896 (9th Cir. 2012).............................................8, 20

*Lawrence v. Reed*, 406 F.3d 1224 (10th Cir. 2005).....................................................15

*Leonard v. Robinson,* 477 F.3d 347 (6th Cir. 2007)....................................................15

*Loupe v. O'Bannon*, 824 F.3d 534 (5th Cir. 2016) ..................................................................7, 9

*Lowrey v. Texas A & M Univ. Sys.*, 117 F.3d 242 (5th Cir. 1997) ................................................6

*Mangieri v. Clifton,* 29 F.3d 1012 (5th Cir. 1994).................................................................. 18-19

*McLin v. Ard*, 866 F.3d 682 (5th Cir. 2017) ..............................................................................19

*MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118 (2007)........................................................25

*Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283 (9th Cir. 1999) ..................................11

*Mesa v. Prejean*, 543 F.3d 264 (5th Cir. 2008) .....................................................................11, 13

*Mills v. City of Bogalusa,* 112 F. Supp. 3d 512 (E.D. La. 2015)................................................18

*N.Y. Times Co. v. Sullivan,* 376 U.S. 254 (1964)......................................................................11

*Oklahoma Publ. Co. v. Oklahoma County Dist. Court,* 430 U.S. 308 (1977).............................15

*Pearson v. Callahan*, 555 U.S. 223 (2009)...........................................................................9, 10

*Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986)............................................................22, 23

*Pineda v. City of Houston*, 291 F.3d 325 (5th Cir. 2002) ...........................................................22

*Pfannstiel v. City of Marion*, 918 F.2d 1178 (5th Cir. 1990).......................................................21

*Reichle v. Howards*, 566 U.S. 658 (2012) ..................................................................................9

*Robinson v. Hunt Cty.,* 921 F.3d 440 (5th Cir. 2019) .................................................................25

*Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819 (1995) ...............................13

*Ryland v. Shapiro*, 708 F.2d 967 (5th Cir. 1983).......................................................................21

*SCLC v. Supreme Court*, 252 F.3d 781 (5th Cir. 2001).................................................................5

*Smith v. Daily Mail Publ. Co.,* 443 U.S. 97 (1979) ............................................................11, 13, 15

*Spivey v. Robertson,* 197 F.3d 772 (5th Cir. 1999)......................................................................7

*State v. Ford*, 179 S.W.3d 117 (Tex. App.—San Antonio 2005).................................................17

*Thomas v. City of Galveston*, 800 F. Supp. 2d 826 (S.D. Tex. 2011)..........................................22

*Turner v. Driver*, 848 F.3d 678 (5th Cir. 2017)......................................................................11, 13

*Turner v. Upton County,* 915 F.2d 133 (5th Cir. 1990) ..........................................................23, 24

*Willowbrook v. Olech*, 528 U.S. 562 (2000) ..............................................................................19

*Wyatt v. Fletcher*, 718 F.3d 496 (5th Cir. 2013)........................................................................10

Statutes

TEXAS GOV. CODE, CHAPTER 552, Texas Public Information Act......................................4, 17, 18

TEXAS PENAL CODE § 1.07(a)(7) ................................................................................................4

TEXAS PENAL CODE § 39.06(c) ..................................................................................... *passim*

42 U.S.C § 1983 ............................................................................................................. *passim*

Constitutional Authorities

First Amendment ............................................................................................................*passim*

Fourth Amendment ....................................................................................................... *passim*

Fourteenth Amendment ..............................................................................................5, 21

Rules

Fed. R. Civ. P. 12(b)(6)................................................................................................. *passim*

The Court should deny Defendants Isidro Alaniz's and Marisela Jacaman's assertion of qualified immunity and Rule 12(b)(6) motion to dismiss. The First Amendment has long prohibited officials from retaliating against a citizen's protected speech. Plaintiff Priscilla Villarreal's allegations detail that Alaniz and Jacaman engaged in a campaign of retaliation against Villarreal, because they dislike her candid journalism that has at times been unflattering to Defendants.

Seeking to silence Villarreal, Defendants investigated and arrested her for doing something journalists do every day—asking the police to confirm facts of a news story, receiving confirmation from the police, and publishing those facts accurately. Any reasonable prosecutor would have known that Villarreal's activity was constitutionally-protected and no basis existed for her arrest. Yet as Villarreal alleges in detail, Alaniz and Jacaman agreed to investigate and arrest Villarreal, and were instrumental in rummaging for and applying an obscure law that no local authority had enforced in the 23 years it was in effect. Granting Alaniz and Jacaman immunity would embolden prosecutors who wish to manipulate the criminal process to intimidate their critics and the press into silence. The Constitution forbids such an outcome. The Court should reject Alaniz's and Jacaman's assertion of absolute and qualified immunity.

The Court also should deny the motion to dismiss as to Villarreal's §1983 municipal liability claim against Defendant Webb County. Villarreal alleges specifically how at the time of her unlawful arrest, Webb County enforced a policy through Alaniz and the county sheriff intended to retaliate against her protected First Amendment activity, and that the policy was a moving force in depriving Villarreal her rights. These allegations defeat the County's motion to dismiss.

## I. Villarreal's allegations and claims against the County Defendants.

### A. Villarreal's work as a citizen journalist in and around Laredo.

Since 2015, Villarreal, best known as "Lagordiloca," has served as a citizen journalist in and around Laredo, Texas. (FAC ¶¶ 24-25). On her Facebook page "Lagordiloca News Laredo

Tx," Villarreal publishes live and recorded video of local crime and traffic scenes, along with information and colorful commentary about newsworthy local issues (*Id.* ¶¶ 32, 33-40). People often discuss Villarreal's publications on the comment section of her Facebook posts. (*Id.* ¶ 38). Local citizens consider Villarreal as a principal source of information about local matters such as crime and government, and have praised her efforts to provide authentic views of Laredo issues and events.  (*Id.* ¶¶ 37-39). She also has several critics because of her candid and gritty style of journalism. (*Id.* ¶ 40). Villarreal has received national coverage of her citizen journalism. (*Id.* ¶ 39). Over 120,000 Facebook users follow the "Lagordiloca" Facebook page. (*Id.* ¶ 37).

Villarreal's live-streams of crime and traffic scenes has sometimes shown Laredo Police Department ("LPD") officers in difficult and controversial situations. (FAC ¶¶ 42-45). While Villarreal has praised LPD at times, she has also published criticism of LPD. (*Id.* ¶ 46). She has published criticism of other city and county government officials as well. (*Id.* ¶ 47-50). For example, she criticized the Webb County District Attorney's office ("WCDA") for deciding not to prosecute a relative of Defendant Jacaman on animal cruelty charges. (*Id.* ¶ 50).

## B.  A pattern of intimidation and retaliation against Villarreal by Defendants.

Several local government officials—including Alaniz and Jacaman—have subjected Villarreal to a pattern of intimidation, harassment and indifference intended to interfere with and retaliate against Villarreal's newsgathering and reporting on matters of local concern. (FAC ¶¶ 51-55). This pattern has included acts such as Alaniz rebuking Villarreal for her criticism of WCDA, behind closed doors and in the presence of other local officials. (*Id.* ¶ 54). This pattern of harassment and intimidation was part of an agreement intended to chill Villarreal's expressive activities, including filming police activity in public and criticizing local officials. (*Id.* ¶¶ 55-57).

**C.  Alaniz and Jacaman decide to selectively investigate and wrongfully arrest Villarreal in retaliation for Villarreal's protected reporting.**

In 2017, Alaniz and Jacaman agreed with Treviño, Ruiz, DV, and the Doe Defendants ("Does") (collectively "LPD Defendants") to target Villarreal for criminal investigation, arrest, and detention, based on two Facebook posts Villarreal published in the spring of 2017 ("Targeted Publications"). (FAC ¶¶ 64-66, 69-70, 101-02). Their goal in investigating and causing the arrest of Villarreal was to intimidate her into self-censorship and retaliate against her for exposing and criticizing LPD and WCDA. (*Id.*   ¶¶ 69, 102). What Villarreal published in the Targeted Publications included the identity and occupation of a man who committed suicide, and information about a family involved in a traffic accident. (*Id.* ¶¶ 65-66). Villarreal initially received this information from members of the public. (*Id.*) She later received information from an LPD officer confirming the information. (*Id.*) Villarreal had published similar information in the past, including information LPD provided. (*Id.* ¶ 67).

Alaniz and Jacaman knew Villarreal engaged in protected First Amendment activity as to the Targeted Publications. (FAC ¶¶ 105-06). They knew the request or receipt of newsworthy information from an LPD official, and truthful publication of the same, was protected First Amendment activity. (*Id.* ¶¶ 85, 106-07, 116). They knew other local media regularly asked for and received information from LPD officials without being arrested. (*Id.* ¶¶ 106, 178).

Thus, Alaniz and Jacaman knew there was no valid basis to arrest Villarreal. (FAC ¶¶ 105-06). Yet they decided to investigate and cause the arrest of Villarreal based on the Targeted Publications, and searched for a pretextual statute with which they could target her. (*Id.* ¶¶ 69-70, 84, 109). Alaniz and Jacaman were instrumental in searching for and ultimately settling on TEXAS PENAL CODE § 39.06(c), "Misuse of Official Information." (*Id.* ¶¶ 70, 113). They knew that no local authority had ever enforced § 39.06 in the 23 years it had been in effect. (*Id.* ¶¶ 84, 141).

3

§ 39.06(c) requires that a defendant "solicits or receives from a public servant information that. . . has not been made public," meaning (a) information that is not publicly accessible and (b) that is excepted from disclosure under the Texas Public Information Act ("TPIA"). (*Id.* ¶¶ 72-73). The statute also requires that the defendant solicit or receive the information "with intent to benefit…" (*Id.*). Texas Penal Code § 1.07(a)(7) defines benefit as "anything reasonably regarded as economic gain or advantage." (*Id.* ¶ 74).

But Alaniz and Jacaman knew that the information Villarreal published was publicly-accessible and not subject to a TPIA exception. (*Id.* ¶¶ 103, 105). And in addition, they knew Villarreal did not use her Facebook page as a source of economic gain. (*Id.* ¶¶ 93, 103). Thus, they knew there was no basis to target Villarreal under § 39.06(c). (*Id.* ¶¶84-85, 89-94, 103, 112-13).

Yet Alaniz and Jacaman willfully pushed forward the pretextual investigation and wrongful conduct leading to Villarreal's arrest and detention. Alaniz and Jacaman advised and assisted the LPD Defendants in the investigation. (FAC ¶¶ 113-14). Alaniz and Jacaman participated in the manufacture of criminal complaints and warrant affidavits, pursuant to their agreement to retaliate against Villarreal. (*Id.* ¶¶ 85, 88, 91, 104, 112, 114). They did so while endorsing Defendant Ruiz's material misstatements and omissions in the affidavits, intending to cause Villarreal's arrest and detention. (*Id.* ¶¶ 88, 101-102, 104, 114). Alaniz's and Jacaman's misconduct was motivated from their hostility toward Villarreal's criticism of WCDA, LPD, and Jacaman's relative. (*Id.* ¶ 115).

Because of the Defendants' wrongful conduct, arrest warrants were issued for Villarreal. (FAC ¶ 95). She turned herself in, where she encountered several LPD officers openly mocking her. (*Id.* ¶¶ 96-97). She was detained at the Webb County jail. (*Id.* ¶ 118). The Webb County sheriff, encouraged by Alaniz, detained Villarreal knowing there was no probable cause. (*Id.* ¶¶ 119-120, 122). This wrongful detention was reflective of an official County policy intended to

4

retaliate against and silence Villarreal. (*E.g.,* FAC ¶¶ 121-23).

After her release on bond, Villarreal filed a writ of habeas corpus, which the trial court granted upon finding that § 39.06(c) was unconstitutionally vague. (FAC ¶ 124-27). Yet Alaniz suggested LPD would keep investigating the events of the Targeted Publications. (*Id.* ¶ 129).

### D. Villarreal's § 1983 claims against the County Defendants.

Villarreal the following claims against the County Defendants:

- Count I: A First Amendment claim for Alaniz's and Jacaman's retaliation against and interference with Villarreal's protected First Amendment activity  (FAC ¶¶130-61).

- Claim II: A Fourth Amendment claim for Alaniz's and Jacaman's participation in causing the arrest and detention of Villareal without probable cause. (*Id.* ¶¶162-72).

- Count III: An equal protection claim for Alaniz's and Jacaman's participation in selectively enforcing Texas Penal Code § 39.06(c) against Villarreal. (*Id.* ¶¶173-86).

- Count IV: Agreeing to and participating in a civil conspiracy that deprived Villarreal of her First, Fourth, and Fourteenth Amendment rights. (*Id.* ¶¶187-199).

- Count VII: A municipal liability claim against Webb County, based on a ratified County policy intended to retaliate against and interfere with Villarreal's exercise of her First Amendment rights. (FAC ¶¶234-50).

- Count VIII: A claim for declaratory relief against all Defendants. (*Id.* ¶¶251-57).

## II. Legal standards under Fed. R. Civ. P. 12(b)(6).

"In the context of a 12(b)(6) motion in a section 1983 suit, the focus should be whether the complaint properly sets forth a claim of a deprivation of rights, privileges, or immunities secured by the Constitution or laws of the United States caused by persons acting under color of state law." *SCLC v. Supreme Court*, 252 F.3d 781, 786 (5th Cir. 2001) (internal quotation omitted). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations, citation and brackets omitted). The Supreme Court has rejected heightened pleading standards for § 1983 claims. *Johnson v. City of Shelby*, 135 S.Ct. 346, 347 (2014) (per curiam).

A Rule 12(b)(6) motion to dismiss "is viewed with disfavor and is rarely granted." *Lowrey v. Texas A & M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997)(citation omitted). In evaluating a Rule 12(b)(6) motion, a court must examine the allegations in the light most favorable to the plaintiff, and with every doubt and all inferences resolved in the plaintiff's favor. *Id.*

### III. Alaniz and Jacaman are not entitled absolute immunity.

Absolute immunity is a narrow shield. "[T]he actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Prosecutors are entitled to absolute immunity only for their conduct of prosecutors that is "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Buckley*, 509 U.S. at 268-69 (quotations omitted). Absolute immunity does not extend to injunctive or declaratory relief. *Chrissy F. ex rel. Medley v. Miss. Dep't of Pub. Welfare*, 925 F.2d 844, 849 (5th Cir. 1991).

In determining whether a prosecutor's conduct is "intimately associated with the judicial phase of the criminal process," the Supreme Court instructs the use of a "functional approach." *Buckley,* 509 U.S. at 269. A court must focus on "the nature of the function performed, not the identity of the actor who performed it." *Id.* (quoting *Forrester v. White,* 484 U.S. 219, 229 (1988)).

#### A. Prosecutors are not entitled to absolute immunity for investigatory acts and other conduct outside the judicial phase of the criminal process.

In employing this function-based approach, the Supreme Court has made clear that prosecutors are not entitled to absolute immunity for conduct that is investigative or administrative

in nature, or otherwise removed from the judicial phase of the criminal process. *Imbler*, 424 U.S. at 430; *Buckley,* 509 U.S. at 273. "Almost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive." *Burns v. Reed*, 500 U.S. 478,   495 (1991). Thus, a prosecutor seeking absolute immunity must prove that he was acting as an advocate for the state. *Buckley,* 590 U.S. at 273-74.

Courts have rejected absolute immunity over a wide scope of conduct. "When a prosecutor performs the investigative functions normally performed by a detective or police officer," the prosecutor is not shielded by absolute immunity. *Buckley*, 509 U.S. at 273; *see also Hoog-Watson v. Guadalupe Cty*., 591 F.3d 431, 438-39 (5th Cir. 2009). A prosecutor generally is not entitled to absolute immunity for their actions in giving legal advice to the police. *Burns*, 500 U.S. at 492-493; *but see Spivey v. Robertson,* 197 F.3d 772, 776 (5th Cir. 1999) (finding absolute immunity for "suggesting legal conclusions on facts already given to [prosecutors] by the police.") (citing *Kalina v. Fletcher* 522 U.S. 118 (1997)). There is no absolute immunity for fabrication of evidence prior to an indictment, as "a prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Buckley*, 509 U.S. at 274. Similarly, a prosecutor does not enjoy absolute immunity when he directs a warrantless arrest without probable cause. *Loupe v. O'Bannon*, 824 F.3d 534, 540 (5th Cir. 2016).

## B. Villarreal's allegations focus on Alaniz's and Jacaman's alleged participation in investigatory acts and planned retaliation well outside the judicial phase.

Villarreal's allegations and claims are directed specifically towards Alaniz's and Jacaman's conduct that preceded the judicial phase of the criminal process. For example:

- Alaniz, in a closed door meeting with other city officials, rebuked Villarreal for her criticism of WCDA and Jacaman's relative with the intent to intimidate her from further publishing such criticism (FAC ¶¶ 54-55);

- Alaniz and Jacaman agreed with LPD officials to retaliate against Villarreal for the exercise of her First Amendment rights, and formulated a decision to do the same, before the criminal investigation of Villarreal began (*Id.* ¶¶ 69, 99, 102, 190);

- That Alaniz and Jacaman were instrumental in searching for and selecting a criminal statute under which to target Villarreal (*Id.* ¶¶ 70-71, 84, 113, 165);

- That Alaniz and Jacaman participated in and directed the criminal investigation of Villarreal and the causing of her arrest (*Id.* ¶¶ 112, 114, 116-117); and

- That Alaniz and Jacaman participated in the preparation of misleading and purposefully-deficient arrest warrant affidavits (*Id.* ¶¶ 86, 104, 114; 165).

### C. Alaniz and Jacaman fail to meet their burden on absolute immunity.

Alaniz and Jacaman cannot meet their burden to show that absolute immunity is justified for the conduct Villarreal alleges. *See Buckley* 509 U.S. at 268-69. Their conduct in helping to select a pretextual statute to target Villarreal, before any investigation began, is at best legal advice provided far outside the scope of the judicial phase of the criminal process, and is not entitled to absolute immunity. *Burns*, 500 U.S. at 492-493.[1] Similarly, any participation in an agreement and plan to investigate and cause the arrest of Villarreal, and the ensuing investigation and pre-arrest conduct, was not part of Alaniz's and Jacaman's role as legal advocates for the state. *Buckley*, 509 U.S. at 274 ("a prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested."); *Hoog-Watson,* 591 F.3d at 438-39. And Alaniz's closed-door rebuke of Villarreal also does not enjoy absolute immunity. *See Buckley* 509 U.S. at 277 (holding that a prosecutor's statements to the media were not entitled to absolute immunity).

Alaniz and Jacaman argue that "[i]n this case, Defendants Alaniz and Jacaman were acting as prosecutors in every action alleged in Counts I through IV." (Dkt. 26, p. 7). Yet Alaniz and Jacaman only argue that absolute immunity extends to their participation in drafting the arrest

---

[1] *See also Lacey v. Maricopa Cty.*, 693 F.3d 896, 914 (9th Cir. 2012) (denying absolute immunity where allegations were that, *inter alia*, the special prosecutor advised officers on a warrantless arrest).

warrant affidavits. (*Id.* ). Their failure to address any of Villarreal's allegations concerning their conduct before the arrest warrants were prepared alone shows they cannot meet their burden on absolute immunity. (*Id.*) Defendants also ignore the allegations that Jacaman, with Alaniz's endorsement, personally approved the arrest warrant affidavits knowing they included material misrepresentations and omissions. (FAC ¶¶ 86, 112, 114). Those were not acts of advocacy, and absolute immunity does not apply. *See Kalina*, 522 U.S. at 129-31; *Buckley*, 509 U.S. at 274-75.

Finally, the policy justification for absolute immunity is insignificant here. None of the conduct about which Villarreal complains concerns independent decision making by prosecutors during the judicial phase of the criminal process. Rather, Villarreal's allegations concern Alaniz's and Jacaman's conduct well before any judicial or quasi-judicial phase. *See Loupe*, 824 F.3d at 540 (reasoning that absolute immunity cannot apply where a prosecutor "acts directly to deprive someone of liberty [,] steps outside of his role as an advocate of the state. . .") The Court should reject Alaniz's and Jacaman's assertion of absolute immunity.

**IV. Because Alaniz and Jacaman are not entitled to qualified immunity, the Court should deny their motion to dismiss.**

**A.  The qualified immunity framework.**

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity, then, shields government officials from civil damages liability unless the official violated a clearly established statutory or constitutional right. *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citation omitted). Assessing qualified immunity involves two steps. "First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Heaney v. Roberts*, 846 F.3d 795,

801 (5th Cir. 2017) (citation omitted). "Second. . .the court must decide whether the right at issue was clearly established at time of [the] defendant's alleged misconduct." *Id.*

Whether a right was clearly established "requires an assessment of whether the official's conduct would have been objectively reasonable at the time of the incident."[2] *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (citation omitted); *see also Pearson,* 555 U.S. at 244. "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). This does "not require a case directly on point," so long as precedent "place[s] the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). As the Fifth Circuit observed:

> '[t]he central concept' behind the 'clearly established' assessment is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'

*Kinney,* 367 F.3d at 350 (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).

A reasonable public official is charged with knowing the law governing his conduct. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982). Objective reasonableness "also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Wesby*, 138 S. Ct. at 590. In other words, "the contours of the right [must be] sufficiently clear  that a reasonable official would understand that what he is doing violates that right." *Kinney,* 367 F.3d at 349-50 (citing *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).

## B. Alaniz and Jacaman are not entitled to qualified immunity on Villarreal's First Amendment claims.

### 1. Villarreal's allegations establish a claim for First Amendment retaliation.

---

[2] Some past Fifth Circuit decisions have treated "objective reasonableness" as a third step in the qualified immunity analysis. *E.g., Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013) (citation omitted). But recent Supreme Court decisions appear to focus on a two-step inquiry. *E.g., District of Columbia v. Wesby,* 138 S. Ct. 577, 589 (2018).

A First Amendment retaliation claim requires a plaintiff to show (1) she was engaged in constitutionally protected activity; (2) the defendants' actions caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendants' adverse actions were substantially motivated against the plaintiff's exercise of constitutionally protected conduct. *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

**First**, Villarreal's allegations establish she was engaged in protected First Amendment activity. This protected activity included filming police activity occurring in public.[3] *Turner v. Driver*, 848 F.3d 678, 687-90 (5th Cir. 2017). It included publishing content unfavorable to LPD, WCDA, and other local officials and conduct.[4] *E.g., N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 269-271, (1964) (explaining the First Amendment protects the "prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions.") (citation omitted); *Mesa v. Prejean*, 543 F.3d 264, 273 (5th Cir. 2008). And it included publication of truthful information on matters of public concern that she rightfully obtained.[5] *E.g., Florida Star v. B.J.F.,* 491 U.S. 524 (1989); *Smith v. Daily Mail Publ. Co.,* 443 U.S. 97 (1979).

**Second**, Villarreal's allegations establish that the Individual Defendants' conduct caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity. This element does not require Villarreal to show she entirely ceased her protected First Amendment activity. *Keenan*, 290 F.3d at 259-60.[6] Villarreal's allegations establish that Alaniz's and Jacaman's retaliatory conduct hindered her ability to exercise her protected rights.

---

[3] (FAC ¶¶ 25-28, 30, 32, 42-45, 54, 68).

[4] (FAC ¶¶ 33, 46-50, 68).

[5] (FAC ¶¶ 29-30, 32, 34, 37, 43, 65-68).

[6] *See also Mendocino Envl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) ("It would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity.")

(FAC ¶¶ 145-47). For example, Villarreal explains that their conduct has caused and continues to cause her to operate in constant fear of Defendants further retaliating against and interfering with her citizen journalism. (*Id.* ¶ 147). She also details that the retaliatory acts caused her loss of sleep, physical ailments, restriction of her person, and reputational harm. (*Id.* ¶ 146).

**Third**, Villarreal's allegations establish that Alaniz's and Jacaman's adverse actions were substantially motivated against Villarreal's exercise of her First Amendment rights. For example, Villarreal details Alaniz and Jacaman's hostility toward Villarreal's reporting because she criticized WCDA and Jacaman's relative. (*E.g.* FAC ¶¶ 52, 54, 115). And Villarreal details that because of their hostility, Alaniz and Jacaman decided to target Villarreal for criminal investigation and arrest despite lacking a valid basis, and also that Alaniz attempted in a closed-door meeting to intimidate Villarreal. (*E.g., id.* ¶¶ 54, 57, 69, 140, 179).

### 2. Villarreal's allegations also establish a claim of First Amendment interference.

A government official's direct restriction of First Amendment rights is a violation distinct from First Amendment retaliation. *See Colson v. Grohman*, 174 F.3d 498, 508-09 (5th Cir. 1999) (contrasting the two distinct First Amendment violations). Villarreal's allegations, when taken as true, show that Alaniz and Jacaman acted to directly interfere with Villarreal's First Amendment activity, including by causing Villarreal's arrest and detention, where she necessarily could not publish material on her Facebook page. *See, e.g., City of Hearne v. Johnson*, No. 6:16-CV-00284-RP-JCM, 2016 U.S. Dist. LEXIS 192745, at *12 (W.D. Tex. 2016) (finding state action that "delayed discussion of a political topic" to be a direct restriction on protected speech). Because Villarreal has made out claims for First Amendment violations, she meets the first step of her burden to overcome Alaniz's and Jacaman's assertion of qualified immunity.

### 3. Villarreal's First Amendment rights were clearly established.

It is long-established "that government retaliation against a private citizen for exercise of

First Amendment rights cannot be objectively reasonable." *Keenan*, 290 F.3d at 261 (citation omitted).[7] Moreover, each of the underlying First Amendment rights Villarreal exercised was clearly established at the time of the Individual Defendants' misconduct. The Fifth Circuit clearly established in February 2017 that citizens like Villarreal have a First Amendment right to film police activity in public. *Turner*, 848 F.3d at 687-90. And it has been long-established that state actors cannot punish speakers on the basis of viewpoint—the "First Amendment protects a significant amount of verbal criticism and challenge directed at police officers" and other officials. *Mesa*, 543 F.3d at 273 (citation and internal quotations omitted). A reasonable prosecutor would have understood that he could not retaliate against Villarreal for filming law enforcement activity in public, or because he disagreed with the content or viewpoints that she published.[8]

It also was clearly established that officials cannot punish a citizen for publishing accurate information about a matter of public concern that was rightfully obtained, as Villarreal did with the Targeted Publications. *E.g., Florida Star,* 491 U.S. 524 (holding that the First Amendment precluded a state from imposing damages for publication of rape victim's name obtained from government); *Daily Mail Publ. Co.,* 443 U.S. 97 (holding that a state cannot constitutionally punish the publication of a juvenile offender's name lawfully obtained from court records). This includes accurately publishing information received from government officials. *Id.* A reasonable prosecutor would have understood that he could not retaliate against Villarreal for publishing truthful information about a matter of public concern, even if the information came from an LPD officer.

Because Villarreal's First Amendment rights were clearly established, she meets her

---

[7] *See also Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("Official reprisal for protected speech offends the Constitution [because] it threatens to inhibit exercise of the protected right.") (internal quotation omitted).

[8] As the Supreme Court has consistently made clear, viewpoint-based discrimination of expressive activity is "'egregious form of content discrimination," and is "presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 828-29 (1995).

burden to overcome Alaniz's and Jacaman's assertion of qualified immunity.

**4. Alaniz's and Jacaman's misconduct was objectively unreasonable.**

**i. A reasonable prosecutor would have understood any investigation and arrest of Villarreal under the circumstances to be unconstitutional.**

Alaniz and Jacaman pin their assertion of qualified immunity on the faulty premise that Villarreal does not allege why they should have known § 39.06(c) was unconstitutional. (*E.g.,* Dkt. 26 pp. 10-12). But Alaniz and Jacaman miscomprehend the key aspect of their wrongful conduct—they never should have targeted Villarreal for criminal investigation and arrest. Villarreal details how Alaniz and Jacaman knew Villarreal's conduct related to the Targeted Publications was protected First Amendment activity, being the same newsgathering and publishing done by local media every day in Laredo. (FAC ¶¶ 105-06, 178). A reasonable prosecutor, knowing it would be unconstitutional to investigate and arrest Villarreal, would have declined to push the criminal process forward. (*E.g., id.* ¶¶ 79-81, 142).

But as Villarreal specifies, Alaniz and Jacaman agreed to investigate and arrest Villarreal for the Targeted Publications and to find a statute into which they could attempt to shoehorn Villarreal's protected activity to give the false impression of probable cause. (FAC ¶¶ 69-70, 84). Their unlawful retaliation, then, **started with their animus-driven decision to criminally target Villarreal**, regardless of the criminal statute Defendants ultimately asserted. (*Id.* ¶ 140). That they selected § 39.06(c), knowing no local authority had enforced it in 23 years, simply confirms the deliberate indifference of their unconstitutional conduct. (*Id.* ¶¶ 84, 141).

Moreover, Alaniz and Jacaman's application of §39.06 to Villarreal under the facts available to them was unconstitutional. A reasonable prosecutor would not have applied any criminal statute, let alone § 39.06(c), to Villarreal and the Targeted Publications. (*E.g,* FAC ¶¶ 78-82). Moreover, "where a statute authorizes conduct that is patently violative of fundamental

14

constitutional principles reliance on the statute does not immunize the officer's conduct." *Lawrence v. Reed*, 406 F.3d 1224, 1231-32 (10th Cir. 2005) (holding it was unreasonable for an officer to rely on a law allowing destruction of derelict automobiles without a hearing because the official could not reasonably have concluded that his actions were consistent with due process) (internal citation omitted); *see also Leonard v. Robinson,* 477 F.3d 347, 359 (6th Cir. 2007) (finding that "viewing the facts in the light most favorable to the plaintiff, no reasonable police officer would believe that any of the three other [] statutes relied upon by the district court are constitutional as applied to [plaintiff's] political speech during a democratic assembly.")[9]

The Supreme Court consistently has found a First Amendment right to publish accurate information lawfully obtained.[10] Most ordinary citizens—let alone any reasonable prosecutor— would have understood the outrageous manner in which Alaniz and Jacaman selected and applied §39.06(c) to violate core First Amendment liberties. Defendants' conduct, if condoned, would threaten felony arrest for any journalist or other citizen who asked for or received information from a public official and accurately published the same. The Constitution prohibits such a result.

Defendants' indefensible application of §39.06(c) also violated Texas's long-established "constitutional right of access to information concerning crime in the community, and to information relating to activities of law enforcement agencies." *Hous. Chronicle Publ'g Co. v. Houston*, 531 S.W.2d 177, 186 (Tex. Civ. App.—Houston [14th Dist.] 1975). And no reasonable

---

[9] *See also Carey v. Nevada Gaming Control Bd.*, 279 F.3d 873, 882 (9th Cir. 2002) (holding that it was unreasonable for an officer to rely on statutes requiring individuals at *Terry* stops to identify themselves because of the clearly established Fourth Amendment right not to identify oneself); *Aubin v. Columbia Cas. Company*, 272 F. Supp. 3d 828, 839 (M.D. La. 2017) ("Based on the Supreme Court's repeated and long-standing precedent validating the right of citizens to verbally criticize police officers no reasonable officer could rely on Louisiana's public intimidation statute to arrest a person who threatens to have them fired.") (citing *Lawrence* and *Carey*).

[10] *Florida Star,* 491 U.S. 524; *Daily Mail Publ. Co.,* 443 U.S. 97; *see also Oklahoma Publ. Co. v. Oklahoma County Dist. Court,* 430 U.S. 308 (1977) (finding that state could not constitutionally enjoin the publication of juvenile offender's name obtained in court proceeding).

prosecutor could have believed gaining popularity on Facebook justified arresting Villarreal for receiving newsworthy information from an LPD officer. (*E.g.,* FAC ¶ 76). This would create potential criminal liability for every publisher in the United States who wants others to read their content. That is a repugnant outcome by any standard, let alone clear First Amendment standards. Finally, a reasonable prosecutor would have known that §39.06(c) had never been enforced by local authorities and found this as another reason not to enforce it against Villarreal. (FAC ¶ 143).

The conduct of Alaniz and Jacaman as alleged was objectively unreasonable.[11] As Villarreal alleges, both had every reason to know they could not criminally punish Villarreal's First Amendment activity, yet they decided to do so anyhow. (FAC ¶¶ 84-85, 105-08, 116, 135). The Texas court's finding that §39.06(c) was unconstitutional merely affirmed the egregiousness of Defendants' decision to investigate and arrest Villarreal under an irredeemable statute. The Court should deny qualified immunity to Alaniz and Jacaman.

### ii.  No reasonable prosecutor could have found probable cause.

The lack of probable cause under § 39.06(c) also establishes objective unreasonableness. Law enforcement officials are not entitled to qualified immunity for First Amendment retaliatory arrests if "there was no actual probable cause for the arrest and the officers were objectively unreasonable in believing there was probable cause for the arrest." *Davidson v. City of Stafford*, 848 F.3d 384, 391 (5th Cir. 2017) (citation omitted). "Probable cause means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is

---

[11] *See Ballentine v. Las Vegas Metro. Police Dep't,* No. 2:14-cv-01584-APG-GWF, 2015 U.S. Dist. LEXIS 54720, at *10-12 (D. Nev. 2015) (rejecting qualified immunity where plaintiff alleged that defendants selectively enforced a statute restricting  speech on the basis of the viewpoint expressed); *Campbell v. City of New Kensington*, No. 05-0467, 2010 U.S. Dist. LEXIS 135268, at *37 (W.D. Pa. 2010) (denying qualified immunity on First Amendment retaliation claim); *Aubin*, 272 F. Supp. 3d at 839.

committing, or is about to commit an offense." *Id.* (quotation omitted). Importantly, law enforcement officials "generally have a duty to know the basic elements of the laws they enforce." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 258 (3d Cir. 2010).

Villarreal's allegations, when accepted as true, show Alaniz and Jacaman knew there were no "facts or circumstances" to suggest that (1) the information she published in the Targeted Publications was not publicly accessible or subject to a TPIA exception or (2) Villarreal published the information with the intent to receive an economic benefit—both of which are essential elements of § 39.06(c). (*E.g.,* FAC ¶¶ 35, 65-67, 72-78, 85, 88, 91, 93, 103, 132); *see also State v. Ford*, 179 S.W.3d 117, 122-23 (Tex. App.—San Antonio 2005, no pet.) (clearly establishing for Webb County officials that "prohibited from disclosure" as used in §39.06(c) means the set of TPIA exceptions). While Defendants generally state "that all government information is subject to release under the TPIA," they do not explain which TPIA exception a reasonable prosecutor could have relied in targeting Villarreal.[12] And here, Villarreal first received the information in the Targeted Publications from members of the public, something the Individual Defendants willfully ignored. (FAC ¶¶ 65-66).

The Court should refuse Defendants' suggestion that Villarreal's arrest was lawful because she did not make a TPIA request to obtain the information in the Targeted Publications. (Dkt. 26 pp. 11-12). Texas law does not require that a person ask for or receive information from the government only through the TPIA process. Nor could it, given the obvious unconstitutionality of so restricting a person's ability to ask her government for information.

Villarreal also specifies that at all relevant times, Alaniz and Jacaman knew she did not use her Facebook page for economic gain. (FAC ¶ 93). Ruiz's statements in his arrest warrant

---

[12] Indeed, the TPIA requires that elected and appointed officials undergo TPIA training. TEX. GOV. CODE § 552.012

affidavits stated only that Villarreal releasing the information before others would gain her popularity on Facebook. (*Id.* ¶ 92). This exemplifies how far the Individual Defendants strained to cause Villarreal's arrest. No reasonable officer could have found probable cause. The Court should reject Defendants' argument that because  "whether or not a suspect published information for 'economic gain' may not be known when a warrant is issued," probable cause could have existed. (Dkt. 26 p. 11). That makes little sense, particularly in the context of an investigation and the principle that officials are charged with knowing a statute's elements.

It is also clearly established as unconstitutional that an official cannot submit material falsehoods or omissions in an arrest warrant affidavit, which taint any resulting arrest warrant. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Villarreal details how Defendant Ruiz made material misrepresentations and omissions in his arrest warrant affidavits—including omitting any details about an applicable TPIA exception or any economic benefit. (FAC ¶¶ 88-94). Villarreal details how Jacaman, with Alaniz's endorsement, assisted with and approved these tainted affidavits. (*Id.* ¶¶ 85-86, 88, 104, 114).  No reasonable law enforcement official would have manufactured deficient affidavits to cause arrest warrants to issue.[13] Defendants do not address these allegations. (*See* Dkt. 26 pp. 10-12).

Villarreal's allegations, when taken as true, show that Alaniz and Jacaman are not entitled to qualified immunity on Villarreal's' First Amendment claims.

### C. Alaniz and Jacaman are not entitled to qualified immunity on Villarreal's Fourth Amendment wrongful arrest claim.

The right to be free from arrest without probable cause was clearly established. *Mangieri*

---

[13] *E.g., Mills v. City of Bogalusa,* 112 F. Supp. 3d 512, 518 (E.D. La. 2015) (finding no qualified immunity on First Amendment retaliation claims where allegations were that defendant police officers allegedly provided false statements that led to the speaker's arrest); *see also Spencer v. Staton*, 489 F.3d 658, 663 (5th Cir. 2007) (reversing grant of qualified immunity where "as a matter of law, a reasonable police officer could [not] have believed the evidence he had was sufficient to constitute probable cause" sufficient to justify an arrest warrant).

*v. Clifton,* 29 F.3d 1012, 1016 (5th Cir. 1994). Officials who engage in conduct leading to a wrongful arrest are appropriate defendants to a wrongful arrest claim, even if they did not make the physical arrest.[14] *See Garza v. Guerra,* No. B-08-084, 2009 U.S. Dist. LEXIS 3304, at *18-19 (S.D. Tex. 2009). Villarreal's well-pled allegations show (i) there was no actual probable cause to arrest Villarreal, (ii) no reasonable prosecutor could have found otherwise and (iii) no reasonable prosecutor would have participated in manufacturing affidavits to give a false impression of probable cause.[15] Alaniz and Jacaman are barred from qualified immunity on Villarreal's wrongful arrest claim. *E.g. McLin,* 866 F.3d at 695 (finding allegations that "the [d]efendants met and conspired to create falsified affidavits for the purpose of obtaining arrest warrants" sufficient to show a Fourth Amendment violation).

### D. Alaniz and Jacaman are not entitled to qualified immunity on Villarreal's Equal Protection clause claim.

For selective enforcement and similar "class of one" equal protection claims, a plaintiff must allege "that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). It was clearly established at the time of Defendants' wrongful conduct that selective enforcement of a statute violates the equal protection clause. *Id; Bryan v. City of Madison*, 213 F.3d 267, 277 (5th Cir. 2000). It also was clearly established that a state actor could selectively enforce a statute if "motivated by improper considerations, such as race, religion, or **the desire to prevent the exercise of a constitutional right**." *Bryan*, 213 F.3d at 277 (emphasis added).

Villarreal's allegations, when taken as true, show that Alaniz and Jacaman intentionally

---

[14] Also, it has been clearly established since August 2017 that voluntary surrender to an arrest warrant is a Fourth Amendment seizure for purposes of a § 1983 claim. *McLin v. Ard*, 866 F.3d 682, 694-95 (5th Cir. 2017)

[15] *See Franks,* 438 U.S. at 155-58.

singled her out for enforcement of TEXAS PENAL CODE § 39.06(c). Villarreal specifies how they decided to target Villarreal under the statute despite knowing that no local authority had ever investigated, arrested, or prosecuted any person under the statute during its 23 years in effect. (FAC ¶¶ 84, 141, 177). Those persons included those similarly-situated to Villarreal, such as local journalists and citizens who routinely asked for and received information from LPD officials, and who accurately published that and other newsworthy information. (*Id.* ¶¶ 106, 177-78). Villarreal also details that the Defendants singled her out under the statute because they wanted to force her into stopping her style of citizen journalism that Defendants disliked. (*Id.* ¶¶ 68-69, 84-85, 195).

No reasonable prosecutor would have enforced § 39.06(c) against Villarreal under the circumstances, knowing that the law had never before been enforced locally, let alone against any similarly-situated persons. (FAC ¶ 84). Villarreal's allegations, when taken as true, show Alaniz and Jacaman were objectively unreasonable in selectively targeting Villarreal. They are not entitled to qualified immunity on Villarreal's equal protection claim.[16]  Defendants' silence on Villarreal's selective enforcement claim confirms this. (*See generally* Dkt 26).

### E.  Alaniz and Jacaman are not entitled to qualified immunity on Villarreal's § 1983 claim for conspiracy to deprive her constitutional rights.

Defendants label Villarreal's conspiracy claim "elaborate." (Dkt. 26 p. 10). But Villarreal's conspiracy claim is simple: (i) she published unflattering stories about Defendants, (ii) she committed no crimes, and (iii) the Individual Defendants agreed to dig up a law that they misapplied to argue local reporting was a crime, knowing, as any reasonable officer must, that such activity is constitutionally protected. (*E.g.,* FAC ¶¶ 188-89, 192-97).

---

[16] *E.g., Lacey,* 693 F.3d at 917, 920-22 (refusing to grant qualified immunity to special prosecutor alleged to have participated in singling out a journalist for arrest);  *Espinoza v. City of N.Y.*, 2012 U.S. Dist. LEXIS 110728, at *14 (S.D.N.Y. 2012) (finding no qualified immunity on selective enforcement claim where plaintiff alleged she was treated differently than similarly-situated vendors and that the "that the selective treatment was motivated by a desire to punish her for exercising her constitutional right to testify against the police.")

"To allege a civil conspiracy under § 1983, a plaintiff must establish "(1) the existence of a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990). Villarreal meets the first prong. She specifies that that Alaniz and Jacaman acted under color of state law. (FAC ¶¶ 10-11; 189). Villarreal details an agreement between Alaniz, Jacaman, and the LPD Defendants aimed at selectively investigating Villarreal and causing her unlawful arrest and detention to retaliate against her citizen journalism. (*Id.* ¶¶ 69, 102, 193). Villarreal specifies that Alaniz and Jacaman furthered the agreement by searching for a pretextual statute under which Defendants could manufacture arrest warrant affidavits. (*Id.* ¶¶ 69-70, 102, 194-95). Villarreal also details another agreement between all the individual Defendants, intended to harass and intimidate Villarreal in retaliation for her exercise of First Amendment rights. (*Id.* ¶¶ 57, 191).

Villarreal's allegations, when taken as true, also meet the second prong of a § 1983 conspiracy claim. As detailed above, Villarreal's allegations establish claims for deprivation of her First Amendment, Fourth Amendment, and Fourteenth Amendment rights. The FAC details how and why both the alleged agreements caused Alaniz and Jacaman to deprive Villarreal of these rights. (*E.g.,* FAC ¶¶ 54, 85-102, 135-147, 163-165, 174-184, 191, 194-96).

Finally, qualified immunity does not bar a conspiracy claim where it does not bar the underlying deprivation of rights, because the unconstitutionality of a conspiracy to deprive constitutional rights is clearly established.[17] Because qualified immunity does not bar Villarreal's First, Fourth, and Fourteenth Amendment claims, it does not bar her § 1983 conspiracy claim.

Villarreal has met her burden at this stage to show that Alaniz and Jacaman are not entitled

---

[17] *E.g, Adams v. City of New Orleans*, No. 15-1543, 2016 U.S. Dist. LEXIS 107534, at *21-22 (E.D. La. Aug. 12, 2016) (citing *Hill v. City of Seven Points*, 31 F. App'x 835 (5th Cir. 2002) and *Ryland v. Shapiro*, 708 F.2d 967, 974 (5th Cir. 1983)).

to qualified immunity on Counts I-IV. The Court should deny their motion to dismiss.

**V. The Court should deny Defendants' motion to dismiss as to Webb County.**

    **A.  Legal standards for § 1983 municipal liability.**

      The elements of a § 1983 municipal liability claim include "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)". *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002); *see also Groden v. City of Dallas*, 826 F.3d 280, 283-84 (5th Cir. 2016). A policy giving rise to § 1983 liability "may be officially promulgated by the governing body, by an official to which policy-making authority has been properly delegated, or by officials or employees of the municipality through a persistent, widespread practice that is so common and well settled as to constitute a custom that fairly represents municipal policy." *Culbertson v. Lykos*, 790 F.3d 608, 628 (5th Cir. 2015) (internal quotations omitted). A policymaker's single decision to adopt a particular course of conduct can subject a municipality to liability. *Pembaur v. City of Cincinnati*, 475 U.S. 469,  481-483 (1986).

      To defeat a 12(b)(6) motion on a municipal liability claim, a plaintiff needs only to "allege facts that show an official policy, promulgated or ratified by the policymaker, under which the municipality is said to be liable." *Groden*, 826 F.3d at 283-84 "In the context of municipal liability, as opposed to individual officer liability, it is exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery. Accordingly, "only minimal factual allegations should be required at the motion to dismiss stage" for pleading municipal liability. *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 842-43 (S.D. Tex. 2011); *see also Colle v. Brazos Cty.,* 981 F.2d 237, 245 (5th Cir. 1993) (reversing dismissal of  municipal liability claim, where allegations "cited with excruciating detail" a county's policies and underlying events causing a constitutional injury.)

### B. Villarreal has sufficiently alleged a Webb County policy.

Villarreal expressly alleges "an official Webb County policy intended to retaliate against and intimidate Villarreal for publishing authentic accounts of and commentary on newsworthy local matters, including those unfavorable to Defendants Alaniz and Jacaman, and to the WCDA generally." (FAC ¶ 121; *see also* ¶ 236). Villarreal further alleges the policy reflects a decision to restrict and interfere with Villarreal's citizen journalism, with the hope that she cease her protected activity. (*Id.* ¶ 237). These allegations are sufficient to defeat Defendants' motion to dismiss. To the extent Defendants suggest that a policy against one person cannot sustain a municipal liability claim, they offer no authority in support. (*See* Dkt. 26 p. 14). A policy against one is still a policy, and Villarreal's allegations suffice to show a § 1983 claim against Webb County.

### C. Villarreal's allegations show a nexus between the policy and final policymakers.

Villarreal's allegations, when taken as true, show that the Webb County Sheriff and Defendant Alaniz, in their capacity as final policymakers for Webb County, made decisions to adopt and act upon the policy that are fairly attributable to Webb County for § 1983 liability. The Fifth Circuit's decision in *Turner v. Upton County,* 915 F.2d 133 (5th Cir. 1990) is instructive. In *Turner*, the plaintiff "[i]n essence [] allege[d] that in her case the sheriff, in conspiracy with the district attorney, set an impermissible goal" to deprive the plaintiff of various rights. 915 F.2d at 136. Reversing a grant of summary judgment, the Fifth Circuit determined that the allegations sufficiently pled a § 1983 municipality liability claim against the county. *Id.* at 137-38. Because the county sheriff and district attorney could both be considered final policymakers, the court in *Turner* held that their "alleged participation in the conspiracy, if proven, will suffice to impose liability on the county." *Id.* (noting a "municipality may be held liable for the illegal or unconstitutional actions of its final policymakers themselves as they engage in the setting of goals and the determination of how those goals will be achieved.") (citing *Pembaur*).

Like the plaintiff in *Turner*, Villarreal's allegations suffice to show a nexus between the alleged policy and the acts and decisions of the County's final policymakers. She specifies how the Webb County Sheriff and Alaniz, as final policymakers for Webb County, acted in purposeful concert to deprive Villarreal of her rights. (FAC ¶¶ 119, 122-23, 238-39, 241). Defendants' unpersuasively argue that Alaniz was not a final policymaker. The Fifth Circuit has found a district attorney to be a county's final policymaker in the area of law enforcement. *E.g., Crane v. Texas,* 759 F.2d 412, 429-30 (5th Cir. 1985); *Turner*, 915 F.2d at 137. That a district attorney may at times serve as a state officer does not limit his ability to serve as a county's final policymaker. *Id.*

Defendants do not contest that the Webb County sheriff had final policymaking authority. They do assert that the sheriff was obligated by law to detain Villarreal and therefore his acts could not be in furtherance of an official policy. (Dkt. 26 pp. 15-16). But Defendants' assertion ignores the key aspect of Villarreal's allegations—that the sheriff's office had knowledge of and complied with the unconstitutional retaliation against Villarreal. (FAC ¶¶ 119, 122-123, 239, 241).

**D.   Villarreal's allegations meet the moving force prong.**

Villarreal's well-pled allegations show that the Webb County policy was a moving force behind the unconstitutional detention of Villarreal retaliating against her exercise of First Amendment rights. (*E.g.,* FAC ¶¶ 121, 236-237, 239, 242, 245-246). The Court should deny Defendants' motion as to Villarreal's claim against the County.

**VI. Villarreal's allegations show she is entitled to pursue injunctive and declaratory relief.**

Villarreal's claims for injunctive and declaratory relief defeat Defendants' motion to dismiss. First, absolute immunity and qualified immunity do not extend to injunctive or declaratory relief. *Chrissy F.*, 925 F.2d at 849. Thus, Alaniz and Jacaman's assertion of immunity does not apply to Villarreal's equitable claims.

Moreover, "[t]he loss of First Amendment freedoms, for even minimal periods of time,

unquestioningly constitute[s] irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Villarreal has alleged the Webb County policy of retaliation against her exercise of First Amendment rights remains in place. (FAC ¶¶ 235-237, 240, 248). Villarreal also details that Alaniz, after Villarreal's habeas petition was granted, suggested more investigation of the circumstances surrounding Villarreal's Target Publications. (*Id.* ¶¶ 129). An injunction is necessary to stop further harm to Villarreal's First Amendment activity. (*Id.* ¶¶ 147, 157, 160).

Villarreal also has sufficiently alleged a claim for declaratory relief. A federal declaratory judgment action requires an actual case or controversy. *E.g. MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 127 (2007) ("Our decisions have required that the dispute be 'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial'...."). "A party may pursue both injunctive and declaratory relief, and [a] court may grant declaratory relief even though it chooses not to issue an injunction or mandamus." *Robinson v. Hunt Cty.,* 921 F.3d 440, 450 (5th Cir. 2019) (internal quotation omitted). Villarreal has alleged facts showing there is a definite and real controversy between she and Defendants, including the threat of future retaliatory acts. (FAC ¶¶ 54, 129, 147, 157, 160, 235-237, 240, 248). She is entitled to proceed on her declaratory judgment claim.

**VII. Conclusion and Prayer.**

Villarreal's allegations, when taken as true as they must be at this stage, establish claims against Defendants for the violation of clearly established constitutional rights, to which no absolute or qualified immunity applies. The Court should deny Defendants' motion to dismiss.

Dated: July 2, 2019                                  Respectfully Submitted,

                                                     /s/ JT Morris
                                                     JT Morris
                                                     Texas State Bar No. 24094444
                                                     jt@jtmorrislaw.com
                                                     Ramzi Khazen
                                                     Texas State Bar No. 24040855
                                                     ramzi@jtmorrislaw.com
                                                     JT MORRIS LAW, PLLC
                                                     1105 Nueces Street, Suite B
                                                     Austin, Texas 78701
                                                     Telephone: (512) 717-5275
                                                     Fax: (512) 582-2948

                                                     **Attorneys for Plaintiff Priscilla Villarreal**

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 2, 2019, I electronically filed the foregoing with the Court using CM/ECF, and served on the same day all counsel of record via the CM/ECF notification system.

/s/JT Morris
JT Morris