United States District Court
Southern District of Texas

**ENTERED**

May 08, 2020

David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# LAREDO DIVISION

| | | |
|---|---|---|
| **PRISCILLA VILLARREAL,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 5:19-CV-48** |
| | § | |
| **THE CITY OF LAREDO, TEXAS,** *et al.*, | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM AND ORDER

Before the Court are (1) Defendants City of Laredo, Claudio Treviño, Jr., Juan L. Ruiz, Deyanira Villarreal, Enedina Martinez, Alfredo Guerrero, Laura Montemayor, and Does 1–2's Motion to Dismiss Pursuant to Rule 12(b)(6) to Plaintiff's First Amended Complaint (Dkt. No. 27) (the "City Defendants' Motion"); and (2) Defendants Isidro Alaniz, Marisela Jacaman and Webb County's Motion to Dismiss for Failure to State a Claim under FRCP 12(b)(6) to Plaintiff's First Amended Complaint (Dkt. No. 26) (the "County Defendants' Motion").

This case involves the balance between Plaintiff's First Amendment rights as a citizen journalist and the legal protections afforded to law enforcement officials for the decisions they make in their official capacities. Defendants arrested and attempted to prosecute Plaintiff under a Texas state statute later found to be unconstitutional. Plaintiff claims this was done in retaliation for previously publishing negative stories about Defendants on Facebook. Defendants have raised various legal defenses to Plaintiff's claims, including the defense of qualified immunity for the individual officials. The purpose of that doctrine is to protect "all but the plainly incompetent or those who knowingly violate the law." Plaintiff faces a high bar to overcome the defense of qualified immunity once it has been invoked by Defendants.

The Court has analyzed the parties' competing arguments in great detail. Although the Court recognizes the profound importance of the rights guaranteed to

citizens, such as Plaintiff in this case, the Court has ultimately determined that Plaintiff has not been able to overcome the claims of qualified immunity and the other arguments raised by Defendants' Motions.

For the reasons set forth in this Memorandum and Order, the City Defendants' Motion (Dkt. No. 27) is **GRANTED** and the County Defendants' Motion (Dkt. No. 26) is **GRANTED**.

## I. Background and Factual Allegations[1]

Plaintiff Priscilla Villarreal filed this action on April 8, 2019. (Dkt. No. 1). In her First Amended Complaint ("FAC") (Dkt. No. 24), Plaintiff asserts claims against the City of Laredo, Texas; Laredo's Chief of Police, Claudio Treviño ("Treviño"); several individual employees of the Laredo Police Department ("LPD"); Webb County, Texas; Webb County District Attorney ("WCDA") Isidro R. Alaniz ("Alaniz"); and Webb County Assistant District Attorney Marisela Jacaman ("Jacaman").

### A. Plaintiff's Online Reporting

Since 2015, Plaintiff has operated a Facebook page, titled "Lagordiloca News Laredo Tx" ("Lagordiloca Facebook page"), where she shares video footage and live video streams of crime scenes, traffic incidents, and other events in the Laredo, Texas, area. (Dkt. No. 24 ¶¶ 24–28). The Lagordiloca Facebook page contains Plaintiff's own live and recorded video footage, recorded videos, photographs, and information from other citizens or news sources on local crime, traffic, missing persons, and fundraising events. (*Id.* ¶¶ 32–34). Plaintiff also shares information that she receives from LPD spokesman Jose Baeza ("Baeza") about local crime and public safety matters. (*Id.*).

In addition to news content, Plaintiff posts promotions for local businesses and is sometimes paid for those promotions. (*Id.* ¶¶ 34–35). Plaintiff has also used the Lagordiloca Facebook page to request donations for new equipment for her reporting. (*Id.*). However, Plaintiff alleges that she does not receive a regular income or other

---

[1] For the purpose of this analysis, the Court must accept as true Plaintiff's allegations as set forth in the First Amended Complaint. (Dkt. No. 24); *see Rosenblatt v. United Way of Greater Houston*, 607 F.3d 413, 417 (5th Cir. 2010).

regular economic gain from the Lagordiloca Facebook page. (*Id.* ¶ 35).

The Lagordiloca Facebook page has over 120,000 followers. (*Id.*). Local residents use the page as a source of local information and also comment on local events and news. (*Id.*). Plaintiff posts her own commentary, which she describes as "colorful," and strives to provide an "authentic and real-time look at Laredo crime and safety, government conduct, and other newsworthy events in the city." (*Id.* ¶¶ 33, 39–40).

Plaintiff's activity on the Lagordiloca Facebook page frequently includes live video streams and recorded videos about activities of LPD officers. (*Id.* ¶ 42). When recording or live streaming LPD activity, Plaintiff alleges that she takes care to record only from public places and not to interfere with law enforcement activities. (*Id.* ¶ 43). Plaintiff alleges that she has posted a recorded video of police activity following a hostage and homicide situation in which LPD officers shot and killed the captor; a live video feed showing LPD officers choking and using force on an arrestee at a traffic stop; a live video feed of a police shooting; and live videos of other LPD activities, including arrests, traffic accident scenes, and crime scenes. (*Id.* ¶ 45). Sometimes Plaintiff has posted follow-up videos with her commentary, both positive and negative, about the LPD activities depicted. (*Id.*).

Plaintiff alleges that in 2015, she posted images and commentary about a malnourished horse and alerted local law enforcement to the problem. (*Id.* ¶¶ 48–50). When officers arrived at the property, they found other animals in similar conditions. (*Id.*). Plaintiff alleges the property was owned by Patricia Jacaman, a relative of Defendant Jacaman. (*Id.*). On the Lagordiloca Facebook page, Plaintiff criticized the Webb County District Attorney's failure to prosecute Patricia Jacaman. (*Id.*).

### B. Allegations of Retaliation and Interference

Plaintiff alleges that Defendants have singled out and subjected Plaintiff to a pattern of harassment, intimidation, and indifference. (*Id.* ¶¶ 51–53). Plaintiff alleges that Defendants City of Laredo and Webb County, and various officials and employees— including Defendants Treviño, Juan L. Ruiz ("Ruiz"), Deyanira Villarreal ("DV"),[2]

---

[2] Plaintiff refers to Defendant Deyanira Villarreal as "DV" to avoid confusion with Plaintiff. (Dkt. No. 24 ¶ 15 n.3). The Court follows the same convention in this Memorandum and Order.

Enedina Martinez ("Martinez"), Alfredo Guerrero ("Guerrero"), Laura Montemayor ("Montemayor"), Does 1–2, Alaniz, and Jacaman—have interfered with and retaliated against Plaintiff's efforts to (a) lawfully gather and publish information about local concern; (b) film and record police activity in public areas; and (c) criticize local officials and provide a forum for others to do so. (*Id.* ¶ 53).

Plaintiff's FAC sets forth several examples of what she alleges were "hostile, defamatory, and indifferent acts," including: (a) Martinez falsely telling other LPD officers that Plaintiff is a five-time convicted felon; (b) Montemayor threating to take Plaintiff's phone—and to keep it as evidence—while Plaintiff was using her phone to record a live video feed of the scene of a shooting from a public area; (c) Guerrero harassing and intimidating Plaintiff without justification while she was working a traffic incident for her employer; (d) LPD treating Plaintiff with indifference when she called and spoke to LPD officers about a sexual assault; (e) Defendants deliberately treating Plaintiff differently than other journalists and media members, including withholding from Plaintiff information generally released to local newspapers and broadcasters; (f) Alaniz telling Plaintiff during a closed-door meeting that he did not appreciate Plaintiff criticizing his office; and (g) members of the City of Laredo City Council (the "Laredo City Council") initially attacking and obstructing a proposal to construct and name a reading kiosk at a local park after Plaintiff's late niece. (*Id.* ¶¶ 54(a)–(g)). Plaintiff contends these acts show a policy and pattern of conduct by Defendants in retaliation for negative information and comments published by Plaintiff. (*See, e.g.*, *id.* ¶¶ 56–57).

### C. Webb County Arrest Warrants

On April 11, 2017, Plaintiff published a story on the Lagordiloca Facebook page about a man who committed suicide by jumping off a public overpass in Laredo. (*Id.* ¶ 65). Plaintiff published the name of the man and identified his employer as the United State Customs and Border Protection agency. (*Id.*). Plaintiff alleges that she learned this information from a janitor who worked near the overpass, and that she later received corroborating information from LPD Officer Barbara Goodman ("Goodman"). (*Id.* ¶ 65).

On May 6, 2017, Plaintiff posted a live video feed of a fatal traffic accident on her

Lagordiloca Facebook page. (*Id*. ¶ 66). She published the location of the accident, and information about the family involved. (*Id*.). Plaintiff first learned this information from a relative of the family who saw the live video feed on the Lagordiloca Facebook page. (*Id*.) Plaintiff later received corroborating information from Goodman. (*Id*.).

Plaintiff alleges that Ruiz, an investigator for LPD, subsequently made statements in support of two criminal complaints and affidavits in support of warrants for Plaintiff's arrest based on the April 11, 2017 and May 6, 2017 posts (collectively, the "Subject Publications"). (*Id*. ¶¶ 86–90). Ruiz's statements alleged that Plaintiff violated the Texas Misuse of Official Information statute, which provides:

> [a] person commits an offense if, with intent to obtain a benefit or with intent to harm or defraud another, he solicits or receives from a public servant information that:
> (1) the public servant has access to by means of his office or employment; and
> (2) has not been made public.

(*Id*. ¶ 72) (citing Tex. Penal Code § 39.06(c) ("§ 39.06(c)")). The statute defines "information that has not been made public" as "any information to which the public does not generally have access, and that is prohibited from disclosure under" the Texas Public Information Act ("TPIA"). (Dkt. No. 24. ¶ 72 (citing Tex. Penal Code § 39.06(c))).

Plaintiff alleges that she had previously published posts similar to the Subject Publications, including a 2015 post about a local suicide, but she had never before been investigated for breaking any law. (*Id*. ¶ 67). Plaintiff further alleges that LPD, the Webb County District Attorney, and the Webb County Sheriff's Office ("WCSO") had never arrested, detained, or prosecuted any person under § 39.06(c). (*Id*.).

On December 5, 2017, two warrants were issued for Plaintiff's arrest (the "Arrest Warrants"). (*Id*. ¶ 95). Plaintiff alleges the Arrest Warrants were issued because of misstatements and omissions in Ruiz's affidavits (the "Arrest Warrant Affidavits"), and that no other LPD officer provided an affidavit or statement in support of the arrest warrants. (*Id*. ¶¶ 87, 95). In the Arrest Warrant Affidavits, Ruiz asserted that Plaintiff violated § 39.06(c) and that probable cause existed. (*Id*. ¶ 88). Ruiz named DV as an officer who participated in the investigation leading to the Arrest Warrant Affidavits and

identified Jacaman as "signing off" on subpoenas concerning the investigation of Plaintiff. (*Id.* ¶ 88). Jacaman signed an "Arrest Warrant Approval Form," dated November 21, 2017, to which the Arrest Warrant Affidavits were attached. (*Id.*).

Ruiz alleged in the Arrest Warrant Affidavits that Plaintiff had received or solicited the name and condition of a traffic accident victim and the name and identification of a suicide victim, and that the information Plaintiff published in the Subject Publications "had not been made public." (*Id.* ¶ 89). Ruiz also alleged that an unnamed source told DV that Plaintiff received this information from Goodman, who communicated with Plaintiff. (*Id.*). Ruiz alleged that Plaintiff gained additional followers on her Lagordiloca Facebook page by publishing this news before other news outlets. (*Id.* ¶ 92).

### D. Arrest, Detention, and Release of Plaintiff

After learning of the Arrest Warrants and LPD's intent to arrest her, Plaintiff turned herself in on December 13, 2017. (*Id.* ¶ 96). After Plaintiff was taken from booking, she alleges that numerous LPD officers and employees—including Martinez, Montemayor, and Guerrero—surrounded Plaintiff, as various individuals laughed at her, took pictures with their cell phones, and "otherwise show[ed] their animus toward [Plaintiff] with an intent to humiliate and embarrass her." (*Id.* ¶ 97).

After being detained at the Webb County Jail, Plaintiff posted bond and was released. (*Id.* ¶ 124). On February 14, 2018, Plaintiff filed a petition for a writ of habeas corpus in Webb County District Court. (*Id.*). On March 28, 2018, Judge Monica Z. Notzon of the 111th District Court of Webb County, Texas held, in a bench ruling, that § 39.06(c) was unconstitutionally vague. (*Id.* ¶ 127).[3] Webb County did not appeal the ruling. (*Id.* ¶ 128).

Alaniz was subsequently quoted in a local paper stating that LPD had not dropped the "investigation" and would continue to investigate in order to identify who in the department provided Plaintiff with the information she published in the Subject Publications. (*Id.* ¶ 129).

---

[3] Defendants state that no order has ever been issued on Judge Notzon's March 28, 2018 ruling. (Dkt. No. 27 at 9 n.2).

### E. Plaintiff's § 1983 Complaint

On April 8, 2019, Plaintiff filed a complaint in this Court. (Dkt. No. 1). Plaintiff filed her FAC on May 29, 2019. (Dkt. No. 24). The FAC asserts claims against the Individual Defendants pursuant to 42 U.S.C. § 1983 ("§ 1983") for retaliation and interference with Plaintiff's First Amendment-protected activity ("Count I"); unlawful arrest and detention in violation of the Fourth and Fourteenth Amendments ("Count II"); deprivation of equal protection under the Fourteenth Amendment ("Count III"); and civil conspiracy to deprive Plaintiff of constitutionally-protected rights ("Count IV"). (*Id.*). The FAC alleges a supervisory liability claim against Treviño ("Count V"); and municipal liability claims against the City of Laredo ("Count VI") and Webb County ("Count VII"). The FAC also seeks declaratory relief against all Defendants for alleged ongoing conduct to retaliate against and interfere with Plaintiff's First Amendment-protected activity ("Count VIII"). (Dkt. No. 24 at 47–54). Finally, the FAC seeks injunctive relief with respect to all of Plaintiff's claims. (*Id.*).

Defendants filed the pending Motions, seeking dismissal of all of Plaintiff's claims asserted against all Defendants. (Dkt. Nos. 26, 27). Defendants City of Laredo, Treviño, Ruiz, DV, Martinez, Guerrero, Montemayor, and Does 1–2 (collectively, the "City Defendants") move for dismissal of Counts I–VI and Count VIII. (Dkt. No. 27). Defendants Webb County, Alaniz, and Jacaman (collectively, the "County Defendants") move for dismissal of Counts I–VI, Count VII, and Count VIII. The parties have fully briefed both Motions and presented oral argument on the Motions. (*See* Min. Entry dated Sept. 10, 2019). The Court ordered the parties to submit supplemental briefs on specific issues, which the Court considers as part of the pending Motions. (*Id.*; Dkt. Nos. 48–50).

## II. Legal Standard

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must determine whether a plaintiff has stated a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). At the motion to dismiss stage, courts are "limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing

*Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000)).

To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotations omitted). "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). This does not require detailed factual allegations but does require "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. The Court must "accept as true all well-pleaded facts." *Rosenblatt*, 607 F.3d at 417. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## III. Discussion

### A. Absolute Prosecutorial Immunity

Alaniz and Jacaman contend that they have absolute immunity as to all claims asserted against them individually. (Dkt. No. 26 at 7). Prosecuting attorneys have absolute immunity from liability for conduct in their prosecutorial function. *Imbler v. Pachtman*, 424 U.S. 409, 424 (1976). "Absolute immunity protects a prosecutor even if the prosecutor acts in bad faith or with ulterior motives, so long as he or she acts within the scope of his or her prosecutorial functions." *Charleston v. Pate*, 194 S.W.3d 89, 91 (Tex. App.—Texarkana, 2006, no pet.). However, the actions of a prosecutor are not subject to absolute immunity merely because they are performed by a prosecutor. Absolute immunity is justified only where "any lesser degree of immunity could impair the judicial process itself." *Kalina v. Fletcher,* 522 U.S. 118, 127 (1997) (internal citation omitted). Conversely, qualified immunity "represents the norm for executive officers, so when a prosecutor functions as an administrator rather than as an officer of the court he is entitled only to qualified immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) (internal citations omitted). The official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question. *Id*. at 268–69. Thus,

a prosecutor seeking absolute immunity must prove that he was acting as an advocate for the state. *Id*. at 273–74.

Alaniz and Jacaman contend they were acting as prosecutors in every action alleged in Counts I through IV. (Dkt. No. 26 at 7). Courts apply a "functional approach" to determine whether an attorney's conduct is within the scope of an attorney's prosecutorial functions. *Buckley*, 509 U.S. at 269. The functional approach "looks to the nature of the function performed, not the identity of the actor who performed it." *Id*. (internal citation omitted). "Prosecutorial functions are those acts representing the government in filing and presenting criminal cases, as well as other acts that are 'intimately associated with the judicial process.'" *Charleston*, 194 S.W.3d at 90.

Courts distinguish between "the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand." *Buckley*, 509 U.S. at 273. "When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect one and not the other." *Id*. at 273 (internal citation omitted). "A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Id*. at 274.

Plaintiff alleges Alaniz and Jacaman "manufacture[d] criminal complaints, a search warrant affidavit and approval, and arrest warrant affidavits and approvals with the intent that [Plaintiff] be arrested and detained in order to coerce her into ceasing her citizen journalism efforts." (Dkt. No. 24 ¶ 85). In addition, Plaintiff alleges:

- Alaniz, in a closed-door meeting with other city officials, rebuked [Plaintiff] for her criticism of WCDA and Jacaman's relative with the intent to intimidate her from further publishing such criticism (*id.* ¶¶ 54–55);

- Alaniz and Jacaman agreed with LPD officials to retaliate against [Plaintiff] for the exercise of her First Amendment rights, and formulated a decision to do the same, before the criminal investigation of [Plaintiff] began (*id.* ¶¶ 69, 99, 102, 190);

- Alaniz and Jacaman were instrumental in searching for and selecting a criminal statute under which to target [Plaintiff] (*id.* ¶¶ 70–71, 84, 113, 165);

- Alaniz and Jacaman participated in and directed the criminal investigation of

[Plaintiff] and the causing of her arrest (*id.* ¶¶ 112, 114, 116–117);

- Alaniz and Jacaman participated in the preparation of misleading and purposefully deficient arrest warrant affidavits (*id.* ¶¶ 86, 104, 114, 165); and

- Jacaman, with Alaniz's endorsement, personally approved the Arrest Warrant Affidavits knowing they included material misrepresentations and omissions (*id.* ¶ 88).

Defendants argue in a conclusory fashion that absolute immunity bars Plaintiff's claims against Alaniz and Jacaman and assert, without citing authority, that their conduct in preparation of the Arrest Warrant Affidavits was "part of the initiating and pursuing a criminal prosecution" for which they are entitled to absolute immunity. (Dkt. No. 26 at 7) (internal citation omitted).

In their briefing and at oral argument, the County Defendants emphasize the Fifth Circuit's holding in *Ortiz v. Montgomery County*, 774 F. App'x 894 (5th Cir. 2019), an unpublished *per curiam* opinion. In *Ortiz*, the district attorney's office had allegedly applied for a warrant to arrest the plaintiff, a referee for a school district's sporting events, based on a statute prohibiting employees of a school from committing certain sexual acts with a student enrolled at that school. *Id.* at 894. Subsequently, in an unrelated case, a Texas Court of Criminal Appeals interpreted the statute and held that certain workers are not "employees" under the statute. The district attorney then dropped its charges against the plaintiff, having determined that he was not a school "employee" under the new interpretation of the statute. *Id.* The Fifth Circuit affirmed the district court's dismissal of the complaint, finding that "the prosecutors' actions in this case fall squarely within" absolute immunity, as it is "well settled that absolute immunity applies when a prosecutor prepares to initiate a judicial proceeding, or appears in court to present evidence in support of a search warrant application." *Id.* at 895 (internal citation omitted). The Fifth Circuit also noted that the plaintiff's "only allegations to the contrary [were] conclusory and hence irrelevant." *Id.*

Here, Defendants contend Plaintiff's argument was rejected by the Fifth Circuit in *Ortiz*. (Dkt. No. 43 at 2–3). The Court finds, however, *Ortiz* does not control here. While the Fifth Circuit's unpublished opinion in *Ortiz* does not comprehensively recount the underlying factual allegations, it characterizes the prosecutors' conduct as "'prepar[ing] to initiate a judicial proceeding[ ] or appear[ing] in court to present evidence in support

of a search warrant application.'" 774 F. App'x at 895 (quoting *Van de Kamp v. Goldstein*, 555 U.S. 335, 343 (2009)). In contrast, there is no allegation in this case that Alaniz or Jacaman filed charges against Plaintiff or appeared in court to present evidence in support of the Arrest Warrant Affidavits. More pertinent here is the Supreme Court's holding in *Malley v. Briggs*: "In the case of the officer applying for a warrant, it is our judgment that the judicial process will on the whole benefit from a rule of qualified rather than absolute immunity." 475 U.S. 335, 343 (1986).[4]

Defendants also cite a Texas Court of Appeals case, *Charleston*, 194 S.W.3d at 90, holding that an attorney was acting as a prosecutor where he "collaborated in the filing and prosecution of the aggravated robbery charge" and represented the state in three habeas corpus petitions seeking release from incarceration. (Dkt. No. 26 at 5). This is insufficient to overcome the clear holding of *Malley* that a prosecutor is entitled to qualified, but not absolute, immunity for his role in applying for a warrant. 475 U.S. at 341. Defendants are unlike the prosecutor in *Charleston*. No charges were filed against Plaintiff, nor do they contend they represented the state any judicial proceedings concerning Plaintiff. It is Defendants' burden to show entitlement to absolute immunity,[5] and Defendants' authority does not show that their alleged conduct was part of their prosecutorial functions entitled to absolute immunity. Furthermore, the Defendants' alleged conduct does not implicate "the same considerations of public policy that underlie the common-law rule" of absolute immunity. *Imbler*, 424 U.S. at 424.

Therefore, the Court finds that Alaniz and Jacaman's alleged conduct relating to advising LPD, investigating, preparing, and authorizing the Arrest Warrant Affidavits

---

[4] The County Defendants also cite *Shipman v. Sowell*, 766 F. App'x 20 (5th Cir. 2019) in their supplemental brief, to support their absolute immunity argument. (Dkt. No. 43 at 3). The Court finds that *Shipman* does not apply here because the plaintiff in *Shipman* was indicted and it was not disputed that the prosecutor's conduct fell within his prosecutorial capacity. 766 F. App'x at 26.

[5] The FAC also alleges that Alaniz and Jacaman were responsible for training, supervising, and employing individuals within the Webb County District Attorney's Office and LPD. (Dkt. No. 24 ¶ 117). The County Defendants contend the allegation that Alaniz or Jacaman were responsible for training local law enforcement is meritless. However, Plaintiff appears to have abandoned any allegation that Alaniz or Jacaman is liable for a failure to train officers, as she does not address this argument in her response to the County Defendant's Motion. (*See* Dkt. No. 30).

is not entitled to absolute immunity.

### B. Qualified Immunity

Section 1983 provides a private right of action for the deprivation of rights, privileges, and immunities secured by the Constitution or laws of the United States. 42 U.S.C. § 1983. In a § 1983 suit, officers may be sued in their individual and/or official capacities. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991). A complaint against officers sued individually under § 1983 must allege that the conduct was committed by a person acting under color of state law and that the complaining parties were deprived of rights guaranteed by the Constitution or laws of the United States. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Piotrowski v. City of Houston* (*Piotrowski I*), 51 F.3d 512, 515 (5th Cir. 1995). Plaintiffs suing public officials under § 1983 must file short and plain complaints that are factual and not conclusive. *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995) (en banc).

Public officials acting within the scope of their official duties are shielded from liability under the doctrine of qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity applies regardless of whether the government official's error was a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "When a defendant invokes qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense." *Club Retro LLC v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009). "A plaintiff must clear a significant hurdle to defeat qualified immunity." *Brown v. Lyford*, 243 F.3d 185, 190 (5th Cir. 2001). Qualified immunity is designed to shield from civil liability "all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341.

The test for qualified immunity involves a "two-step analysis: (1) whether [a plaintiff has] stated a violation of their First Amendment rights; and if so, (2) whether [the defendants'] conduct was objectively reasonable in light of clearly established law." *Powers v. Northside Sch. Dist.*, 951 F.3d 298, 305–06 (5th Cir. 2020) (citing *Salas v.*

*Carpenter*, 980 F.2d 299, 305–06 (5th Cir. 1992)). The Court may address the two steps in any order. *See id.* "The second prong of the qualified immunity test is better understood as two separate inquiries: whether the allegedly violated constitutional rights were *clearly established at the time of the incident*; and, if so, whether the conduct of the defendant[ ] was objectively unreasonable in the light of that then clearly established law." *Id.* at 306 (citing *Hare v. City of Corinth, Miss.*, 135 F.3d 320, 326 (5th Cir. 1998)) (internal citation omitted). Thus, even if an official violates a person's civil rights, the official may still be entitled to qualified immunity if the conduct is objectively reasonable. *See id.*; *see also Sanchez v. Swyden*, 139 F.3d 464 (5th Cir. 1998).

"Objectively reasonable" means that, given the totality of the circumstances confronting the official, viewed objectively, the action was justified. *See Ashcroft v. Al-Kidd*, 563 U.S. 731, 736 (2011). Whether an official's conduct is objectively reasonable depends upon the circumstances confronting the official as well as clearly established law in effect at the time of the official's actions. *Sanchez*, 139 F.3d at 467. "We ask whether the circumstances, viewed objectively, justify the challenged action. If so, that action was reasonable *whatever* the subjective intent motivating the relevant officials." *Al-Kidd*, 563 U.S. at 736 (internal citations omitted). The Court may address the requirements in any order it chooses. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *Pearson*, 555 U.S. at 236.

In a qualified immunity inquiry, "whether the conduct of which the plaintiff complains violated clearly established law" is an "essentially legal question." *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). For immunity to apply, the "actions of the officer must be objectively reasonable under the circumstances, such that a reasonably competent officer would not have known his actions violated then-existing clearly established law." *Id.* (internal citations omitted).

### 1. Count II: § 1983 Claim under Fourth Amendment

Because Plaintiff's claims primarily arise from her investigation and arrest under § 39.06(c), allegedly without probable cause, the Court first addresses Plaintiff's Fourth

Amendment claim under § 1983 (Count II). Plaintiff alleges Alaniz, Jacaman, Treviño, Ruiz, DV, and Does 1–2,

> (a) knowingly manufactured allegations under a pretextual application of Texas Penal Code § 39.06, upon which no reasonable official would have relied under the circumstances; (b) knowingly prepared and obtained a warrant for Plaintiff's arrest under false pretenses; and (c) knowingly arrested and detained her and/or caused her arrest and detention without probable cause and against her will, based on a knowing or deliberately indifferent wrongful application of [§ 39.06(c)].

(Dkt. No. 24 ¶ 165).

The existence of probable cause for an arrest defeats a § 1983 claim for unlawful arrest and false imprisonment. *Pfannstiel*, 918 F.2d at 1183. A reasonable person standard is used to establish probable cause. *Id.* Probable cause exists "when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Glenn v. City of Tyler,* 242 F.3d 307, 313 (5th Cir. 2001) (quoting *Spiller v. Tex. City,* 130 F.3d 162, 165 (5th Cir. 1997)); *accord Maryland v. Pringle*, 540 U.S. 366, 370–71 (2003); *see also Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). "[T]here must not even 'arguably' be probable cause for the search and arrest for immunity to be lost." *Lyford*, 243 F.3d at 190 (internal citation omitted). Thus, qualified immunity shields officers from liability if, given the law and information known at the time, a reasonable officer could have believed the arrest was lawful. *Ventura v. Hardge*, No. CA 3:99-CV-1468-R, 2000 WL 1123262, *3 (N.D. Tex. Aug. 7, 2000), *aff'd*, 248 F.3d 1143 (5th Cir. 2001); *see also Messerschmidt v. Millender*, 565 U.S. 535, 556 (2012) (citing *Malley*, 475 U.S. at 341) (holding that officers were entitled to qualified immunity where the arrest warrant "was not so obviously lacking in probable cause that the officers can be considered 'plainly incompetent'").

Plaintiff contends the information contained in the Arrest Warrant Affidavits failed to satisfy the elements of the offense defined in § 39.06(c). Specifically, Plaintiff

contends the Arrest Warrant Affidavits failed to allege that Plaintiff (1) had the intent required under § 39.06, and (2) sought or received information that was not generally available to the public or that the information was excepted from disclosure under TPIA. (Dkt. No. 24 ¶¶ 90–93). Plaintiff's factual allegations with respect to the Arrest Warrant Affidavits are set forth *supra* Part I(C).

First, Plaintiff alleges the Arrest Warrant Affidavits failed to address the statute's intent requirement by failing to allege that Plaintiff "intended to enjoy an economic advantage or gain from the request for or receipt of the information in the [Subject Publications]." (Dkt. No. 24 ¶ 92). Plaintiff further alleges that "[a]ny reasonable official would have understood that the 'benefit' element of the Statute required a showing of economic gain or advantage," and that "[n]o reasonable official would have determined [Plaintiff] gathered and published the information in the [Subject] Publications with the intent of economic gain or advantage." (*Id.* ¶ 76). Under Texas Penal Code § 1.07(a)(7), "benefit" is defined as "anything reasonably regarded as economic gain or advantage." (*See id.* ¶ 74).

However, Plaintiff does not contend that she has never received any economic benefit from reporting police information on the Lagordiloca Facebook page. To the contrary, Plaintiff admits that she "sometimes enjoys a free meal from appreciative readers, and occasionally receives fees for promoting a local business [and] has used her Lagordiloca Facebook page to ask for donations for new equipment necessary to continue her citizen journalism efforts." (Dkt. No. 24 ¶ 35).[6] Based on these admissions, the Court is unable to find that no reasonable officer would have believed Plaintiff intended to gain economically from the receipt of information from Goodman. Accordingly, the Court finds Plaintiff has not alleged plausible facts to support an inference that no reasonable officer could have found probable cause as to the benefit element of the statute.

---

[6] Defendants contend the officers "had reason to believe that Plaintiff was deriving an economic benefit from her Facebook journalism in the form of sponsors." (Dkt. No. 27 at 10). In support, Defendants cite a March 10, 2019 *New York Times* article that discusses local restaurants hiring Plaintiff to advertise and promote their businesses. (*Id.*). However, as Plaintiff was arrested in 2017, the article cannot have formed the basis for probable cause, and therefore the Court affords it no weight in this analysis.

Second, Plaintiff contends there was no probable cause as to the statute's requirement that the information sought or received "has not been made public." § 39.06(c)(2). Plaintiff acknowledges the Arrest Warrant Affidavits stated that the information she received from Goodman "had not been made public." (Dkt. No. 24 ¶ 89). However, Plaintiff contends Ruiz's statements failed to establish probable cause because the information did not meet the definition of "information that has not been made public" set forth in § 39.06(d), i.e.,: "any information to which the public does not generally have access, and that is prohibited from disclosure under" the TPIA. Tex. Penal Code § 39.06(d).

Plaintiff suggests the information she received from Goodman does not meet the statute's definition of "information that has not been made public" because Plaintiff first heard the information from other individuals who were not City or County officers. Plaintiff has not pointed to any legal authority to support this interpretation of § 39.06(d). *See* § 39.06(d) (defining "information that has not been made public" as "any information to which the public does not *generally* have access") (emphasis added). And Plaintiff's interpretation misses the point. The fact that Plaintiff received the information from someone with personal knowledge of those facts—a witness or a family member for example—does not equate to the information being "made public." Instead, Plaintiff alleges that certain Defendants "deliberately did not question or attempt to question [Plaintiff] about the circumstances of her access to the information in the [Subject Publications], in furtherance of their efforts to manufacture the Arrest Warrant Affidavits and cause the arrest of [Plaintiff] without probable cause." (Dkt. No. 24 ¶ 91).

The Court finds Plaintiff has failed to support a plausible inference that no reasonable officer could have found that the information at issue was public and therefore subject to the statute. Moreover, Plaintiff has failed to show that Defendants were under an obligation to interview Plaintiff about how she obtained the information in the Subject Publications. While an officer may not ignore potentially exculpatory evidence once he has obtained evidence from a reasonably credible source, he has "no constitutional obligation to conduct any further investigation before making an arrest." *Woods v. City*

16 / 59

*of Chicago*, 234 F.3d 979, 997 (7th Cir.), *cert. denied*, 534 U.S. 955 (2001).

In this case, Ruiz alleged in the Arrest Warrant Affidavits that an unnamed source, whom Plaintiff identifies "on information and belief" as Doe 1 or Doe 2, informed DV that Goodman was communicating with Plaintiff. (Dkt. No. 24 ¶ 88). Plaintiff has neither alleged the unnamed source was suspect or unreliable, nor has she alleged any other circumstances that would have required the officers to conduct further investigation into how Plaintiff received the information. To the contrary, this allegation supports an inference that Defendants reasonably believed probable cause existed. *Cf. Shipman*, 766 F. App'x at 28 (holding that an officer's affidavit demonstrated probable cause where it contained, inter alia, "the actual complaint of a person who alleged that" the defendant engaged in prohibited conduct). Further, Plaintiff has admitted that she received information about the two incidents from Goodman.[7] (*Id.* ¶¶ 65–66). Nothing in the FAC suggests that the failure to question Plaintiff about how she obtained information resulted in a false statement by Ruiz in the Arrest Warrant Affidavits or that the officers acted with reckless disregard for the truth. Plaintiff therefore has not plausibly alleged that no reasonable officer could have believed Plaintiff received "information to which the public does not generally have access" from Goodman. *See* Tex. Penal Code § 39.06(c)–(d).

Finally, Plaintiff contends Defendants lacked probable cause because the information Plaintiff received from Goodman was not "prohibited from disclosure" within the meaning of § 39.06(d). (Dkt. No. 24 ¶ 73). A Texas Court of Appeals has construed "prohibited from disclosure" in § 39.06(d) to mean "the set of exceptions to disclosure listed in Subchapter C" of the TPIA. *State v. Ford*, 179 S.W.3d 117, 123 (Tex. App.—San Antonio 2005, no pet.).

Plaintiff alleges that "[t]here is no TPIA exception that permits the withholding of the information [Plaintiff] published in the [Subject Publications], and any reasonable official would have understood this." (Dkt. No. 24 ¶ 78). Texas statute provides that "basic

---

[7] Plaintiff's concedes that Jose Baeza, not Goodman, is the official LPD spokesman. (Dkt. No. 24 ¶¶ 30, 67).

information about an arrested person, an arrest, or a crime" is not excepted from disclosure. Tex. Gov't Code § 552.108(c). However, the City Defendants contend the TPIA does not mandate disclosure of *all* the information obtained by Plaintiff that was the subject of the Arrest Warrant Affidavits. (Dkt. No. 27 at 10–11). The City Defendants note that various provisions of Texas law that might have entitled them to withhold some or all of the information Plaintiff received from Goodman. *E.g.*, Tex. Gov't Code § 552.108 (other than certain "basic information" identified in statute, information "held by a law enforcement agency or prosecutor that deals with the detection, investigation, or prosecution of crime" excepted from disclosure under the TPIA if, inter alia, "release of the information would interfere with the detection, investigation, or prosecution of crime"); Tex. Transp. Code § 550.065(c)(4) (unredacted accident reports may only be released to specific categories of persons); Tex. Fam. Code § 58.008(b) (law enforcement records concerning a child and information concerning a child that are stored by electronic means or otherwise and from which a record could be generated may not be disclosed to the public)). However, because Plaintiff did not follow the TPIA's process for requesting the information in her reports, LPD had no opportunity to invoke these exceptions.

The Court agrees with Defendants that, under the facts alleged, a reasonable person could have believed that the information Plaintiff received from Goodman was information to which the public did not generally have access and that was prohibited from disclosure under the TPIA at the time Plaintiff received the information, pursuant to § 39.06(d). Accordingly, Plaintiff has failed to show that the Arrest Warrant was "so obviously lacking in probable cause that the officers can be considered 'plainly incompetent.'" *Messerschmidt*, 565 U.S. at 556. Because the FAC does not allege facts to plausibly show that any Defendant acted objectively unreasonably in investigating and arresting Plaintiff, each of the Individual Defendants is entitled to qualified immunity as to this claim. Accordingly, Plaintiff's Fourth Amendment § 1983 claims against the Individual Defendants (Count II) should be dismissed.

### 2. Count I: § 1983 Claim under First Amendment

#### a. Retaliation

##### i.   Investigation and Arrest Pursuant to § 39.06(c)

Plaintiff alleges that the Individual Defendants retaliated against her in violation of her First Amendment rights by their "deliberate choice to target [Plaintiff] for investigation and arrest [her] under a pretextual and inapplicable statute and deliberately deficient and misleading arrest warrant affidavits, while knowing that no probable cause existed to arrest or detain [Plaintiff]." (Dkt. No. 24 ¶ 132(a)). "The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" *Reed v. Town of Gilbert, Arizona*, 576 U.S. 155 (2015) (citing U.S. Const. amend. I). "Under that Clause, a government, including a municipal government vested with state authority, 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Id.* (quoting *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95 (1972)). To establish a § 1983 claim of retaliation in violation of the First Amendment, a plaintiff must show that "(1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

Plaintiff's alleged protected activity includes filming police activity occurring in public; lawfully gathering publicly available and truthful information; and publishing content unfavorable to LPD, WCDA, and other local officials. (Dkt. No. 24 ¶¶ 68, 80). Plaintiff alleges that Defendants' conduct caused her various injuries, including fear of continued retaliation, loss of sleep, physical ailments, restriction of her person, and reputational harm. (*Id.* ¶¶ 145–47). Finally, Plaintiff contends that Defendants were substantially motivated to retaliate against her because Defendants showed hostility toward Plaintiff due to her criticism of LPD and WCDA. (*Id.* ¶¶ 52, 54, 115). Plaintiff contends that this hostility was demonstrated by the decision to target Plaintiff for

criminal investigation and arrest despite lacking a valid basis, and by Alaniz's alleged rebuke of Plaintiff, which Plaintiff characterizes as acts done "to intimidate" her. (*E.g., id.* ¶¶ 54, 69, 102, 140; Dkt. No. 30 at 12).

Each of the Individual Defendants—LPD officers (Ruiz, DV, Does 1–2, Guerrero, Martinez, and Montemayor); police chief Treviño; and attorneys Alaniz and Jacaman— is entitled to qualified immunity unless the FAC alleges facts plausibly supporting an inference that the individual officer violated a clearly established constitutional right and that the officer's conduct was objectively unreasonable. *See Keenan*, 290 F.3d at 261. Here, the Court will first determine whether any officer's conduct was objectively unreasonable. The Court then will determine whether the FAC alleges a violation of a clearly established constitutional right. Plaintiff has alleged a First Amendment retaliation claim on two distinct bases: (1) that the Individual Defendants retaliated against her by investigating, arresting, and prosecuting her under § 39.06(c) and (2) that the Individual Defendants separately engaged in various conduct constituting retaliation and interference with her First Amendment rights, independent of their actions relating to the enforcement of § 39.06(c). The Court will discuss qualified immunity as it relates to these allegations separately.

Plaintiff has based her First Amendment claim primarily on the decision to investigate and arrest her under § 39.06(c), allegedly without probable cause. To assert a claim of retaliatory arrest against an arresting officer, a plaintiff generally must plead and prove that the arresting officer lacked probable cause for the arrest.[8] *See Nieves v.*

---

[8] The exception to this general rule is when a plaintiff presents objective evidence that other, similarly situated individuals not engaged in the same sort of protected speech were not arrested. *Nieves*, 139 S. Ct. at 1727 (providing by way of example, that when an individual who vocally complained about law enforcement is arrested for jaywalking, a First Amendment claim for retaliation should not be dismissed even though there may be undoubtable probable cause). Here, Plaintiff pleads in a conclusory manner that Defendants did not arrest or prosecute other similarly situated, but unidentified, persons "who asked for or received information from local law enforcement officials" and "who published truthful and publicly-accessible information on a newsworthy matter." (Dkt. No. 24 ¶ 177). This description is conclusory and does not appropriately define similarly situated individuals. Plaintiff conflates persons who may have obtained information from LPD's public spokesperson, Baeza, with persons who, like Plaintiff, obtained information from a private source within the police department. This is unlike the example in *Nieves*, where there was objective evidence of individuals jaywalking. *See Nieves*, 139 S. Ct. at 1727. Plaintiff's allegation further mischaracterizes the basis for

*Bartlett*, 139 S. Ct. 1715, 1727 (2019); *Mesa v. Prejan*, 543 F.3d 543, 272 n.1 (5th Cir. 2008). It is clearly established that the First Amendment prohibits "adverse governmental action against an individual in retaliation for the exercise of protected speech activities." *Keenan*, 290 F.3d at 258 (citing *Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir. 1999)). However, the Fifth Circuit has considered "a situation in which law enforcement officers might have a motive to retaliate but there was also a ground to charge criminal conduct against the citizen they disliked." *Id.* at 261. The Fifth Circuit held that in this circumstance, "the objectives of law enforcement take primacy over the citizen's right to avoid retaliation." *Id.* at 261–62 (internal citation omitted). Accordingly, "If probable cause existed . . . or if reasonable police officers could believe probable cause existed, they are exonerated." *Id.* at 262 (internal citations omitted). Here, as set forth *supra* Part III(B)(1), the Court has determined that a reasonable officer could have found probable cause to arrest Plaintiff for violating § 39.06(c). Under *Keenan*, that conclusion precludes Plaintiff's First Amendment claim to the extent that it is based on the arrest. 290 F.3d at 258; *see also Nieves*, 139 S. Ct. 1715.

Although not clearly articulated under Count I, Plaintiff may also be further alleging that it was objectively unreasonable to investigate and arrest her pursuant to § 39.06(c) under the circumstances because a reasonable officer would have understood that the statute was facially unconstitutional in violation of her First Amendment rights. *See Lawrence v. Reed*, 406 F.3d 1224, 1232 (10th Cir. 2005) (holding that "where a statute authorizes conduct that is patently violative of fundamental constitutional principles, reliance on the statute does not immunize the officer's conduct") (internal citation omitted). Plaintiff pleads that § 39.06(c) was found to be unconstitutionally vague after her arrest. (Dkt. No. 24 ¶ 127).[9]

---

Plaintiff's arrest and prosecution under § 39.06(c) as being for the "publishing" of information, rather than for *obtaining* information. (*Compare id.* ¶ 81 *with id.* ¶ 89 (stating that Arrest Warrant Affidavits alleged that Plaintiff "received or solicited" certain information from Goodman)). For these reasons, the Court determines that Plaintiff has not sufficiently pleaded an exception to the general rule that probable cause defeats her First Amendment retaliation claim.

[9] As Defendants note, § 39.06(c) was first declared unconstitutionally vague by Judge Notzon of the 111th District Court, Webb County, Texas in Plaintiff's habeas proceeding. (Dkt. No. 29 at 12). Judge Notzon's ruling was issued from the bench, and no written order is available on the ruling.

No party has cited to Fifth Circuit precedent discussing the application of qualified immunity to law enforcement actions taken pursuant to a statute later determined to be unconstitutional. However, the Tenth Circuit's consideration of whether conduct is "patently violative of fundamental constitutional principles," *Lawrence*, 406 F.3d at 1232, seems to comport with the established qualified immunity standard of whether any reasonable law enforcement officer could have believed that his conduct did not violate a clearly established right. If no reasonable law enforcement officer could have believed that their enforcement of the statute against the Plaintiff was constitutional "then their [actions] violated clearly established law in this circuit." *Keenan*, 290 F.3d at 262; *see also Aubin v. Columbia Cas. Co.*, 272 F. Supp. 3d 828, 838 (M.D. La. 2017) (holding that a statute criminalizing non-violent threats to an officer's employment was "so patently and obviously unconstitutional, that no reasonable officer could believe it to have been valid"). The Court finds *Lawrence's* "patently violative" standard provides appropriate guidance to this case.

Plaintiff pleads, "It is clearly established that the First Amendment protects the right of every citizen to gather and publish truthful information about matters of public concern that is publicly-accessible, publicly-available, or otherwise lawfully obtained." (Dkt. No. 24 ¶ 149). It is Plaintiff's burden to identify the legal precedent establishing the clearly established right. *See Keller v. Fleming*, 52 F.3d 216, 225 (5th Cir. 2020) (stating that to show a right was clearly established, "Plaintiffs must point this court to a legislative directive or case precedent that is sufficiently clear such that every reasonable official would have understood that what he is doing violates that law"). Plaintiff directs the Court to *The Florida Star v. B.J.F.*, 491 U.S. 524 (1989), *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97 (1979), and *Houston Chronicle Publishing Co. v. City of Houston*, 531 S.W.2d 177 (Tex. Civ. App.—Houston [14th Dist.] 1975), *writ ref'd n.r.e.*, 536 S.W.2d 559 (Tex. 1976). As a general proposition, the First Amendment protects a citizen's right to publish lawfully obtained truthful information. Yet, these cases show that this principle is far from universal. Rather, courts conduct a fact-specific inquiry to determine a state's ability to prohibit publication of truthful and lawfully

obtained information.

Each time the Supreme Court has addressed the scope of such right, it has narrowly tailored its ruling to the facts of the case before it. *See The Florida Star,* 491 U.S. at 530 ("[A]lthough our decisions have without exception upheld the press' right to publish, we have emphasized each time that we were resolving this conflict only as it arose in a discrete factual context."). In fact, the Supreme Court has specifically declined "to hold broadly that truthful publication may never be punished consistent with the First Amendment," recognizing that "the sensitivity and significance of the interests presented in clashes between First Amendment and privacy rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case." *Id.* at 524, 533.

In *The Florida Star*, a sheriff's department released a report of a rape incident to the public, and then attempted to prosecute the newspaper that published an article containing the name of the rape victim. *Id.* at 526–27. The Supreme Court reviewed its prior precedent—including *Daily Mail*—upholding the First Amendment right of the media to publish truthful information obtained from a governmental entity, and noted that each of the previous cases dealt with factual scenarios in which the information published by the media had previously been made public by the governmental entity. *Id.* at 530–31.

The facts of the present case are distinguishable from *The Florida Star* and the cases discussed therein because § 39.06(c) punishes the obtaining of information from a governmental entity which has *not* been released to the public. The Supreme Court recognized the government's right to forbid the nonconsensual acquisition of sensitive information. *Id.* at 534. It further noted, "To the extent sensitive information is in the government's custody, it has even greater power to forestall or mitigate the injury caused by its release." *Id.*

Likewise, Plaintiff's reliance on *Houston Chronicle* is misplaced. Plaintiff relies on *Houston Chronicle* for the proposition that Texas law also recognizes the long-established "constitutional right of access to information concerning crime in the community, and to

information relating to activities of law enforcement agencies." (Dkt. No. 29 at 21). In fact, *Houston Chronicle* does not support the proposition that the media has an unfettered right of access to such information. That case upheld the constitutionality of the TPIA, while also recognizing that the constitutional right of access to information *can be limited* for legitimate purposes. *Id.* at 186. While the court held that "the press and the public have a constitutional right of access to information concerning crime in the community, and to information relating to activities of law enforcement agencies" it limited the reach of this constitutional right of access, finding it "necessary to weigh and evaluate legitimate competing interests." *Houston Chronicle*, 531 S.W.2d at 186.

The question before the Court is not whether § 39.06(c) is unconstitutional but whether any reasonable law enforcement officer could have believed that their enforcement of the statute against the Plaintiff was constitutional. Based on a review of the legal precedent identified by Plaintiff, the Court determines that § 39.06(c) was not so patently or obviously unconstitutional that no reasonable law enforcement officer could have believed that their enforcement of the statute against the Plaintiff was constitutional. Plaintiff does not contend that the statute lacks any legitimate law enforcement purpose. *Cf. Keenan*, 290 F.3d at 262. Nor does Plaintiff argue that the statute could not be valid under any circumstances. Plaintiff's allegations therefore do not evidence "patently and obviously unconstitutional" conduct vitiating the officers' entitlement to qualified immunity.

### ii.   Incidents of First Amendment Retaliation in Paragraphs 54(a)–(g)

#### A.   Qualified Immunity

Apart from her arrest under § 39.06(c), Plaintiff apparently[10] seeks to assert First

---

[10] The Court notes that Plaintiff's FAC is inconsistent regarding whether the allegations of paragraphs 54(a)—(g) are asserted as independent acts of First Amendment retaliation by the Individual Defendants as opposed to being identified as evidence of hostile animus. Plaintiff appears to concede that these alleged acts do not stand as violations on their own. To the contrary, Plaintiff specifies that Defendants' "unlawful retaliation . . . **started with the animus-driven decision to criminally target Villarreal**, regardless of the criminal statute Defendants ultimately asserted." (Dkt. No. 29 at 12–13) (emphasis in original). Similarly, with respect to Alaniz and Jacaman, Plaintiff notes that "the key aspect of their wrongful conduct" was the investigation and arrest of Plaintiff. (Dkt.

Amendment § 1983 retaliation claims based on the Individual Defendants' conduct as "exemplified by (but not limited to)" the acts set forth in paragraphs 54(a)–(g) of the FAC. (Dkt. No. 24 ¶ 131–32(c)). The Individual Defendants assert qualified immunity as to all claims against them. (Dkt. No. 26 at 7, 18; Dkt. No. 27 at 6). Plaintiff, who bears the burden to overcome a qualified immunity defense, fails to identify legal precedent showing that any act alleged in paragraphs 54(a)–(g) of the FAC was objectively unreasonable or violated a clearly established right. Therefore, Plaintiff fails to overcome qualified immunity as to each of these independent acts of First Amendment retaliation. *See Keller*, 52 F.3d at 225.

In her responses to the Motions, Plaintiff addresses the second prong of the qualified immunity analysis—whether a constitutional right was clearly established— with broad, sweeping strokes. (Dkt. No. 29 at 18–19; Dkt. No. 30 at 19–21). However, the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Al-Kidd*, 563 U.S. at 742; *see also Kinney v. Weaver*, 367 F.3d 337, 367 (5th Cir. 2004) ("The First Amendment right to free speech was of course clearly established in general terms long before the events giving rise to this case. In order to defeat the [defendants'] claim of qualified immunity, however, [the plaintiffs] must show that [t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right."). While there need not be a case "directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna,* 136 S. Ct. 305, 308 (2015) (quoting *Al–Kidd*, 563 U.S. at 741); *see also Turner v. Lieutenant Driver*, 848 F.3d 678, 687 (5th Cir. 2017). In other words, there must be "controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Morgan*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc) (internal citation omitted).

As a threshold issue, Plaintiff has not pleaded dates on which any of the incidents

---

No. 30 at 14). Regardless, the Court will evaluate the allegations as allegations of independent acts of First Amendment retaliation by the Individual Defendants.

occurred. The significance of such deficiencies will be further discussed *infra* Part III(C)(2); but with regard to a qualified immunity analysis, these allegations are insufficient for the Plaintiff to meet her burden to show that a constitutional right was clearly established at the time each incident occurred. In addressing the "clearly established rights" prong of Defendants' qualified immunity defense, Plaintiff's argument focuses on the Defendants' conduct of the investigation, arrest, detention, and prosecution of Plaintiff under § 39.06(c). Plaintiff also fails to address the conduct described in paragraphs 54(a)—(g).

Paragraph 54(c) of the FAC, for example, alleges that Officer Guerrero "harass[ed] and intimidate[ed] [Plaintiff] without justification." (Dkt. No. 24 ¶ 54(c)). This language is conclusory, and Plaintiff has identified no legal precedent illustrating the "contours" of the First Amendment right to show that "harassing" or "intimidating" conduct violates any clearly established First Amendment right. Paragraph 54(d) alleges that "LPD treat[ed] [Plaintiff] with indifference" when she called to report a sexual assault she endured at a business. (*Id.* ¶ 54(d)). Plaintiff fails to provide any details of the conduct constituting indifference and neglects to identify any named Defendant responsible for this alleged First Amendment violation. *See Harvey v. Montgomery County, Tex.*, 881 F. Supp. 2d 785, 807 (S.D. Tex. 2012) ("To the extent Plaintiff states a claim for retaliation, Plaintiff's allegations concern individuals who are not a part of this lawsuit."). This allegation is therefore inadequate to show a violation of a clearly established First Amendment right by any Individual Defendant in this suit. For similar reasons, Plaintiff's allegations that unidentified persons treated Plaintiff differently from other journalists and members of the media is deficient. (Dkt. No. 24 ¶ 54(e))

Plaintiff also describes a meeting she attended, during which Alaniz "openly declared to [Plaintiff] that he did not appreciate her criticizing his office." (*Id.* ¶ 54(f)). Plaintiff fails to address whether this conduct violated a clearly established constitutional right. It is not enough for Plaintiff to assert that Alaniz was motivated to retaliate against Plaintiff as a result of previous negative reporting. Additionally, it is not enough for Plaintiff to restate broad propositions of law such as "government

retaliation against a private citizen for exercise of First Amendment rights cannot be objectively reasonable"; "citizens . . . have a First Amendment right to film police activity in public"; or "state actors cannot punish speakers on the basis of viewpoint." (Dkt. No. 30 at 19–20). Plaintiff simply fails to address whether Alaniz's conduct, described only as openly declaring that "he did not appreciate her criticizing his office," violates a clearly established right. This is true for each of the Individual Defendants' conduct described in paragraphs 54(a)–(g).[11]

Based on the foregoing, the Court concludes that Plaintiff has failed to meet her burden to demonstrate that the Individual Defendants are not entitled to qualified immunity as to the allegations set forth in paragraphs 54(a)–(g).

## B.  Sufficiency of Allegation in Paragraphs 54(a)–(g)

Although the Court has determined that the Individual Defendants are entitled to qualified immunity as to the First Amendment retaliation claims asserted in paragraphs 54(a)–(g), the Court will address, in the alternative, whether those allegations would otherwise survive a 12(b)(6) analysis. The Court agrees with the City Defendants that each of the acts alleged in paragraphs 54(a)–(g) of the FAC fail to support an independent First Amendment retaliation claim. (Dkt. No. 27 at 8 (citing *Keenan*, 290 F.3d at 259)).

To the extent the separate incidents described in paragraphs 54(a)–(g) are pleaded as independent First Amendment violations, the majority of those allegations are conclusory and vague. As noted in *supra* Part III(B)(2)(a)(ii), the allegation in paragraph 54(c) that Officer Guerrero "harass[ed] and intimidate[ed] [Plaintiff] without justification" (Dkt. No. 24 ¶ 54(c)) is vague and conclusory. The allegation in paragraph

---

[11] The remaining allegations are similarly inadequate in failing to allege a clearly established right: (1) that Martinez knowingly made a false representation to other officers that Plaintiff was a five-time felon (Dkt. No. 24 ¶ 54(a)); see *Siegert v. Gilley*, 500 U.S. 226, 231–34 (1991) (holding that the right against defamation is not a constitutionally protected liberty interest); (2) that Montemayor threatened to take Plaintiff's phone as evidence while she was recording the scene of a shooting (Dkt. No. 24 ¶ 54(b)); see *Turner*, 848 F.3d at 687 (finding that "there was no clearly established First Amendment right to record the police at the time of [Plaintiff's] activities"); and (3) that members of the Laredo City Council "initially attack[ed] and obstruct[ed]" the naming of a reading kiosk after Plaintiff's deceased niece (*id.* ¶ 54(g)) (failing to name an individual Defendant).

54(d) that "LPD treat[ed] [Plaintiff] with indifference" when she called to report a sexual assault she endured at a business (Dkt. No. 24 ¶ 54(d)) is conclusory. Plaintiff fails to provide any details of the conduct constituting indifference and neglects to name any Defendant as being responsible for this alleged First Amendment violation. These allegations are therefore inadequate to support a reasonable inference that any Individual Defendant caused any "injury that would chill a person of ordinary firmness from continuing to engage in that activity." *Keenan*, 290 F.3d at 258; *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999) (holding that mere conclusory allegations of retaliation are insufficient, and that plaintiff must allege more than his personal belief that he has been the victim of retaliation).

Likewise, the allegation that Alaniz stated that "he did not appreciate [Plaintiff] criticizing his office" (*id.* ¶ 54(f)) is insufficient to establish that a person of ordinary firmness would feel threatened by his statement, or that it suggested any type of harm to Plaintiff if she continued her reporting. Based only on the description of the Alaniz's statement in paragraph 54(f), Plaintiff has not sufficiently pleaded that Alaniz's conduct would rise to the level of chilling the speech of a reasonably firm person.

The allegation in paragraph 54(g) that Laredo City Council members *initially* attacked and obstructed a proposal to build a reading kiosk named after Plaintiff's niece does not allege conduct by an Individual Defendant named in this lawsuit. Even if it did identify an Individual Defendant, this reference to "initial" "attacking" and "obstructing" is a conclusory description and further fails to describe any "injury that would chill a person of ordinary firmness from continuing to engage in that activity." Accordingly, and for the additional reasons stated in *supra* fn.11, the allegations in paragraphs 54(a)–(g) do not state independent First Amendment violations of retaliation.

### b. Interference

Plaintiff contends she can also assert a First Amendment claim for interference with the exercise of First Amendment rights, separate and distinct from her First Amendment retaliation claim. (*See, e.g.*, Dkt. No. 24 ¶ 137). Plaintiff's purported

interference claim is based on (1) Montemayor threatening to take Villarreal's phone as "evidence"; (2) Guerrero "harassing and intimidating" Plaintiff "without justification"; and (3) Plaintiff's arrest and detention pursuant to the Arrest Warrants. (Dkt. No. 29 at 10).

As explained *supra* Part III(B)(1), the Court has found that Plaintiff's arrest under § 39.06(c) was supported by objective probable cause. Thus, Plaintiff has failed to satisfy her burden to overcome qualified immunity as to a First Amendment interference claim based on her arrest and detention. With respect to the other two incidents, Plaintiff has not cited case law showing that the alleged conduct violated a clearly established right. The Fifth Circuit has made clear that the right to record police activity is not absolutely protected under the First Amendment. *Turner*, 848 F.3d at 687 (noting that at the time of the alleged conduct, such right was not clearly established sufficiently to "place[ ] . . . the constitutional question *beyond debate*"). Notably, the right to "film[ ] the police may be subject to reasonable time, place, and manner restrictions." *Id.* (internal citation omitted).

Plaintiff cites *Colson v. Grohman*, 174 F.3d at 508–09, to support her First Amendment interference claim. The court in *Colson* affirmed the dismissal of a city council member's First Amendment retaliation claim and noted that "[a]s a general rule, the First Amendment prohibits not only direct limitations on speech but also adverse government action against an individual because of her exercise of First Amendment freedoms." *Id.* at 508 (citing examples). However, the examples of retaliation noted in *Colson* are so distinguishable from the present case that it provides little guidance as to whether Plaintiff has properly alleged a claim of interference with her protected First Amendment activity.[12]

As the Court has already discussed, Plaintiff must allege more than a general violation of a right. Accordingly, the Court finds that Plaintiff has failed to show the

---

[12] *Reed*, another case cited by Plaintiff, is similarly unavailing. 576 U.S. 155 (2015). In *Reed*, the Supreme Court applied strict scrutiny to a town's sign ordinance and determined that it violated the First Amendment; however, there was no § 1983 claim at issue. *Id.* Plaintiff does not allege a prior restraint comparable to that in *Reed* and provides no explanation of how *Reed* applies to her claim.

alleged interference by the Individual Defendants violated any clearly established right existing at the time of each of the incidents. Moreover, as set forth *supra* Part III(A)(2)(a)(ii)(A), Plaintiff has not alleged facts sufficient to draw an inference that Montemayor's threat to take her phone or Guerrero's "harassing and intimidating" conduct was objectively unreasonable. Accordingly, Plaintiff has not met her burden to overcome qualified immunity with respect to First Amendment interference claim. And as discussed *supra* Part III(A)(2)(a)(ii)(B), the allegation that Guerrero engaged in "harassing and intimidating" conduct, without further description, is too conclusory to constitute a well pleaded fact and survive dismissal.

Accordingly, the Court finds that the FAC does not state a plausible interference claim under the First Amendment. Thus, Plaintiff's First Amendment § 1983 claims against the Individual Defendants (Count I) should be dismissed.

### C. Count III: § 1983 Selective Enforcement Claim Under Fourteenth Amendment Equal Protection Clause

Count III of the FAC asserts a § 1983 claim based on the equal protection clause of the Fourteenth Amendment against the Individual Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and Does 1–2, in their individual capacities. Plaintiff alleges that those Defendants "intentionally and arbitrarily singled [Plaintiff] out in a selective enforcement of [§ 39.06(c)]" by "their wrongful criminal investigation of [Plaintiff], and knowingly causing her arrest and detention." (Dkt. No. 24 ¶ 175).

"The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000) (internal citation omitted). The Fifth Circuit recognizes a claim for selective enforcement where an official allegedly used their powers selectively against a single party. *Bryan v. City of Madison, Miss.*, 213 F.3d 267, 277 n.17 (5th Cir. 2000) (explaining that "[o]ur cases have recognized successful equal protection claims brought by a 'class of one'")). Thus, at the time of Defendants' alleged conduct relating to Plaintiff, it was

clearly established that selective enforcement of a statute violates the equal protection clause.

"Generally, to establish an equal protection claim the plaintiff must prove that similarly situated individuals were treated differently." *Wheeler v. Miller*, 168 F.3d 241, 252 (5th Cir. 1999); *see also Lacey v. Maricopa County*, 693 F.3d 896, 920 (9th Cir. 2012) (internal quotations omitted) ("To prevail on an equal protection claim under the Fourteenth Amendment, a plaintiff must demonstrate that enforcement had a discriminatory effect . . . ."). To support a plausible inference that a plaintiff was treated differently than other similarly situated individuals, the plaintiff must "allege some facts, either anecdotal or statistical, demonstrating 'that similarly situated defendants . . . could have been prosecuted, but were not.'" *Lacey*, 693 F.3d at 920 (quoting *United States v. Armstrong,* 517 U.S. 456, 469 (1996)). To allege a selective enforcement claim based on a "class of one," a plaintiff must also allege that a defendant was "motivated by improper considerations, such as race, religion, or the desire to prevent the exercise of a constitutional right." *Madison*, 213 F.3d at 277 (citing *Allred's Produce v. U.S. Dep't of Agric.,* 178 F.3d 743, 748 (5th Cir. 1999) and *Stern v. Tarrant County Hosp. Dist.,* 778 F.2d 1052, 1058 (5th Cir. 1985)).

The Court first considers whether the FAC plausibly alleges that Plaintiff was treated differently from other, similarly situated persons. Plaintiff alleges that "similarly-situated persons" include "those who had asked for or received information from local law enforcement officials." (*Id.* ¶ 177). However, this allegation ignores the grounds for probable cause to arrest Plaintiff. As explained *supra* Part III(B)(1), Defendants had objectively reasonable grounds to find probable cause that Plaintiff violated § 39.06(c).

Plaintiff fails to allege any facts indicating that Defendants failed to enforce § 39.06(c) against any other person where a similar situation existed. The FAC alleges that Plaintiff, "like most local media, requested and received law enforcement information from LPD spokesman Baeza and other LPD officials." (*Id.* ¶ 178). However, as set forth in the FAC, the allegations in the Arrest Warrant Affidavit concerned

Plaintiff's receipt of information *not* from Baeza, but from *Goodman*. (*Id.* ¶¶ 88–89).[13] Plaintiff does not allege that other journalists solicited or received information from Goodman or some other unofficial or unsanctioned source of information within the police department, as Plaintiff undisputedly did. Plaintiff also fails to allege that other journalists sought or received information that Defendants reasonably believed had not been made public within the meaning of the statute. Thus, accepted as true for the purpose of a motion to dismiss, Plaintiff's allegation that other "persons . . . asked for or received information from local law enforcement officials" is insufficient to establish that any other person was similarly situated to Plaintiff. (*Id.* ¶ 177).

Next, Plaintiff alleges that other similarly situated persons "published truthful and publicly-accessible information on a newsworthy matter." (*Id.*). However, as set forth *supra* Part III(B)(1), an objectively reasonable officer could have determined that the information Plaintiff obtained from Goodman included information that had *not* been made public. Plaintiff does not allege that any other media members or journalists had solicited or received information from someone other than the Baeza that had not been made public, or that could objectively be viewed as qualifying for a TPIA exception. Therefore, the fact that other persons published "truthful and publicly-accessible information on a newsworthy matter" does not establish a reasonable inference that any other person was similarly situated to Plaintiff here. (*Id.*)

Finally, Plaintiff alleges in broad terms that (a) Defendants intentionally treated her differently than other journalists and media outlets (*see id.* ¶ 54); (b) Defendants had never enforced § 39.06(c) (*see id.* ¶¶ 177, 182, 194); (c) the alleged difference in treatment had no rational basis (*id.* ¶ 182); and (d) the enforcement of § 39.06(c) against Plaintiff

---

[13] Plaintiff also alleges that she had previously published "similar posts" based on information she received from Baeza and was not investigated at that time. (Dkt. No. 24 ¶ 67). To the extent Plaintiff suggests that her earlier posts were "similarly situated" incidents, that argument fails for the same reason. Although not expressly alleged in the FAC, the most plausible inference from Plaintiff's allegations is that Goodman was not authorized to release information that had not been made public. Therefore, Plaintiff's receipt of information from Baeza, an official LPD spokesperson, is materially different from allegedly obtaining nonpublic information from a private or unofficial source within LPD, as alleged in the Arrest Warrant Affidavits. (*See id.* ¶ 88 ("Ruiz also alleged that an unnamed source (on information and belief, one of the Doe Defendants) informed Defendant DV that Goodman was communicating with [Plaintiff]."). *See also supra* Part III(B)(2) n.9.

was in retaliation against her criticism of LPD and WCDA. (*Id.* ¶¶ 53–55, 57, 101). However, the only "anecdotal or statistical" *fact* set forth above is the allegation that Defendants had never enforced § 39.06(c). *See Lacey*, 693 F.3d at 920. Assuming as true that Defendants had never before sought to enforce the statute, that fact by itself does not give rise to an inference of discriminatory effect because it does not establish that other similarly situated persons "could have been prosecuted, but were not." *Id*. Rather, it would be equally plausible to infer that Defendants had never before encountered circumstances giving rise to potential prosecution under the statute. *Cf. Ballentine v. Las Vegas Metro Police Dep't*, No. 2:14-CV-01584-APG, 2015 WL 2164145, at *2 (D. Nev. Apr. 27, 2015) (citing *Freeman v. City of Santa Ana*, 68 F.3d 1180 (9th Cir. 1995), *as amended on denial of reh'g and reh'g en banc* (Dec. 29, 1995) (noting that "[t]he goal of identifying a similarly situated class . . . is to isolate the factor allegedly subject to impermissible discrimination"). Plaintiff's remaining allegations concerning persons "similarly situated" are vague and conclusory, and therefore fail to meet *Olech*'s requirement to allege "that [Plaintiff] has been intentionally treated differently from others similarly situated [with] no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564.

Because Plaintiff has not plausibly alleged that she was treated differently than other similarly situated persons, it is not necessary to determine whether the FAC alleges sufficient facts to satisfy the "improper motive" element of a § 1983 claim based on equal protection. Plaintiff's failure to allege facts that plausibly satisfy the "similarly situated" element alone precludes her selective-enforcement claim. Accordingly, Plaintiff's Fourteenth Amendment § 1983 claim (Count III) should be dismissed.

### D. Count IV: § 1983 Civil Conspiracy Claim

Plaintiff asserts a claim for conspiracy under § 1983 against each of the Individual Defendants. (Dkt. No. 24 ¶ 188). Plaintiff alleges that the Individual Defendants "conspired with the intent to deprive [Plaintiff] her constitutionally-protected rights, including those arising under the First, Fourth, and Fourteenth Amendments." (*Id.* ¶¶ 188, 191). All the Individual Defendants assert qualified immunity as to the conspiracy claim. (Dkt. No. 26 at 13; Dkt. No. 27 at 11).

To allege a civil conspiracy under § 1983, a plaintiff must establish "(1) the existence of a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." *Pfannstiel*, 918 F.2d at 1187; *see also Jabary v. City of Allen*, 547 F. App'x 600, 610 (5th Cir. 2013). "The proper order of review is *first* whether [Plaintiffs] have alleged a constitutional violation that is objectively unreasonable in light of clearly established Fourth Amendment law, and *only if that is the case* should the court then consider whether Plaintiffs have alleged a conspiracy." *Morrow v. Washington*, 672 F. App'x 351, 355 (5th Cir. 2016). In other words, a court must first determine whether a plaintiff has alleged a deprivation of civil rights before considering, if necessary, whether a plaintiff sufficiently pleaded the existence of a conspiracy. *See id.*; *see also Pfannstiel*, 918 F.2d at 1187; *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995). If all defendants alleged to have violated a plaintiff's rights are entitled to qualified immunity, a conspiracy claim is not actionable. *Morrow*, 672 F. App'x at 354 (internal citations omitted); *see also Hale*, 45 F.3d at 920–21 (finding that a conspiracy claim was not actionable against state actors who were entitled to qualified immunity on the First Amendment claim).

For the reasons set forth *supra* Part III(B)(1), the Court finds that Defendants' conduct relating to the investigation and arrest of Plaintiff was objectively reasonable. In addition, the Court finds that the Individual Defendants are entitled to immunity against each of Plaintiff's underlying § 1983 claims. *Supra* Part III(B)(2)–3). Thus, under clearly established Fifth Circuit precedent, Plaintiff cannot maintain a civil conspiracy claim under § 1983 as to the Individual Defendants. *Pfannstiel*, 918 F.2d at 1187. It is therefore unnecessary to determine whether the FAC pleads the existence of an agreement among Defendants sufficient to satisfy the first element of a conspiracy claim. Accordingly, Plaintiff's § 1983 conspiracy claim (Count IV) should be dismissed.

### E. Count V: § 1983 Supervisory Liability Claim against Treviño under First, Fourth, and Fourteenth Amendments

Count V of the FAC asserts a supervisory liability claim against Treviño in his

individual capacity for violations under the First, Fourth, and Fourteenth Amendments. (Dkt. No. 24 ¶¶ 200–13). A claim for supervisory liability must allege that "(1) the supervisor either failed to supervise or train the subordinate officer; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights, and (3) the failure to train or supervise amounts to deliberate indifference." *Davidson v. City of Stafford, Texas*, 848 F.3d 384, 397 (5th Cir. 2017), *as revised* (Mar. 31, 2017) (quoting *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 452–53 (5th Cir. 1994) (en banc)). Plaintiff asserts supervisory liability on theories of both failure to train and failure to supervise.

As an initial matter, a claim for supervisory liability must adequately allege an underlying constitutional violation. *Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 425 (5th Cir. 2006) ("It is facially evident that this test [for supervisory liability] cannot be met if there is no underlying constitutional violation."). The Court has determined that Plaintiff failed to state a claim for violations under the First Amendment with respect the retaliation claims in paragraphs 54(a)–(g) of the FAC and Fourteenth Amendment equal protection. *Supra* Part II(B)(2)(ii)(B), II(B)(3). Thus, there can be no claims for supervisory liability premised on such violations. However, with respect to the First and Fourth Amendment violations stemming from Plaintiff's arrest, the Court found that the Individual Defendants were entitled to qualified immunity. *Supra* Part III(B)(1). Accordingly, the Court will analyze Plaintiff's supervisory liability claim against Treviño, assuming *arguendo* that Plaintiff has alleged an underlying constitutional violation under the First and Fourth Amendment with respect to Plaintiff's arrest.

### 1. Failure to Train

The claim against Treviño for failure to train is premised solely on First Amendment violations. While the Court found that the Individual Defendants were entitled to qualified immunity as to Plaintiff's First Amendment claims, this does not preclude a potential claim for supervisory liability premised on the same allegations. *See Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005) (stating that a jury's

findings of qualified immunity on behalf of a subordinate officer are "neither inconsistent nor preclusive" to a finding of supervisory liability for the chief of police).

Plaintiff alleges that Treviño inadequately trained LPD officers with respect to citizens' First Amendment rights. (Dkt. No. 24 ¶ 204). Plaintiff contends that by failing to train the LPD officers, Treviño ratified and approved a pattern of retaliation by LPD officers against Plaintiff. (*Id*.). The City Defendants argue that Plaintiff is required to "prove that the deficiency in the training actually caused the police officer's indifference" to Plaintiff's rights. (Dkt. No. 27 at 13).

To plead a plausible claim for failure to train, Plaintiff must allege facts that enable the court to draw the reasonable inference that (1) the training procedures were inadequate; (2) the city's policymaker was deliberately indifferent in adopting the training policy; and (3) the inadequate training policy directly caused Plaintiff's injury. *See Carnaby v. City of Houston*, 636 F.3d 183, 189 (5th Cir. 2011).

In a failure to train claim, "the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform." *Roberts*, 397 F.3d at 293 (internal citation omitted). Specifically, a plaintiff must allege "*with specificity* how a particular training program is defective." *Id*.; *Boggs v. Krum Indep. Sch. Dist.*, 4:17-CV-583, 2018 WL 2463708, at *6 (E.D. Tex. June 1, 2018)). In *Roberts*, the Fifth Circuit was careful to advise plaintiffs that they "cannot prevail by styling their complaints about the specific injury suffered as a failure to train claim," noting that "the Supreme Court specifically warned against this type of artful pleading." *Id*. (citing *City v. Canton*, 489 U.S. 378, 391 (1989)). Additionally, to satisfy the second prong, Plaintiff must generally show "a pattern of similar violations arising from the training that is so clearly inadequate as to be obviously likely to result in a constitutional violation." *Id*. (internal quotations marks omitted).

With respect to the first prong, Plaintiff alleges that Treviño failed to train "LPD officers and staff regarding the clearly-established First Amendment rights of citizens, including (1) the right to film and record police activity in public; (2) the right to criticize and challenge police activity; (3) the right to lawfully gather and report truthful

36 / 59

information on matters of public concern; and (4) the right [to] exercise one's First Amendment rights free of retaliation from law enforcement." (Dkt. No. 24 ¶ 204). The Court views these allegations to be the type of "artful" pleading advised against in *Canton*. It appears that Plaintiff merely repackages alleged constitutional violations— what she terms a "pattern of . . . retaliatory action"—as deficiencies in the training of LPD officers. (*Id.* ¶ 204). The Court finds this insufficient.[14]

In *Connick v. Thompson*, the Supreme Court stated that a claim for failure to train requires the plaintiff to prove "that a particular *omission* in their training program causes city employees to violate citizens' constitutional rights." 563 U.S. 51, 61 (2011) (emphasis added). Here, Plaintiff fails to allege any *facts* supporting an inference that Treviño employed a deficient training program. *See Wilson v. City of Hattiesburg*, 396 F. Supp. 3d 711, 717 (S.D. Miss. 2019) (dismissing a failure to train claim where the plaintiff only alleged that the city "failed to train its employees properly to prevent the violations of his rights," because the plaintiff "did not identify a training program or specifically allege how any training program was deficient") (internal citation omitted). In *Williams v. City of Cleveland, Mississippi*, 736 F.3d 684, 687 (5th Cir. 2013), the plaintiff alleged isolated incidents of constitutional violations—that an officer utilized a chokehold and that officers cycled tasers simultaneously—but the court rejected his claim for failure to train because the complaint "fail[ed] to specify *how* the City of Cleveland's training program treated these issues or specifically *how* the training program regarding these issues is defective." *Id.* (emphases added). Plaintiff's allegations as to the first prong in a failure to train claim are deficient.

---

[14] Plaintiff concedes in her response to the City Defendants' Motion that Treviño underwent an open records training program mandatory for appointed public officials. (Dkt. No. 29 at 29) (citing Tex. Gov. Code § 555.012). It appears to the Court, though it is not explicit in Plaintiff's argument, that Plaintiff references this training program to underscore Treviño's deliberate indifference when training his own employees. In other words, Plaintiff suggests that, because Treviño received this training, he was put on notice that he should similarly train his employees. Thus, any violation by his subordinates that stemmed from a failure to train should be attributed to Treviño. Plaintiff misconstrues the concept of notice in a failure to train claim. In a failure to train claim, notice is provided by alleging "a pattern of similar constitutional violations by untrained employees." *Connick*, 563 U.S. at 62. Thus, the supervisor can be held liable for the specific constitutional violations arising from training deficiencies of which he was put on notice. *Id.*

Plaintiff's FAC also fails to demonstrate a *pattern* of violations with respect to the second prong of a failure to train claim. Plaintiff must allege "the existence of a pattern of tortious conduct by inadequately trained employees" to adequately demonstrate that there was a failure to train employees. *Bd. of the County Comm'rs of Bryan County v. Brown* (*Brown I*), 520 U.S. 397, 407–08 (1997). Plaintiff points to the incidents in paragraphs 54(a)–(g) of the FAC as evidence that Treviño had actual or constructive knowledge of a pattern of retaliation. (Dkt. No. 24 ¶ 203). However, as discussed *supra* Part III(B)(2)(ii)(B), paragraphs 54(a)–(g) contain either conclusory allegations or isolated incidents,[15] all of which pertain solely to Plaintiff and not to other persons in the community. Paragraphs 54(a)–(g) do not establish that LPD officers had a pattern of violating First Amendment rights. Moreover, paragraphs 54(a)–(g) do not demonstrate that Treviño had knowledge of violations such that he can be held liable for failing to train LPD officers.[16] And by failing to adequately allege "a pattern of conduct or a continued adherence to a program [,] . . . [Plaintiff] has not pled the deliberate indifference" requisite to establish the second prong in a failure to train claim. *See Howard v. Del Castillo*, No. CIV. A. 00-3466, 2001 WL 1090797, at *3 (E.D. La. Sept. 17, 2001) (finding that, absent a pattern of conduct, "the only connection between the alleged acts of the officers and [the police superintendent was] the fact of their employment" which was insufficient to establish a failure to train claim).

---

[15] The Court found that the allegations in paragraphs 54(a)–(g) are insufficient to state a claim for retaliation in violation of the First Amendment. Consistent with Fifth Circuit precedent, there can therefore, be no failure to train claim premised on these allegations.

[16] Plaintiff asserts, "As chief of police, Treviño knew of the various LPD acts of retaliation specified in paragraphs 54(a)–(g), or was willfully blind to the same. Treviño took no action to remedy the acts of retaliation against [Plaintiff]'s exercise of her First Amendment rights by LPD officers, and encouraged the same." (Dkt. No. 24 ¶ 61). Plaintiff further states that she "reported on her Facebook page about several of the incidents detailed in Paragraph 54." (*Id.* ¶ 62). Plaintiff states, "[T]he Laredo City Manager and Laredo City Council members regularly accessed [Plaintiff]'s Facebook page, or were routinely advised about the same." (*Id.*). The Court finds these conclusory allegations do not state sufficient facts to allege that Treviño was aware of any action by LPD officers. First, Plaintiff does not provide information about *what* she posted on Facebook. Specifically, Plaintiff does not state that she included in her Facebook posts any instances of LPD officers singling out Plaintiff, retaliating against Plaintiff, or infringing upon Plaintiff's First Amendment Rights. Moreover, even if Plaintiff's general conclusions about Facebook posts were sufficient, she only alleges that the Laredo City Manager and Laredo City Council accessed her Lagordiloca Facebook page. She makes no similar assertion regarding Treviño.

### 2. Failure to Supervise

Plaintiff further alleges that Treviño had "oversight and approval of" and "supervised" the criminal investigation of Plaintiff; the preparation, issuance, and execution of the Arrest Warrants; and Plaintiff's arrest and detention. (*Id*. ¶¶ 206–07). Plaintiff contends that Treviño's alleged failure to supervise caused violations of Plaintiff's First, Fourth, and Fourteenth Amendment rights. (*Id*. ¶ 206). The City Defendants move to dismiss because Plaintiff has failed to allege that Treviño was *personally* involved in any constitutional deprivation or that Treviño acted with deliberate indifference. (Dkt. No. 27 at 13). Further, the City Defendants argue that immunity shields Treviño for enforcing a penal code provision that was constitutional at the time. (*Id*.).

As an initial matter, the City Defendants seek dismissal of this supervisory claim because "enforcing a penal code provision that was valid at the time of enforcement is not an objectively unreasonable action that would waive immunity." (Dkt. No. 27 at 13). The Court construes this statement, as well as the City Defendants' argument that Treviño is "entitled to qualified immunity for Counts I–V" as an assertion of qualified immunity for supervisory liability. (*Id*. at 13, 16).

The Fifth Circuit has recognized the "difficulty in reconciling the deliberate indifference standard [for supervisory liability] with the objective reasonableness standard used in addressing qualified immunity." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (citing *Hare*, 135 F.3d at 327–28). The Fifth Circuit has established that an official is entitled to qualified immunity unless his actions "amount to deliberate indifference." *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005). Similarly, a failure to supervise claim requires a plaintiff to allege that (1) the supervisor failed to supervise a subordinate officer; (2) a causal link exists between the failure to supervise and the violation of the plaintiff's rights, and (3) the failure to supervise amounts to deliberate indifference. *Davidson*, 848 F.3d at 397 (citing *Doe*, 15 F.3d at 452–53).

"Deliberate indifference is a stringent standard of fault, requiring proof that a

municipal actor disregarded a known or obvious consequence of his action." *Davidson*, 848 F.3d at 397 (quoting *Estate of Davis*, 406 F.3d at 381). "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference." *Id.*; *see also Brown v. Callahan,* 623 F.3d 249, 255 (5th Cir. 2010) ("Deliberate indifference is more than mere negligence or even gross negligence."). Deliberate indifference generally requires a showing of more than a single instance of the lack of supervision causing a violation of constitutional rights. *Brumfield v. Hollins,* 551 F.3d 322, 329 (5th Cir. 2008). A plaintiff must demonstrate *at least* a pattern of similar violations arising from training or supervising that is so clearly inadequate as to be obviously likely to result in a constitutional violation. *Id.* The Fifth Circuit has "stressed that a single incident is usually insufficient to demonstrate deliberate indifference," but rather the plaintiff must "demonstrate a *pattern* of violations." *Estate of Davis*, 406 F.3d at 383 (emphasis added). In particular, the pattern must demonstrate "similar incidents in which the citizens were injured." *Id.* (quoting *Sydney v. Trepagnier*, 142 F.3d 791, 798–99 (5th Cir. 1998) (internal citation omitted)).

In this case, Plaintiff seeks to hold Treviño liable for his supervision of LPD officers with respect to the investigation and arrest of Plaintiff. However, Plaintiff does not point to a single incident, aside from Plaintiff's, where an individual was investigated and arrested in violation of the First and Fourth Amendment, let alone an incident in which Treviño was the supervisor. In fact, Plaintiff repeatedly draws the Court's attention to the fact that she was the first individual arrested under § 39.06(c). (*See id.* ¶¶ 177, 182, 194).

The Fifth Circuit has identified a single incident exception to supervisory liability, where a single act of retaliation can give rise to supervisory liability. *See Davidson*, 848 F.3d at 397. Plaintiff cites to *Aubin*, 272 F. Supp. 3d. at 834–35, to support the use of the single incident exception in this case. In *Aubin*, the plaintiff alleged that the County Sheriff had "an official policy that his deputies may arrest anyone who makes threats against their jobs." *Id.* at 834. The court determined, "Considering these allegations it is plausible that [the Sheriff] officially adopted and promulgated the policy in question

because two supervisors allegedly confirmed the same policy to [their subordinate]." *Id*. The *Aubin* court found the Sheriff's policy to be facially unconstitutional without consideration of whether a single incident exception could prove deliberate indifference. *Id*. ("[A]n unconstitutional official policy renders a municipality culpable under § 1983, without any need to consider deliberate indifference.") (internal citation omitted).

*Aubin* is distinguishable from this case. As Plaintiff alleges, she was the first individual to be arrested under § 39.06(c). Thus, unlike in *Aubin*, there was no generally applicable policy that resulted in Plaintiff's arrest under the statute. In addition, the allegations in paragraphs 54(a)–(g) are deficient as allegations of a pattern or policy of First Amendment retaliation. For example, because Plaintiff neglects to provide any dates for the Defendants' conduct alleged in these paragraphs, it is impossible to discern when they occurred in relation to Plaintiff's publishing of negative articles about the Defendants or even in relation to each other.[17] Moreover, only three of the allegations of paragraphs 54(a)–(g) reference LPD officers, and only two allegations mention the name of the officer.

The Court finds *Davidson* instructive in this case. 848 F.3d at 384. In *Davidson* the plaintiff alleged that his constitutional rights were infringed upon based on an arrest made pursuant to a Texas statue. *Id*. at 392. The court found that the arrest was made without probable cause and violated plaintiff's First and Fourth Amendment rights. *Id*. In that case, the chief of police reviewed the plaintiff's arrest and determined that there was no violation from which to discipline the officers who arrested the plaintiff. *Id*. at 395. The plaintiff also pointed to various other arrests made under the same statute, two of which the Court concluded also violated individuals' constitutional rights. *Id*. Nevertheless, the *Davidson* court refused to find the chief of police individually liable for failure to supervise. *Id*. at 398. The plaintiff in *Davidson* put forth a similar argument to

---

[17] For § 1983 purposes, "A pattern requires similarity and specificity . . . [and also requires] 'sufficiently numerous prior incidents.'" *Peterson v. City of Fort Worth, Tex*., 588 F.3d 838, 851 (5th Cir. 2009). Thus, if any incident in paragraphs 54(a)–(g) occurred *after* her arrest or was significantly different than Plaintiff's arrest, it would not demonstrate a pattern that could put a municipality or a municipal actor, like Treviño on notice. *Id*. at 858.

Plaintiff's in this case—that the chief of police endorsed an unconstitutional interpretation of a statute that caused a pattern of constitutional violations, and that the plaintiff's arrest was the obvious consequence of the chief of police's misinterpretation. *Id*. at 397–98. In *Davidson*, the plaintiff failed to show a pattern of deliberate indifference, or that the plaintiff's injury was the "highly predictable consequence" of the chief of police's understanding of the statute. *Id*. at 398.

Like the *Davidson* court, the Court finds that Treviño was not deliberately indifferent because the violations that Plaintiff alleges were not the highly predictable consequences of Treviño's supervision of LPD officers. Unlike the chief of police in *Davidson*, the Court has determined in *supra* Part III(B)(2) that § 39.06(c) was not so patently or obviously unconstitutional that no reasonable law enforcement officer could have believed that their enforcement of the statute against the Plaintiff was constitutional. Plaintiff's alleged injury was not the "highly predictable consequence" of Treviño's supervision of LPD officers who were enforcing the statute. Thus, Plaintiff's allegations do not demonstrate the deliberate indifference standard requisite for supervisory liability.

Accordingly, Plaintiff's § 1983 supervisory liability claim against Treviño (Count V) should be dismissed.

### F. *Monell* Claims against Municipal Defendants

#### 1. Standard for *Monell* Claims

Counts VI and VII allege municipal liability claims pursuant to *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978), against the City of Laredo and Webb County, respectively. To successfully claim municipal liability under *Monell*, Plaintiff must allege three elements: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Valle v. City of Houston*, 613 F.3d 536, 541–42 (5th Cir. 2010) (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)).

The first element, the existence of an official policy or custom, can be established in several ways. First, a policy may be "officially adopted and promulgated" by the municipality or by an official with policymaking authority. *Burge v. St. Tammany Parish*, 336 F.3d 363, 369 (5th Cir. 2003). Second, a "persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Id.* Third, a "single decision by a policy maker may, under certain circumstances, constitute a policy for which a [municipality] may be liable." *Valle*, 613 F.3d at 542 (alteration in original) (quoting *Brown v. Bryan County* (*Brown II*), 219 F.3d 450, 462 (5th Cir. 2000)). Lastly, "[t]he failure to provide proper training may fairly be said to represent a policy for which [a municipality] is responsible, and for which the [municipality] may be held liable if it actually causes injury." *Id.* at 544 (quoting *Brown II*, 219 F.3d at 457).

To establish the second element of a *Monell* claim, a plaintiff must identify an official policymaker with actual or constructive knowledge of the constitutional violation. *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 167 (5th Cir. 2010). A policymaker is "one who takes the place of the governing body in a designated area of city administration." *Id.* (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984)). "The policymaker must have final policymaking authority." *Davis v. Tarrant County*, 565 F.3d 214, 227 (5th Cir. 2009). "Whether a particular official has 'final policymaking authority'" is a question of state and local law. *Id.* (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).

To satisfy the third "moving force" element, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Valle*, 613 F.3d at 542 (quoting *Brown I*, 520 U.S. at 404). A municipality is culpable under § 1983 if (1) an official policy is unconstitutional or (2) a facially innocuous policy was "promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Piotrowski v. City of Houston*

43 / 59

(*Piotrowski II*), 237 F.3d 567, 579 (5th Cir. 2001) (quoting *Brown I*, 520 U.S. at 407). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown I*, 520 U.S. at 410.

### 2. Count VII: *Monell* Liability as to Webb County

#### a. Plaintiff's Allegations Against Webb County

Count VII alleges that acts taken pursuant to official Webb County policy constituted impermissible state action that deprived Plaintiff of rights under the First, Fourth, and Fourteenth Amendment. (Dkt. No. 24 ¶ 242). In support of her *Monell* claim, Plaintiff alleges that Webb County maintained a policy to "intimidate, retaliate against, and punish" Plaintiff for recording and publishing about law enforcement activities and other matters of public concern. (*Id*. ¶ 236). Plaintiff further describes Webb County's policy as "a decision to restrict and interfere with [Plaintiff]'s citizen journalism" to curb Plaintiff's gathering and publishing of unfavorable information. (*Id*. ¶ 237). Plaintiff alleges that "[t]he official county policy was developed, ratified, enforced, and continues to be enforced through and by officials vested with final policymaking authority either by law or delegation, including at least Defendant Alaniz and the Webb County Sheriff." (*Id*. ¶ 241). Plaintiff further alleges that "[t]he County's official policy were [*sic*] the moving force behind the deprivation of [Plaintiff]'s constitutional rights as alleged herein, as they contributed to and caused the wrongful arrest of [Plaintiff] done in retaliation for her exercise of First Amendment rights." (*Id*. ¶ 245).

#### b. Analysis

In the County Defendants' Motion, the County Defendants contend the FAC fails to state a plausible *Monell* claim. (Dkt. No. 26 at 13–17). The County Defendants contend Plaintiff has not adequately alleged a final policymaker or a policy requisite for a *Monell* claim. (*Id*. at 14, 16–17).

### i. Official Policymaker

The County Defendants contend that, as a matter of law, a district attorney is not a final policymaker for a municipality for *Monell* liability. (*Id.* at 16). Rather, the County Defendants argue that the District Attorney is a state official for purposes of liability arising out of his prosecutorial decisions. (*Id.*). The County Defendants cite *Esteves v. Brock*, 106 F.3d 674 (5th Cir. 1997), *cert. denied*, 522 U.S. 828 (1997), in which the Fifth Circuit held a district attorney, acting in his prosecutorial capacity, is an agent of the state, not an agent of the county in which the case is prosecuted. (Dkt. No. 26 at 16).

The Court disagrees with the County Defendants' argument that Alaniz acted solely in a prosecutorial capacity for the conduct alleged in the FAC. The Court has already determined *supra* Part III(A) that the investigative actions of Alaniz and Jacaman were not taken in their capacity as advocates for the state, and therefore Alaniz and Jacaman are not entitled to the absolute immunity afforded to prosecutors representing the state. The Court finds *Esteves* does not compel a different conclusion with respect to *Monell* liability. In *Esteves*, the Fifth Circuit explained that the determination of whether a district attorney is acting on behalf of the state or county is determined by state law *and* by an analysis of the duties alleged to have caused the constitutional violation. 106 F.3d at 677. Thus, the Court must analyze the role of the district attorney in his conduct as alleged by Plaintiff.

The Court's analysis of Alaniz's duties for the purposes of determining whether Alaniz is entitled to prosecutorial immunity applies equally to the analysis of Webb County's municipal liability. *See Brown v. City of Houston*, 297 F. Supp. 3d 748, 765 (S.D. Tex. 2017) ("Both municipal liability and Rizzo's prosecutorial immunity turn on the scope of Rizzo's prosecutorial duties. Those arguments are addressed under [the defendant's] motion to dismiss based on his absolute prosecutorial immunity."). Plaintiff alleges that Alaniz's conduct was outside the scope of his prosecutorial duties, and therefore Alaniz was not acting as a state agent in relation to Plaintiff's claims. *See, e.g.*, *Crane v. State of Tex.*, 766 F.2d 193, 195 (5th Cir. 1985) (determining that the district attorney was "properly viewed as a county official" regarding allegations of a policy of

issuing arrest warrants without probable cause); *Wooten v. Roach*, 377 F. Supp. 3d 652, 667 (E.D. Tex. 2019) (finding that the district attorney was the policymaker for the county regarding a policy of "pursuing wrongful arrests and prosecution without probable cause and without due process" because it fell outside the district attorney's role as a prosecutor in one case). Under the standard of Rule 12(b)(6), Plaintiff has sufficiently alleged that Alaniz is a policymaker for Webb County.[18]

### ii. Official Policy or Custom

The Court next considers whether Plaintiff has adequately alleged an official policy or custom of Webb County under *Monell*. The County Defendants correctly note that Webb County cannot be liable on a theory of *respondeat superior*. (*Id.* at 14); *Monell*, 436 U.S. at 691.

Plaintiff does not contend the alleged policy was "officially adopted and promulgated" by Webb County's lawmaking officers. Rather, she alleges that Webb County implemented a policy targeting her and only her. (Dkt. No. 24 ¶ 231). However, Plaintiff offers no authority for her assertion that "a policy against one is still a policy." (Dkt. No. 30 at 30). Similarly, Defendants fail to provide authority in support of their contention that a single-plaintiff policy *cannot* be a policy for purposes of municipal liability.

Nonetheless, the Supreme Court's opinion in *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986), and subsequent Fifth Circuit cases provide guidance on this issue. *See, e.g.*, *Webb v. Town of Saint Joseph*, 925 F.3d 209 (5th Cir. 2019); *Cherry Knoll, L.L.C. v. Jones*, 922 F.3d 309 (5th Cir. 2019). In *Pembaur*, the Court considered whether, and in what circumstances, a decision by municipal policymakers on a single occasion

---

[18] The Fifth Circuit in *Groden v. City of Dallas, Texas* made clear that it is the Court's role to determine the policymaker as a matter of law. 826 F.3d 280, 285–286 (5th Cir. 2016). For the reasons stated above, the Court finds that, as a matter of law, the Webb County District Attorney was the policymaker for Webb County with respect to his investigative actions. Thus, the Court need not delve into the allegations as they relate to the Webb County Sheriff. However, for the sake of completeness, the Court finds that even if the Webb County Sheriff were a policymaker for the circumstances in question, Plaintiff failed to allege *any* deliberate decision attributable to the Webb County Sheriff that would rise to the level of an official policy. Plaintiff merely makes the conclusory assertion that the Webb County Sheriff "participated in the selective arrest." (Dkt. No. 24 ¶ 239).

may satisfy the requirement of an official municipal policy. 475 U.S. at 481. In that case, the county prosecutor had told the assistant prosecutor to instruct the deputy sheriffs to "go in and get [the witnesses]" by serving capiases at the petitioner's clinic. *Id.* at 473. The court of appeals held that the plaintiff, by only showing that the sheriff decided to force entry on *one* occasion, failed to prove the existence of a county policy. *Id.* at 476–77. The Supreme Court reversed this holding and found that, "a government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations." *Id.* at 481. The Court further reasoned, "If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." *Id.*

The Fifth Circuit expanded upon *Pembaur* in *Webb*, 925 F.3d at 215. The Fifth Circuit held that, in addition to (1) an official policy and (2) a widespread practice or custom, a plaintiff may also demonstrate a municipal policy a third way—in "rare circumstances when the official or entity possessing final policymaking authority for an action performs the specific act that forms the basis of the § 1983 claim." *Id.* (internal citations omitted). The Fifth Circuit reasoned that a municipal policy can be proven by "[a] final decisionmaker's adoption of a course of action tailored to a particular situation and not intended to control decisions in later situations." *Id.* (quoting *Pembaur*, 475 U.S. at 481). However, the Fifth Circuit made clear that this third method requires a "deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* (internal citation and emphasis omitted).

In *Cherry Knoll*, the Fifth Circuit applied *Pembaur* to find that the plaintiffs sufficiently alleged a municipal policy where they alleged the city council "made the deliberate decision . . . to file the Subdivision Plats over Cherry Knoll's objection and to use the filed plats as leverage in its land-acquisition effort." 922 F.3d at 317. The plaintiffs in *Cherry Knoll* alleged that these decisions were "expressly ratified" in a public meeting and pointed to various facts including admissions by the city council that it was

"aware" of the plaintiffs' objections. *Id.*

Applying *Pembaur* and its progeny, the Court finds that Plaintiff has not pleaded a policy for municipal liability. In this analysis, the "critical question is generally to decide who is the final policymaker." *Webb*, 925 F.3d at 215 (internal citation omitted). The Court has answered this question *supra* Part III(D)(2)(b)(i). In the circumstances alleged, the Webb County's final decisionmaker is the district attorney, Alaniz. The Court then looks to Plaintiff's allegations to determine if this is one of those "rare circumstances" where Alaniz "perform[ed] the specific act that forms the basis" of Plaintiff's § 1983 claim. *Id.* Plaintiff's claim against Defendant County consists of "state action intended to restrict and interfere with [Plaintiff]'s First Amendment activity, and to retaliate against [Plaintiff] for the same. (Dkt. No. 24 ¶ 235). Plaintiff states that Defendant County made decisions to "intimidate, retaliate against, and punish [Plaintiff]" and also to "restrict and interfere with [Plaintiff]'s citizen journalism." (*Id.* ¶¶ 236, 237). Plaintiff alleges that this official policy is "reflected in the deliberate acts and decisions of Alaniz." (*Id.* ¶ 238). However, based on the specific allegations provided in Plaintiff's FAC, the Court disagrees.

As discussed, this third avenue to prove the existence of a policy is reserved for "rare occurrences" and must demonstrate that the final policymaker *performed* the acts resulting in the deprivation of Plaintiff's rights. Plaintiff states, in a conclusory fashion, that Alaniz participated in, approved of, and supervised the investigation and arrest of Plaintiff. (*Id.* ¶ 238). She further broadly asserts that Alaniz developed, ratified, and enforced the policy. (*Id.* ¶ 240). These general and conclusory allegations are supported only by the single factual allegation that Alaniz performed a "closed-door rebuke of [Plaintiff]" (*Id.* ¶ 238), which did not occur in connection with Plaintiff's arrest and prosecution. These allegations do not suffice to hold Webb County responsible for the "deliberate choices" of Alaniz.

Allegations of approval, supervision, ratification, and enforcement are distinguishable from the deliberate acts of the decisionmakers in *Webb* and *Cherry Knoll*. In *Webb*, the plaintiff had a judgment rendered against him and the city attempted to

48 / 59

collect on that judgment. 925 F.3d at 212. The plaintiff believed that the collection process violated his rights. *Id*. In particular, the plaintiff alleged that the decisions of the mayor constituted a policy for municipal liability. *Id*. at 213. In that case, the mayor, the final decisionmaker, had sent a letter to the plaintiff stating that the plaintiff's wages would be withheld until payment on the judgment. *Id*. at 218. In *Cherry Knoll*, the plaintiffs alleged that the decisions made by the city council constituted a policy that violated its rights to due process and equal protection. 922 F.3d at 317. In that case, the plaintiffs alleged that the city council made the decision to record certain land plats without the plaintiff's consent and over their objections. *Id*. The plaintiffs supported this with factual allegations such as statements made at a public meeting by the city council, emails from city council representatives stating their decision, and the city council's admission that it was aware of the plaintiffs' opposition. *Id*. The court found that these "well-pleaded factual allegations [made] it plausible that the City Council" itself performed the deliberate decision. *Id*.

Plaintiff does not allege any "deliberate decisions" made by Alaniz. *See Cherry Knoll*, 922 F.3d at 317. In fact, allegations of approval and supervision, without suggesting a policy of inadequate supervision, read remarkably close to a theory of *respondeat superior* prohibited by *Monell*. Furthermore, the alleged "ratification" suggests limited involvement, *unlike* the involvement of decisionmakers in *Webb* and *Cherry Knoll*.[19] Notably absent from Plaintiff's claim are specific *factual* allegations of conduct by Alaniz, such as those in *Cherry Knoll*. Plaintiff's single factual allegation of the closed-door rebuke does not support Alaniz' involvement in the investigation of the criminal charges against her. But, assuming *arguendo* that this constituted a deliberate decision to infringe on Plaintiff's rights, it was certainly not the moving force behind the

---

[19] Municipal liability based on ratification requires a plaintiff to plead *facts* sufficient to show that the final policymaker ratified a subordinate's conduct. *Groden*, 826 F.3d at 286. In *Groden*, the plaintiff pleaded that the city spokesperson gave media interviews announcing a city policy, which— for a motion to dismiss—were sufficient factual allegations that the city had ratified the policy. *Id*. The Fifth Circuit has stated that ratification "is necessarily cabined" to "prevent the ratification theory from becoming a theory of *respondeat superior*, which theory *Monell* does not countenance." *Milam v. City of San Antonio*, 113 F. App'x. 622, 627 (5th Cir. 2004). "Policymakers alone can create municipal liability, and so any violation must be causally traceable to them, not just to their subordinates." *Id*.

alleged constitutional violations. *See Webb*, 925 F.3d at 220 (finding that, while the plaintiffs "have painted a picture of poor decisions and bureaucratic dysfunction," the decision of the mayor to withhold the plaintiffs' wages to secure payment for a judgment was not the moving force behind the violation of any constitutional right). Absent a well-pleaded policy of Webb County, the Court finds that Plaintiff has not sufficiently pled a *Monell* claim against Defendant Webb County. Accordingly, Plaintiff's *Monell* claim against Defendant Webb County (Count VII) should be dismissed.

### 3. Count VI: Municipal Liability as to City of Laredo

#### a. Plaintiff's Allegations Against City of Laredo

Count VI alleges that acts taken pursuant to official City of Laredo policy constituted impermissible state action that deprived Plaintiff of rights under the First, Fourth, and Fourteenth Amendments. (Dkt. No. 24 ¶¶ 215, 229). Plaintiff's claim for municipal liability against the City of Laredo is appropriately analyzed under the *Monell* framework. Accordingly, Plaintiff must allege three elements: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Valle*, 613 F.3d at 541 (quoting *Pineda*, 291 F.3d at 328).

Plaintiff alleges the City of Laredo maintained a policy "to intimidate, retaliate against, and punish" Plaintiff for her recording and publication of law enforcement activities and matters of public interest. (Dkt. No. 24 ¶ 216). Plaintiff adds that the City's policy "also was and remains a decision to restrict and interfere with [Plaintiff]'s citizen journalism." (*Id.* ¶ 217). Plaintiff states that Treviño, the Laredo City Manager, and the Laredo City Council were final policymakers responsible for this policy. (*Id.* ¶ 225). Plaintiff further alleges that "[t]he official city policy or custom was the moving force behind the investigation, arrest, and detention of [Plaintiff], as evidenced (for example and without limitation) by Treviño's participation in, approval of and supervision of these acts, as detailed herein." (*Id.* ¶ 221). On the other hand, the City Defendants contend the FAC fails to state a claim against the City of Laredo because Plaintiff has not alleged an

official policy or custom that may form the basis for a plausible *Monell* claim. (*Id*. at 13–15).

### b. Analysis

#### i. Official Policymaker

In the City Defendants' Motion, the City Defendants do not address whether Treviño, the Laredo City Council, or the Laredo City Manager were final policymakers for the City of Laredo. (Dkt. No. 27). However, the determination of the policymaker is a question of law to be decided by the Court and is requisite to the analysis of a municipality's policy. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988); *Groden*, 826 F.3d at 285.

"State law, including valid local ordinances and regulations, 'will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business.'" *Dallas Police Ass'n v. City of Dallas*, No. 3:03-cv-0584-D, 2004 WL 2331610, at *4 (N.D. Tex. Oct. 15, 2004) (quoting *Praprotnik*, 485 U.S. at 125)). A governing body may delegate policymaking authority to a city official in one of two ways: (1) by an express statement, job description, or formal action; or (2) "by its conduct or practice, encourag[ing] or acknowledg[ing] the agent in a policymaking role." *Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir. 1984). As such, the Court must "consider state and local positive law as well as evidence of [the City of Laredo's] customs and usages in determining which City official or bodies had final policymaking authority over the policies at issue." *Gros v. City of Grand Prairie*, 181 F.3d 613, 616 (5th Cir. 1999). Plaintiff bears the burden "to identify the positive law or evidence of custom demonstrating that" the Chief of Police, the Laredo City Council, and the Laredo City Manager were policymakers. *Dallas Police*, 2004 WL 2331610, at *4 (citing *Bass v. Parkwood Hosp*., 180 F.3d 234, 244 (5th Cir. 1999) and *Macias v. Raul A. (Unknown), Badge No. 153*, 23 F.3d 94, 99 (5th Cir. 1994)).

Plaintiff has not met that burden. Plaintiff asserts only that "Treviño is a duly appointed official of the City of Laredo . . . and is a final policymaker for the City of

Laredo," (Dkt. No. 24 ¶ 12), and that the Laredo City Council and Laredo City Manager were "vested with final policymaking authority either by law or delegation." (*Id.* ¶ 225). Plaintiff cites the Laredo City Charter as authority for these propositions.

However, the Laredo City Charter and local ordinances do not support Plaintiff's contention that Treviño is a final policymaker. The City of Laredo ordinances state that while "[t]he police chief shall have management of the department as authorized under civil service law . . . [t]he police chief *shall report directly to the city manager* or deputy city manager." Laredo, Tex., Code of Ordinances ch. 26, art. II, § 26–22 (2020) (emphasis added). The City of Laredo Charter also identifies the Laredo City Manager as the chief administrative and executive officer of the City. Laredo, Tex., City Charter art. III, § 3.05 (2020). The Laredo City Charter further states that as the head of a Council-Manager government, the "City Manager . . . shall execute the laws and administer the government of the City." *Id.* art. I, § 1.04. Thus it is clear that while the Chief of Police may be a decisionmaker, he is not the City's *final* policymaker for purposes of municipal liability.[20] *See Praprotnik*, 485 U.S. at 145–46 (Brennan, J., concurring) ("While these officials may well have policymaking authority, that hardly ends the matter; the question before us is whether the officials . . . were final policymakers."); *Jett v. Dallas Indep. Sch. Dist.*, 7 F.3d 1241, 1246–47 (5th Cir. 1993) ("Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to

---

[20] District courts within the Fifth Circuit have consistently held that while the chief of police may be a decisionmaker, they are not a *final* policymaker when they are under supervision of the city manager. *See, e.g.*, *Pinedo v. City of Dallas, Tex.*, No. 3:14-CV-0958-D, 2015 WL 221085, at *5 (N.D. Tex. Jan. 15, 2015) ("consider[ing] . . . language from the City Charter and conclud[ing] that the delegation it contains demonstrates that the Chief of Police is not the final policymaker for the Dallas Police Department because he is at all times subject to the rules and supervision of the City Manager."); *Mosser v. Haney*, No. CIV.A.3:03CV2260-B, 2005 WL 1421440, *4 (N.D. Tex. June 17, 2005) ("Thus, the Chief of Police is not the policymaker for Dallas's police department, as he remains subject to the rules and supervision of the City Manager."). As the *Arevalo of City of Farmers Branch, Texas* court explained, "Courts that have determined that chiefs of police are final policymakers have done so because the particular government body has provided the chief of police with policymaking authority. . . Other government entities, such as the City of Dallas, do not delegate final policymaking to their chief of police." No. 3:16-CV-1540-D, 2017 WL 1153230, *6 (N.D. Tex. Mar. 28, 2017).

municipal liability based on an exercise of that discretion.").

While the Laredo City Charter clearly delegates administrative and executive authority to the Laredo City Manager, the Charter limits *policymaking* authority to the Laredo City Council. The City Charter states, "City Council . . . shall enact local legislation, adopt budgets, determine policies, and appoint the Laredo City Manager." City. Laredo, Tex., City Charter art. I, § 1.02 (2020). In *Bolton v. City of Dallas, Texas*, the Fifth Circuit held that, while a local charter may give broad discretion to a city manager, including executive and administrative decision-making power, in the absence of a local law explicitly giving the city manager responsibility to set *policy*, under Texas state law the municipality's "governing body" is the final policymaker. 541 F.3d 545, 550 (5th Cir. 2008). In this case, as in *Bolton*, the Laredo City Charter expressly assigns final policymaking authority to the Laredo City Council.

### ii. Official Policy or Custom

For the purpose of Rule 12(b)(6), a plaintiff may allege a municipal policy under *Monell* by alleging any of the following: (1) an official policy; (2) a persistent, widespread practice that is so common as to constitute a custom; or (3) deliberate acts taken by a final policymaker. *See Webster*, 735 F.2d. at 841; *Pembaur* 475 U.S. at 483. Plaintiff appears to allege a City of Laredo policy under each of these categories.

An "[o]fficial policy is ordinarily contained in duly promulgated policy statements, ordinances or regulations." *Piotrowski II*, 237 F.3d at 579. While the FAC states that the City of Laredo had an "official City Policy" to retaliate against Plaintiff and interfere with the exercise of her First Amendment rights, it fails to allege facts showing that any such official policy exists. (Dkt. No. 24 ¶ 215). Therefore, the Court finds that Plaintiff has not sufficiently alleged an official policy pursuant to the first method.

Alternatively, a plaintiff may allege a "persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski II*, 237 F.3d at 579. Here, Plaintiff's claim

against the City of Laredo alleges the same "policy against one" the Court has found inadequate to state a *Monell* claim against Webb County. (Dkt. No. 24 ¶ 218); *see supra* Part III(D)(2)(b)(ii). As the Court has determined the Laredo City Council is the final policymaker, Plaintiff must allege that the Laredo City Council "perform[ed] the specific act that forms the basis" of Plaintiff's § 1983 claim. *Webb*, 925 F.3d at 215. Plaintiff alleges that the City of Laredo's "final policy making officials . . . knowingly influenced, directed, participated in, and encouraged LPD and [WCDA]" in the investigation and arrest of Plaintiff. (Dkt. No. 24 ¶ 220). However, the FAC has not alleged any specific conduct by the Laredo City Council. Accordingly, Plaintiff has not plausibly alleged the "rare circumstances" in which the Court may find a "custom" of the City of Laredo. *See Webb*, 925 F.3d at 215.

Alternatively, Plaintiff contends that Treviño's actions of investigating and causing Plaintiff's arrest indicate a "deliberate choice" by Treviño that establishes a City of Laredo policy. (Dkt. No. 24 ¶ 238.). However, the Court has found that the Laredo City Council—not Treviño—is the final policymaker for the City of Laredo. A city may be liable under the *Pembaur* method only for decisions by a *final policymaker*. *Webb*, 925 F.3d at 215. For the reasons stated above, Treviño is not a final policymaker with respect to the allegations against the City of Laredo. Treviño's alleged actions therefore cannot form the basis of municipal liability under *Pembaur*. *See* 475 U.S. at 481–81.

In this case, to plausibly allege a policy under the *Pembaur* approach, Plaintiff would need to show that the Laredo City Council "perform[ed] the specific act that forms the basis of the § 1983 claim." *See Webb* 925 F.3d at 215. Plaintiff makes no such allegations. With respect to the Laredo City Council, Plaintiff only alleges that they "initially attack[ed] and obstruct[ed]" a proposal to name a park reading kiosk after her late niece (Dkt. No. 24 ¶ 54(g)), and that the Laredo City Manager and the Laredo City Council regularly accessed Plaintiff's Lagordiloca Facebook page, and thus knew about "several of" paragraphs 54(a)–(g)'s allegations. (*Id.* ¶ 62). The Court finds that these allegations do not evidence a policy by the Laredo City Council. Specifically, declining to name a kiosk located at a park after Plaintiff's niece is not a deliberate act by the Laredo

City Council which could, even in the most liberal construction, be construed as a policy to deprive Plaintiff of her rights as a journalist. Moreover, merely having access to Plaintiff's Lagordiloca Facebook page does not constitute a policy taken by the Laredo City Council for purposes of municipal liability.[21]

Even assuming *arguendo* that the Laredo City Manager was a final policymaker, Plaintiff's allegations against the Laredo City Manager are equally inadequate. Plaintiff's factual allegations with respect to the Laredo City Manager are limited to the following: "the Laredo City Manager . . . knew of the pattern of retaliation against [Plaintiff]'s exercise of her First Amendment rights, or [was] willfully blind to the same" and "the Laredo City Manager . . . regularly accessed [Plaintiff]'s Facebook page." (Dkt. No. 24 ¶ 62). None of these allegations point to actions taken by the Laredo City Manager which could be evidence of a policy by the City of Laredo. Finally, while the Court finds that Plaintiff failed to allege a policy, her claim would nevertheless fail as her allegations also fail to allege the moving force element for municipal liability.[22] Accordingly, Plaintiff's *Monell* claim against Defendant City of Laredo (Count VI) should be dismissed.

### G. Count VIII: Declaratory Relief

Plaintiff seeks a declaratory judgment against all Defendants under Count VIII of the FAC. (Dkt. No. 24 ¶¶ 234–57). The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such

---

[21] In *Estate of Davis*, the Fifth Circuit outlined the strict standard that a plaintiff must meet to show that a municipality's awareness rose to the level of actionable deliberate indifference.

> [D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

406 F.3d at 381 (internal citations omitted). Plaintiff's allegations that the Laredo City Manager and the Laredo City Council were "aware" of the Lagordiloca Facebook page do not rise to the level of deliberate indifference.

[22] A municipality's failure to remedy a situation must be the moving force and "result in the specific injury suffered." *Davidson*, 848 F.3d at 386. Plaintiff makes no allegations that the Laredo City Manager and the Laredo City Council's awareness of her Lagordiloca Facebook page were the moving force behind a constitutional violation.

declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). A federal declaratory judgment action requires an actual case or controversy. *See*, *e.g.*, *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 127 (2007) ("Our decisions have required that the dispute be 'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial' . . . ."). "Neither absolute nor qualified personal immunity extends to suits for injunctive or declaratory relief under § 1983." *Chrissy F. by Medley v. Mississippi Dep't of Pub. Welfare*, 925 F.2d 844, 849 (5th Cir. 1991); *see also Singleton v. Cannizzaro*, No. 19-30197, 2020 WL 1922377, at 4 n.3 (5th Cir. Apr. 21, 2020).

Plaintiff contends she has alleged facts showing "a definite and real controversy between [Plaintiff] and Defendants, including the threat of future retaliatory acts." (Dkt. No. 29 (citing Dkt. No. 24 ¶¶ 54, 129, 147, 157, 160, 235–237, 240, 248)). Plaintiff contends that because "Alaniz was quoted in a local publication stating that the criminal investigation would continue," Plaintiff "has no reason to believe that Defendants will refrain from attempting to suppress or retaliate against her protected expressive activities in the future, or selectively and arbitrarily attempt to enforce the law against her." (*Id.* ¶ 256). In addition, Plaintiff alleges that Defendants' actions "continue to cause [Plaintiff] to constantly fear further interference and retaliation from LPD, [WCDA], and other city and county officials against her protected citizen journalism efforts[,]" and that "[c]onstantly operating under this fear hindered and curtailed [Plaintiff's] ability to exercise her protected First Amendment rights." (*Id.* ¶ 147).

The Court finds these allegations do not establish a genuine case or controversy warranting declaratory relief. In order to meet the standing requirements under the Declaratory Judgment Act, Plaintiff must establish "actual present harm or a significant possibility of future harm." *Peoples Rights Org. v. City of Columbus*, 152 F.3d 522, 527 (6th Cir. 1998). "An actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Bauer v. Texas,* 341 F.3d 352, 358 (5th Cir. 2003).

According to Plaintiff's allegations, Defendants' attempted prosecution of Plaintiff ended on March 28, 2018, over two years ago, when the state district court ruled that

§ 39.06(c) was unconstitutionally vague. (Dkt. No. 24 ¶ 127). Plaintiff acknowledges that the Defendants did not appeal the state district judge's ruling. (*Id.* ¶ 128). Since dismissal of the criminal case, Plaintiff does not allege any actions against her by anyone from Webb County or the City of Laredo, much less the named Defendants. Plaintiff alleges that Alaniz was quoted as saying "the LPD was refusing to drop the investigation, and would continue to look into *who in the department* supplied [Plaintiff]" with the information she published. (*Id.* ¶ 129) (emphasis added). Although Plaintiff interprets Alaniz's statement as a threat of further investigation of her, the Court disagrees with Plaintiff's interpretation. The stated intent was to investigate the person within the police department who provided the information to Plaintiff, and therefore the statement does not constitute a threat of any type against Plaintiff. Moreover, as set forth *supra* Part III(D)(2)–(3), Plaintiff has failed to allege plausibly that the City of Laredo or Webb County has a policy or custom of violating her constitutional rights.

For the foregoing reasons, Plaintiff has not alleged facts establishing a significant possibility of future harm. Accordingly, Plaintiff's claim for declaratory relief against all Defendants (Count VII) should be dismissed.

### H. Injunctive Relief

Plaintiff seeks injunctive relief from all Defendants.[23] With respect to the Individual Defendants, Plaintiff contends that she is entitled to injunctive relief because, "Their acts of targeting [Plaintiff] under the color of state law for engaging in activity protected under the First and Fourteenth Amendment [are] likely to continue absent injunctive relief."[24] (Dkt. No. 24 ¶ 159). Plaintiff similarly seeks injunctive relief against

---

[23] Plaintiff's FAC lists an injunctive claim in her *Monell* claim against Webb County (Count VII). However, Plaintiff's prayer for relief seeks injunctive relief from *all* Defendants. The prayer for relief in Plaintiff's FAC does not provide paragraph numbers, thus the Court cites to pagination designated by the Court's electronic filing system, CM/ECF.

[24] Plaintiff specifically requests that the Court enjoin the Individual Defendants from "engaging in acts intended to harass and intimidate [Plaintiff] and interfere with her citizen journalism efforts" including: "harassing, threatening, suppressing, interfering with constitutionally protected rights to (i) record and publish law enforcement activities occurring in or viewable from public spaces, (ii) inquire about, gather, and publish accurate information on matters of public concern, (iii) express viewpoints that are critical of or unfavorable to Defendants, and (iv) facilitate commentary about matters of public concern from other citizens." (Dkt. No. 24 at 52).

the municipal Defendants for their "[policies] or custom[s] of targeting [Plaintiff] for engaging in activity protected under the First and Fourth Amendment." (Dkt. No. 24 ¶ 231). Defendants seek dismissal of Plaintiff's claims for injunctive relief.

A plaintiff seeking an injunction must satisfy a four-factor test by demonstrating (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury to the plaintiff outweighs any damage the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest. *DSC Communications Corp. v. DGI Techs., Inc.*, 81 F.3d 597, 600 (5th Cir. 1996) (citing *Plains Cotton Co-op. Ass'n v. Goodpasture Computer Serv., Inc.*, 807 F.2d 1256, 1259 (5th Cir.), *cert. denied*, 484 U.S. 821 (1987)). "[F]or an injunction to issue based on a past violation, [plaintiff] must establish that there is a 'real or immediate threat that he will be wronged again.'" *Residents Against Flooding v. Reinvestment Zone No. Seventeen, City of Houston, Tex.*, 260 F. Supp. 3d 738, 776 (S.D. Tex. 2017), *aff'd sub nom*. *Residents Against Flooding v. Reinvestment Zone No. Seventeen*, 734 F. App'x. 916 (5th Cir. 2018) (quoting *Hainze v. Richards*, 207 F.3d 795, 802 (5th Cir. 2000)).

As an initial matter, Plaintiff's claims for injunctive relief, though directed at all Defendants, are based exclusively on alleged constitutional violations of her First and Fourteenth Amendment rights. The Court finds that Plaintiff has failed to show a substantial likelihood of success on the merits. The Court is mindful that qualified immunity has no relevance when injunctive relief is sought. *Mangaroo v. Nelson*, 864 F.2d 1202, 1208 (5th Cir. 1989). However, the Court has determined, assuming *arguendo*, that even if the Individual Defendants were not entitled to qualified immunity, Plaintiff still has failed to state a claim for retaliation under the First Amendment or selective enforcement under the Fourteenth Amendment. *Supra* Parts III(B)(2)(ii), III(C). Because Plaintiff has failed to state viable causes of action for violations of her First and Fourteenth Amendment rights, Plaintiff has not demonstrated a substantial likelihood of success on the merits. *See Sahara Health Care, Inc. v. Azar*, 349 F. Supp. 3d 555, 579 (S.D. Tex. 2018) (finding that the court's "analysis of Defendants' motion to dismiss for

failure to state a claim" was "sufficient to show there is no substantial likelihood Plaintiff will prevail on the merits"). Similarly, the Court has determined, *supra* Parts III(E)–(F), that Plaintiff has failed to sufficiently allege a policy on behalf the City of Laredo or Webb County. Accordingly, Plaintiff has not met the first factor in demonstrating a substantial likelihood of success on the merits of her claims against municipal Defendants.

Additionally, for the same reasons Plaintiff failed to establish an "actual present harm or significant possibility of future harm," *supra* Part III(G), the Court determines that Plaintiff is also unable to establish a "real or immediate threat that [she] will be wronged again." *See Residents Against Flooding*, 260 F. Supp. 3d at 776. Accordingly, Plaintiff's claims for injunctive relief against all Defendants should be dismissed.

## IV. Conclusion

For the reasons set forth in this Memorandum and Order, the City Defendants' Motion (Dkt. No. 27) is **GRANTED**; the County Defendants' Motion (Dkt. No. 26) is **GRANTED**; and Counts I–VIII asserted in the First Amended Complaint (Dkt. No. 24) are **DISMISSED** with **PREUDICE**. The Court determines that further amendment would be futile as Plaintiff has failed to cure the pleading deficiencies addressed in the first motion to dismiss. (Dkt. No. 21). A separate judgment will be entered forthwith.

It is so **ORDERED**.

**SIGNED** on May 8, 2020.

John A. Kazen
United States Magistrate Judge